# EXHIBIT A

Civil Action Cover Sheet - Case Initiation                    (05/27/16) CCL 0520

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, LAW DIVISION

Lettuce Entertain You Enterprises, Inc., et al.

v.

Employers Insurance Company of Wausau, et al.

No. _____

**2020L008099**

FILED DATE: 7/30/2020 9:01 PM    2020L008099

### CIVIL ACTION COVER SHEET - CASE INITIATION

A Civil Action Cover Sheet - Case Initiation shall be filed with the complaint in all civil actions. The information contained herein is for administrative purposes only and cannot be introduced into evidence. Please check the box in front of the appropriate case type which best characterizes your action. Only one (1) case type may be checked with this cover sheet.

Jury Demand  ☒ Yes  ☐ No

**PERSONAL INJURY/WRONGFUL DEATH**
CASE TYPES:
- ☐ 027  Motor Vehicle
- ☐ 040  Medical Malpractice
- ☐ 047  Asbestos
- ☐ 048  Dram Shop
- ☐ 049  Product Liability
- ☐ 051  Construction Injuries
         (including Structural Work Act, Road
         Construction Injuries Act and negligence)
- ☐ 052  Railroad/FELA
- ☐ 053  Pediatric Lead Exposure
- ☐ 061  Other Personal Injury/Wrongful Death
- ☐ 063  Intentional Tort
- ☐ 064  Miscellaneous Statutory Action
         (Please Specify Below**)
- ☐ 065  Premises Liability
- ☐ 078  Fen-phen/Redux Litigation
- ☐ 199  Silicone Implant

**TAX & MISCELLANEOUS REMEDIES**
CASE TYPES:
- ☐ 007  Confessions of Judgment
- ☐ 008  Replevin
- ☐ 009  Tax
- ☐ 015  Condemnation
- ☐ 017  Detinue
- ☐ 029  Unemployment Compensation
- ☐ 031  Foreign Transcript
- ☐ 036  Administrative Review Action
- ☐ 085  Petition to Register Foreign Judgment
- ☐ 099  All Other Extraordinary Remedies

By: John H. Mathias/Jenner & Block LLP (Firm No. 05003)
    (Attorney)                          (Pro Se)

FILED
7/30/2020 9:01 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2020L008099

(FILE STAMP)

**COMMERCIAL LITIGATION**
CASE TYPES:
- ☒ 002  Breach of Contract
- ☐ 070  Professional Malpractice
         (other than legal or medical)
- ☐ 071  Fraud (other than legal or medical)
- ☐ 072  Consumer Fraud
- ☐ 073  Breach of Warranty
- ☐ 074  Statutory Action
         (Please specify below.**)
- ☐ 075  Other Commercial Litigation
         (Please specify below.**)
- ☐ 076  Retaliatory Discharge

**OTHER ACTIONS**
CASE TYPES:
- ☐ 062  Property Damage
- ☐ 066  Legal Malpractice
- ☐ 077  Libel/Slander
- ☐ 079  Petition for Qualified Orders
- ☐ 084  Petition to Issue Subpoena
- ☐ 100  Petition for Discovery

** _____
_____

Primary Email: jmathias@jenner.com

Secondary Email: ggillett@jenner.com

Tertiary Email: _____

**Pro Se Only:** ☐ I have read and agree to the terms of the *Clerk's Office Electronic Notice Policy* and choose to opt in to electronic notice form the **Clerk's Office** for this case at this email address: _____

## DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

1910 - No Fee Paid
1919 - Fee Paid
Jury Demand

(Rev. 12/31/15) CCG N067

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

COUNTY_____ DEPARTMENT/ LAW_____ DISTRICT

Lettuce Entertain You Enterprises, Inc., et al.

v.

Employers Insurance Company of Wausau, et al.

No. _____

### JURY DEMAND

The undersigned demands a jury trial.

/s/    John H. Mathias
_____
**(Signature)**

☑ Atty. No.: 05003_____

Name: John H. Mathias/Jenner & Block LLP

Atty. for: Plaintiffs

Address: 353 North Clark Street

City/State/Zip: Chicago, IL 60654

Telephone: 312-923-2917

Primary Email: jmathias@jenner.com

Secondary Emai: ggillett@jenner.com

Tertiary Email: _____

**Dated:** July 30, 2020

FILED DATE: 7/30/2020 9:01 PM   2020L008099

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, LAW DIVISION**

FILED DATE: 7/30/2020 9:01 PM   2020L008099

| | |
|---|---|
| LETTUCE ENTERTAIN YOU ENTERPRISES, INC.; 12 W. ELM LLC d/b/a SPARROW; CHICAGO SCOOPS LLC; GIBSONS L.L.C.; GOLDEN FIVE, INC.; G DOCK, LLC d/b/a HARBOR CHICAGO; HOT ASIAN BUNS, LLC d/b/a WOW BAO; HUBBARD HOUSE RESTAURANT LLC d/b/a/ HUBBARD INN; JB AT RIVER NORTH d/b/a OLD CROW SMOKEHOUSE; JK SHIELDS LLC d/b/a SMYTH & THE LOYALIST; MAC PARENT, LLC; MANNY'S COFFEE SHOP, INC. d/b/a MANNY'S CAFETERIA & DELICATESSEN; NOODLES & COMPANY; ROTI RESTAURANTS, INC.; RPDC ILLINOIS LLC d/b/a ROBERT'S PIZZA AND DOUGH COMPANY; EPIC BURGER, INC.; FAST SANDWICH HOLDINGS INC.; 2263 N. LINCOLN CORP. d/b/a THE DIME; BANGERS & LACE CHICAGO LLC d/b/a BANGERS & LACE CHICAGO; DDMB INC. d/b/a EMPORIUM ARCADE BAR; R.F.R., INC. d/b/a GOLDEN CORRAL RESTAURANT; SARDHARIA BROTHERS, INC. d/b/a TANDOOR CHAR HOUSE; SECOND VENTURE LLC d/b/a L3 HOSPITALITY GROUP; WELL DONE HOSPITALITY GROUP, | Case No. |
| *Plaintiffs,* | |
| *vs.* | |
| EMPLOYERS INSURANCE COMPANY OF WAUSAU, | |
| *Defendants.* | |

[Caption continued on following page]

## <u>COMPLAINT</u>

Jeremy M. Creelan (*Pro Hac Vice* forthcoming)
JENNER & BLOCK LLP (Firm No. 05003)
919 Third Ave., 38th Floor
New York, NY 10022
Telephone:  212-891-1678
Email: jcreelan@jenner.com

John H. Mathias Jr.
David M. Kroeger
Gabriel K. Gillett
Megan B. Poetzel
Precious S. Jacobs
Joshua M. Levin
JENNER & BLOCK LLP (Firm No. 05003)
353 N. Clark Street
Chicago, IL 60654-3456
Telephone: 312-923-2917
Email: jmathias@jenner.com

*Counsel for Plaintiffs*

FILED DATE: 7/30/2020 9:01 PM    2020L008099

[Caption continued from previous page]

**Case No.**

DDMB2 LLC d/b/a EMPORIUM ARCADE BAR; BANGERS & LACE
EVANSTON, LLC d/b/a BANGERS & LACE; BANGERS & LACE
ROSCOE VILLAGE LLC d/b/a KITE STRING CANTINA; BARNBQ
LLC d/b/a OLD GROUNDS SOCIAL; BUCKTOWN
DYSFUNCTIONAL PUB, INC.; DB STATE LLC d/b/a DOUGH
BROS; DUSABLE MUSEUM OF AFRICAN AMERICAN HISTORY,
INC.; DIVISION STREET CAFÉ LLC d/b/a LITTLE VICTORIES;
FULTON PEORIA PARTNERS LLC d/b/a EMPORIUM ARCADE
BAR; GC BLOOMINGDALE, LLC; HUBBARD STEAK, LLC d/b/a
JOY DISTRICT; CHICAGO ACADEMY OF SCIENCES / PEGGY
NOTEBAERT NATURE MUSEUM; JO-KIM LOUNGE CORP. d/b/a
HAPPY'S BAMBOO BAR AND LOUNGE; LOGAN SQUARE
TAVERN LLC D/B/A SPILT MILK; NAS RESTAURANT GROUP,
INC. d/b/a MIXED GREENS; PRIMOS LLC d/b/a HVAC PUB; SAN
BENEDETTO, LLC d/b/a JULIET'S; URBAN PLATES LLC

*Plaintiffs,*

*vs.*

AFFILIATED FM INSURANCE COMPANY; ARGONAUT GREAT
CENTRAL INSURANCE COMPANY; BADGER MUTUAL
INSURANCE COMPANY; THE CHARTER OAK FIRE INSURANCE
COMPANY; THE CINCINNATI INSURANCE COMPANY;
CITIZENS INSURANCE COMPANY OF AMERICA; HARTFORD
FIRE INSURANCE COMPANY; ILLINOIS CASUALTY COMPANY;
OHIO SECURITY INSURANCE COMPANY; NORTH AMERICAN
ELITE INSURANCE COMPANY; SENTINEL INSURANCE
COMPANY, LIMITED; SOCIETY INSURANCE; SPECIALTY RISK
OF AMERICA d/b/a SPRISKA; STARR SURPLUS LINES
INSURANCE COMPANY; SECURA SUPREME INSURANCE
COMPANY; TWIN CITY FIRE INSURANCE COMPANY;
VIGILANT INSURANCE COMPANY; ZURICH AMERICAN
INSURANCE COMPANY,

*Defendants.*

FILED DATE: 7/30/2020 9:01 PM   2020L008099

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................................. 1

JURISDICTION AND VENUE ............................................................................................ 6

PARTIES ................................................................................................................................ 7

I.    Plaintiffs .......................................................................................................................... 7

II.    Defendants ..................................................................................................................... 11

FACTUAL ALLEGATIONS ............................................................................................... 15

I.    The Shutdown and Reopening Orders ........................................................................ 15

II.    Plaintiffs Suffered Direct Physical Loss and/or Damage to Their Properties as a Result of the Shutdown and Reopening Orders. ......................................................... 18

        A.    Lettuce Entertain You .................................................................................... 18

        B.    Manny's ............................................................................................................ 27

        C.    Wow Bao ........................................................................................................... 32

        D.    Chicago Scoops ................................................................................................ 34

        E.    Epic Burger ....................................................................................................... 36

        F.    Footman Hospitality ....................................................................................... 39

        G.    Gibsons Restaurant Group ............................................................................ 47

        H.    Noodles & Company ....................................................................................... 51

        I.    Harbor Chicago ............................................................................................... 55

        J.    Third Coast Hospitality ................................................................................. 57

        K.    Hubbard Inn ..................................................................................................... 60

        L.    Tandoor Char House ...................................................................................... 62

        M.    HVAC Pub ........................................................................................................ 64

        N.    L3 Hospitality .................................................................................................. 66

        O.    Smyth & The Loyalist ..................................................................................... 68

        P.    Mac Parent ....................................................................................................... 71

i

FILED DATE: 7/30/2020 9:01 PM    2020L008099

Q.   The DuSable Museum of African American History ...................................75

R.   Old Grounds Social...........................................................................................77

S.   Peggy Notebaert Nature Museum .................................................................79

T.   Robert's Pizza ...................................................................................................81

U.   Fast Sandwich ...................................................................................................83

V.   Roti.......................................................................................................................85

W.   Urban Plates .......................................................................................................89

X.   Well Done Hospitality Group .........................................................................91

Y.   Mixed Greens .....................................................................................................97

Z.   Dough Bros .........................................................................................................99

AA.   Golden Corral Franchisees............................................................................101

BB.   Joy District ........................................................................................................103

CC.   The Dime ...........................................................................................................105

DD.   Juliet's................................................................................................................106

EE.   Happy's Bamboo Bar......................................................................................107

FF.   Emporium Arcade Bar ...................................................................................108

CLAIMS FOR RELIEF .....................................................................................................111

FIRST CAUSE OF ACTION—DECLARATORY JUDGMENT ....................................111

SECOND THROUGH FORTY THIRD CAUSES OF ACTION—BREACH OF
       CONTRACT .....................................................................................................112

FORTY FOURTH CAUSE OF ACTION—UNJUST ENRICHMENT ...........................158

FILED DATE: 7/30/2020 9:01 PM     2020L008099

## INTRODUCTION

1.      Plaintiffs—a broad and diverse group of restaurants and cultural institutions—
assert claims for business interruption insurance coverage under all-risk commercial
property insurance policies ("Policies or Policy") issued and sold to each of them by the
Defendant Insurers.[1] Under longstanding and bedrock principles of insurance law, Plaintiffs
are entitled to payment under those policies for multi-million dollar business income losses
suffered as a direct result of unprecedented state and municipal executive shutdown orders
("Shutdown Orders") and restrictive executive reopening orders ("Reopening Orders") that
caused direct physical loss or damage to their properties by physically impairing,
detrimentally altering, and rendering them nonfunctional as restaurants and cultural
institutions. Each Plaintiff comes to this Court with a common threshold legal question: whether
Defendant Insurers must provide coverage under all-risk commercial property insurance Policies
for direct physical loss and/or damage caused by unprecedented executive orders which have
physically impaired, detrimentally altered, and rendered Plaintiffs' properties nonfunctional.

2.      Among the Plaintiffs are owners and operators of some of the most iconic and
well-known restaurants in the Chicago metropolitan area. They comprise a diverse cross section
of Chicago's legendary restaurant industry: from large national outfits with hundreds of locations
and millions in revenue, to small single-location, family-run neighborhood restaurants and bars;
from independently owned fine dining establishments to fast-casual franchises. Plaintiffs'
establishments cross a wide variety of cuisines and service models, including popular fast-casual

---

[1] Copies of the Policies are, on information and belief, already in the possession of the Defendant Insurers
that issued them. Because of their volume, copies of the Policies are not attached to this Complaint.
Copies of the Policies can be made available to the Court and counsel upon request. The Appendix
attached hereto as Exhibit A lists the Plaintiffs, their respective Defendant Insurer, their respective Policy
number(s), and the cities in which each Plaintiff owns or operates a location covered under its Policy.

FILED DATE: 7/30/2020 9:01 PM   2020L008099

lunch spots in the Loop, venerable steakhouses downtown and in the suburbs, neighborhood bars in Wrigleyville, an acclaimed restaurant on the South Side, and Michelin-starred fine dining hotspots. Tourists and locals alike flock to these venues. Together, Plaintiffs' establishments are the lifeblood of Chicago and vital to its economy and culture.

3.     Prior to the Shutdown Orders, Plaintiffs' establishments were bustling. Their dining rooms, bars, cafes, and other physical spaces were places where people congregated. Guests sat down to share a meal or drink. Families and friends gathered to celebrate special occasions. Business people met to get deals done. Locals and visitors alike came to learn and experience Chicago's history and culture.

4.     But the Shutdown Orders brought an end to all of that activity by imposing direct physical restrictions that impaired Plaintiffs' properties and rendered them nonfunctional for their intended purposes. Dining rooms were off-limits. Tables verboten. Bars shuttered. The physical premises of each of their establishments, including their appearance, shape, physical layout, the arrangement of seats and furniture, and the physically demarcated routes for customer traffic—all of which are critical to their operations—were materially and detrimentally altered by the Shutdown Orders.

5.     Under the Shutdown Orders and the restrictive Reopening Orders that followed, Plaintiffs had to block off sections of their physical space; create or install barriers to prevent congregation; manipulate tables, chairs, and other equipment into nonfunctional arrangements; place physical markers on the floors or walls; and redesign routes for entrance and egress. Collectively, vast amounts of square footage in their properties—many painstakingly designed to maximize the customer's experience and the establishment's revenue—were lost, detrimentally altered, and rendered nonfunctional for their intended purposes. The Shutdown and Reopening

2

FILED DATE: 7/30/2020 9:01 PM    2020L008099

Orders required detrimental physical alterations to Plaintiffs' properties as a means to prevent the congregation of people in close proximity to one another—not because the coronavirus was found in or anywhere near the Plaintiffs' properties.

***Plaintiffs' All-Risk Insurance Policies and Defendants' Denial of Plaintiffs' Claims***

6.      Plaintiffs turned to Defendant Insurers, reasonably expecting that they would cover Plaintiffs' mounting losses that directly resulted from the Shutdown Orders. To insure against losses from unexpected and unprecedented circumstances like these, Plaintiffs had purchased business interruption coverage as part of all-risk commercial property insurance policies. As Defendant Insurers are well aware, "all risk" commercial property policies cover all possible risks of any kind or description, unless specifically excluded. Unlike "enumerated perils" property insurance, which covers only specified causes of loss, all-risk property insurance provides consumers with the comfort of knowing that even unprecedented and unanticipated risks of loss are covered. Due to the breadth of coverage, Plaintiffs paid a substantial premium for this type of insurance. Here, the Shutdown Orders and Reopening Orders are clearly within the scope of "all risks" covered by the Policies.

7.      Plaintiffs' Policies included business interruption coverage (also known as "Time Element" coverage), which insures against the loss of business income and extra expense sustained as a result of "direct physical loss of or damage to" insured property (or, in some Policies, "direct physical loss or damage to," or "direct physical loss of or physical damage to," insured property).

8.      Thus, when the Shutdown Orders caused Plaintiffs to suffer property loss or damage—*i.e.*, when their premises were physically impaired and rendered nonfunctional as a direct result of the Shutdown Orders—Plaintiffs reasonably believed that the Shutdown Orders were among the risks covered under their "all-risk" Policies.

FILED DATE: 7/30/2020 9:01 PM    2020L008099

9.    At the time Defendant Insurers underwrote and sold their Policies, they understood and expected that they would be insuring these properties as fully functioning and operational restaurants and venues. Defendant Insurers knowingly calculated Plaintiffs' business interruption premiums based in material part on the revenue they expected Plaintiffs to generate as fully functioning and operational businesses. Defendant Insurers are fully aware that Plaintiffs' businesses and properties have been physically impaired by the Shutdown and Reopening Orders and that Plaintiffs have lost the means to generate that revenue—*i.e.*, that Plaintiffs have suffered direct physical loss of and damage to their insured properties. Yet Defendant Insurers have continued to charge and accept full premium payments from Plaintiffs as if their insured properties remained fully functional and operational.

***The Shutdown Orders Caused Direct Physical Loss and/or Damage to Plaintiffs' Properties***

10.    Each Plaintiff gave timely notice of a claim for business interruption coverage, but their claims were denied (or will be denied), often without any investigation. In denying coverage, Defendant Insurers contend that Plaintiffs did not sustain "direct physical loss" or "damage to" property within the meaning of the Policies. But the Shutdown and Reopening Orders *did* cause direct physical loss of and damage to Plaintiffs' properties. Under any reasonable construction, the phrase "direct physical loss of or damage to" property is broad and would include detrimental physical effects which alter and impair the functioning of the tangible, material dimensions of property—especially where, as here, property is rendered nonfunctional for its intended purpose due to the altered appearance, shape, and other material aspects of the property. That is precisely the type of loss and damage caused by the Shutdown and Reopening Orders.

FILED DATE: 7/30/2020 9:01 PM    2020L008099

11.     Defendant Insurers chose not to define the terms "direct physical loss" or "damage" in the Policies, nor did they define "direct physical damage" or "physical damage." Instead, Defendant Insurers intentionally left each of these terms undefined—even though they knew, or should have known, that these terms can reasonably be construed, and indeed have been construed by courts, more broadly than the narrow self-serving definition that they contend should provide the terms' only meaning. As undefined terms in the Policies, each of these terms must be given its plain and ordinary meaning consistent with the knowledge and expectations of an ordinary, reasonable consumer.

12.     In the Policies, "loss" is used in the alternative to "damage." Thus, there is coverage provided for both "loss" and "damage," either alternatively or collectively, because "loss" coverage is different from, and in addition to, "damage" coverage. Property "loss" refers to, among other things, being deprived of a property's function, while "damage" refers to, among other things, the impairment of property or a reduction in its functionality. The adjective "physical," among other things, distinguishes between the tangible, material aspects of an object and those that are purely intangible, such as sentiment, emotion, or imagination. In addition, under a plain grammatical reading of the phrase "direct physical loss of or damage to" property (or "direct physical loss or damage to" property), the words "direct" and "physical" can be reasonably construed as modifying only "loss" coverage—not "damage" coverage. To the extent that any language in the Policies is ambiguous, it should be construed against Defendant Insurers and in favor of coverage.

13.     Here, the Shutdown and Reopening Orders caused both property loss and property damage by directly, physically impairing the functionality of Plaintiffs' property and dispossessing Plaintiffs of their tangible spaces. Dining rooms closed, areas blocked off, barriers

erected, appearances altered, furniture moved, fixtures altered, spaces shuttered, floors marked, plexiglass mounted—these are but some examples of the direct physical loss and damage Plaintiffs' properties have incurred.

14.     Each of the Plaintiffs understood, expected, and believed that their Policies would cover the direct physical loss of or damage to their property that they suffered as a direct result of the Shutdown and Reopening Orders. This understanding and expectation is both subjectively and objectively reasonable. Defendant Insurers cannot now redefine or narrow the meaning of physical loss or damage—or any other undefined terms in the Policies—to support a denial of coverage in these unprecedented circumstances.

15.     Because there is a reasonable construction of these terms that provides coverage to Plaintiffs for their business interruption claims—and based on bedrock insurance law principles requiring policy terms to be construed broadly in favor of coverage for Plaintiffs— Defendant Insurers must pay Plaintiffs' claims.

16.     Accordingly, Plaintiffs seek a declaratory judgment that the Shutdown and Reopening Orders caused direct physical loss or damage to their insured properties. Plaintiffs also bring breach of contract claims for Defendant Insurers' failure to indemnify Plaintiffs for the losses sustained as a direct result of the Shutdown and Reopening Orders. Plaintiffs further assert their full entitlement to coverage under all applicable Policy provisions, independently or alternatively as appropriate, including but not limited to all relevant extensions of coverage. Plaintiffs do not waive any claims for Defendant Insurers' wrongful denials of coverage for the substantial losses Plaintiffs have incurred, the full amount of which will be proven at trial.

## JURISDICTION AND VENUE

17.     This Court has jurisdiction over Defendant Insurers pursuant to 735 ILCS 5/2- 209(a)(1) because this action arises from Defendant Insurers' transaction of business within

FILED DATE: 7/30/2020 9:01 PM    2020L008099

FILED DATE: 7/30/2020 9:01 PM  2020L008099

Illinois; pursuant to 735 ILCS 5/2-209(a)(4) because this action arises from Defendant Insurers'

contracting to insure property or risks located within Illinois; and/or pursuant to 735 ILCS 5/2-

209(a)(7) because this action arises from Defendant Insurers' making one or more contracts

substantially connected with Illinois and their breach thereof.

18.     Venue in Cook County is proper pursuant to 735 ILCS 5/2-101(1) and 735 ILCS

5/2-102(a) because Defendant Insurers are private corporations that do business in Cook County

and are therefore residents of Cook County; pursuant to 735 ILCS 5/2-101(2) because the

transaction or some part thereof, out of which this action arises, occurred in Cook County; and/or

pursuant to 735 ILCS 5/2-103(e) because Defendant Insurers are insurance companies that are

either incorporated in Illinois or doing business in Illinois, and one or more of the Plaintiffs

resides in Cook County.

## PARTIES

### I.     Plaintiffs

19.     Plaintiff 12 W. Elm LLC d/b/a Sparrow ("Sparrow") is an Illinois limited liability

company with a principal place of business in Chicago, Illinois.

20.     Plaintiff 2263 N. Lincoln Corp. d/b/a The Dime ("The Dime") is an Illinois

corporation with a principal place of business in Chicago, Illinois.

21.     Plaintiff Chicago Academy of Sciences/Peggy Notebaert Nature Museum ("Peggy

Notebaert Nature Museum") is an Illinois non-profit corporation organized under 26 U.S.C.

§ 501(c)(3) with a principal place of business in Chicago, Illinois.

22.     Plaintiff Chicago Scoops LLC ("Chicago Scoops") is an Illinois limited liability

company with a principal place of business in Chicago, Illinois.

23.     Plaintiff DDMB Inc. d/b/a Emporium Arcade Bar ("Emporium Wicker Park") is

an Illinois corporation with a principal place of business in Chicago, Illinois.

FILED DATE: 7/30/2020 9:01 PM    2020L008099

24.     Plaintiff DDMB2 LLC d/b/a Emporium Arcade Bar ("Emporium Logan Square") is an Illinois limited liability company with a principal place of business in Chicago, Illinois.

25.     Plaintiff DuSable Museum of African American History, Inc. (the "DuSable Museum of African American History" or "DuSable Museum") is an Illinois non-profit corporation organized under 26 U.S.C. § 501(c)(3) with a principal place of business in Chicago, Illinois.

26.     Plaintiff Bangers & Lace Evanston, LLC d/b/a Bangers & Lace ("Bangers & Lace") is an Illinois limited liability company with a principal place of business in Chicago, Illinois.

27.     Plaintiff Bangers & Lace Chicago LLC d/b/a Bangers & Lace ("Bangers & Lace Chicago") is an Illinois limited liability company with a principal place of business in Chicago, Illinois.

28.     Plaintiff Bangers & Lace Roscoe Village LLC d/b/a Kite String Cantina ("Kite String Cantina") is an Illinois limited liability company with a principal place of business in Chicago, Illinois.

29.     Plaintiff BarnBQ LLC d/b/a Old Grounds Social ("Old Grounds Social") is an Illinois limited liability company with a principal place of business in Chicago, Illinois.

30.     Plaintiff Bucktown Dysfunctional Pub, Inc. ("Bucktown Dysfunctional Pub") is an Illinois limited liability company with a principal place of business in Chicago, Illinois.

31.     Plaintiff DB State LLC d/b/a Dough Bros ("Dough Bros") is an Illinois limited liability company with a principal place of business in Chicago, Illinois.

32.     Plaintiff Division Street Café LLC d/b/a Little Victories ("Little Victories") is an Illinois limited liability company with a principal place of business in Chicago, Illinois.

8

FILED DATE: 7/30/2020 9:01 PM    2020L008099

33.    Plaintiff Epic Burger, Inc. ("Epic Burger") is a Delaware limited liability company with a principal place of business in Chicago, Illinois.

34.    Plaintiff Fast Sandwich Holdings Inc. ("Fast Sandwich") is a Delaware Corporation with a principal place of business in Rosemont, Illinois.

35.    Plaintiff Fulton Peoria Partners LLC d/b/a Emporium Arcade Bar ("Emporium Fulton Market") is an Illinois limited liability company with a principal place of business in Chicago, Illinois.

36.    Plaintiff GC Bloomingdale, LLC ("GC Bloomingdale") is an Illinois limited liability company with a principal place of business in Bloomingdale, Illinois.

37.    Plaintiff G Dock, LLC d/b/a Harbor Chicago ("Harbor Chicago") is an Illinois limited liability company with a principal place of business in Chicago, Illinois.

38.    Plaintiff Gibsons L.L.C. ("Gibsons Restaurant Group") is an Illinois limited liability company with a principal place of business in Chicago, Illinois. As defined here, Gibsons Restaurant Group includes each of the additional named insureds on Gibsons Restaurant Group's Policy with the exception of the restaurant R.L.

39.    Plaintiff Golden Five, Inc. ("Golden Five") is an Illinois corporation with a principal place of business in Tinley Park, Illinois.

40.    Plaintiff Hot Asian Buns, LLC d/b/a Wow Bao ("Wow Bao") is a Delaware limited liability company with a principal place of business in Chicago, Illinois.

41.    Plaintiff Hubbard House Restaurant LLC d/b/a/ Hubbard Inn ("Hubbard Inn") is an Illinois limited liability company with a principal place of business in Chicago, Illinois.

42.    Plaintiff Hubbard Steak, LLC d/b/a Joy District ("Joy District") is an Illinois limited liability company with a principal place of business in Chicago, Illinois.

FILED DATE: 7/30/2020 9:01 PM    2020L008099

43.    Plaintiff JB at River North d/b/a Old Crow Smokehouse ("Old Crow Smokehouse") is an Illinois limited liability company with a principal place of business in Chicago, Illinois. Old Crow Smokehouse is one of the restaurant concepts owned and operated by Third Coast Hospitality and is hereinafter referred to as "Third Coast Hospitality."

44.    Plaintiff JK Shields LLC d/b/a Smyth & The Loyalist ("Smyth & The Loyalist") is an Illinois limited liability company with a principal place of business in Chicago, Illinois.

45.    Plaintiff Jo-Kim Lounge Corp. d/b/a Happy's Bamboo Bar and Lounge ("Happy's Bamboo Bar") is an Illinois corporation with a principal place of business in Chicago, Illinois.

46.    Plaintiff Lettuce Entertain You Enterprises, Inc. ("Lettuce Entertain You") is an Illinois corporation with a principal place of business in Chicago, Illinois.

47.    Plaintiff Logan Square Tavern LLC d/b/a Spilt Milk ("Spilt Milk") is an Illinois limited liability company with a principal place of business in Chicago, Illinois.

48.    Mac Parent LLC ("Mac Parent") is a Delaware limited liability company with a principal place of business in Denver, Colorado.

49.    Plaintiff Manny's Coffee Shop, Inc. d/b/a Manny's Cafeteria & Delicatessen ("Manny's") is an Illinois corporation with a principal place of business in Chicago, Illinois.

50.    Plaintiff NAS Restaurant Group, Inc. d/b/a Mixed Greens ("Mixed Greens") is an Illinois corporation with a principal place of business in Chicago, Illinois.

51.    Plaintiff Noodles & Company is a Delaware corporation with a principal place of business in Broomfield, Colorado.

52.    Plaintiff Primos LLC d/b/a HVAC Pub ("HVAC Pub") is an Illinois limited liability company with a principal place of business in Chicago, Illinois.

53.     Plaintiff R.F.R., Inc. d/b/a Golden Corral Restaurant ("RFR") is a Missouri corporation with a principal place of business in Farmington, Missouri.

54.     Plaintiff Roti Restaurants, Inc. ("Roti") is a Delaware corporation with its principal place of business in Chicago, Illinois.

55.     Plaintiff RPDC Illinois LLC d/b/a Robert's Pizza and Dough Company ("Robert's Pizza") is an Illinois limited liability company with a principal place of business in Chicago, Illinois.

56.     Plaintiff San Benedetto, LLC d/b/a Juliet's ("Juliet's") is an Illinois limited liability company with a principal place of business in Frankfort, Illinois.

57.     Plaintiff Sardharia Brothers, Inc. d/b/a Tandoor Char House ("Tandoor Char House") is an Illinois corporation with its principal place of business in Chicago, Illinois.

58.     Plaintiff Second Venture LLC d/b/a L3 Hospitality Group ("L3 Hospitality") is a Delaware limited liability company with a principal place of business in Chicago, Illinois.

59.     Plaintiff Urban Plates LLC ("Urban Plates") is a Delaware limited liability company with a principal place of business in Cardiff, California.

60.     Plaintiff Well Done Hospitality Group (the "Well Done Hospitality Group" or "Well Done") is an Illinois limited liability company with a principal place of business in Chicago, Illinois.

## II.     Defendants

61.     Defendant Affiliated FM Insurance Company ("Affiliated FM Insurance") is a property and casualty insurance provider incorporated in Rhode Island with a principal place of business in Johnston, Rhode Island. Affiliated FM Insurance provides insurance products and services throughout the United States, including in Illinois.

11

FILED DATE: 7/30/2020 9:01 PM    2020L008099

62.     Defendant Argonaut Great Central Insurance Company ("Argonaut") is a property and casualty insurance provider incorporated in Illinois with a principal place of business in Peoria, Illinois. Argonaut provides insurance products and services throughout the United States, including in Illinois.

63.     Defendant Badger Mutual Insurance Company ("Badger Mutual") is a Wisconsin company with a principal place of business in Milwaukee, Wisconsin. Badger Mutual is engaged in the business of selling insurance contracts to commercial entities such as Plaintiffs in Illinois and elsewhere.

64.     Defendant The Charter Oak Fire Insurance Company ("Charter Oak Fire"), a Connecticut corporation, is an affiliate of The Travelers Companies, Inc. ("Travelers Insurance"), and has a principal place of business in Hartford, Connecticut. Charter Oak Fire provides insurance coverage nationally, including in Illinois.

65.     Defendant The Cincinnati Insurance Company ("Cincinnati") is an Ohio company with a principal place of business in Ohio. Cincinnati is an insurance company engaged in the business of selling insurance contracts to commercial entities such as Plaintiffs in Illinois and elsewhere.

66.     Defendant Citizens Insurance Company of America ("Citizens Insurance"), an affiliate of The Hanover Insurance Group, Inc., is a Michigan company with a principal place of business in Worcester, Massachusetts. Citizens Insurance is engaged in the business of selling insurance contracts to commercial entities such as Plaintiffs in Illinois and elsewhere.

67.     Defendant Employers Insurance Company of Wausau ("Employers Insurance"), which is an affiliate of Liberty Mutual Insurance Company ("Liberty Mutual"), is a property and casualty insurance provider incorporated in Wisconsin, with a principal place of business in

FILED DATE: 7/30/2020 9:01 PM    2020L008099

Boston, Massachusetts. Employers Insurance provides insurance products and services throughout the United States, including in Illinois.

68.     Defendant Ohio Security Insurance Company ("Ohio Security"), which is also an affiliate of Liberty Mutual, is a property and casualty insurance provider incorporated in New Hampshire, with a principal place of business in Boston, Massachusetts. Ohio Security provides insurance products and services throughout the United States, including in Illinois.

69.     Defendant Illinois Casualty Company ("Illinois Casualty") is an Illinois corporation with a principal place of business in Rock Island, Illinois. Illinois Casualty provides insurance in a number of states, including Illinois.

70.     Defendant Hartford Fire Insurance Company ("Hartford Fire"), which is an affiliate of The Hartford Financial Services Group, Inc. ("The Hartford Financial Services Group"), is a property and casualty insurance provider incorporated in Connecticut with a principal place of business in Hartford, Connecticut. Hartford Fire provides insurance products and services throughout the United States, including in Illinois.

71.     Defendant North American Elite Insurance Company ("North American Elite") is a property and casualty insurance provider incorporated in New Hampshire with a principal place of business in Kansas City, Missouri. North American Elite provides insurance products and services throughout the United States, including in Illinois.

72.     Defendant SECURA Supreme Insurance Company ("Secura") is a property and casualty insurance provider incorporated in Wisconsin with a principal place of business in Appleton, Wisconsin. Secura provides insurance products and services throughout the United States, including in Illinois.

FILED DATE: 7/30/2020 9:01 PM        2020L008099

73.     Defendant Sentinel Insurance Company, Limited ("Sentinel"), which is an affiliate of The Hartford Financial Services Group, is a property and casualty insurance provider incorporated in Connecticut with a principal place of business in Hartford, Connecticut. Sentinel provides insurance products and services throughout the United States, including in Illinois.

74.     Defendant Society Insurance ("Society") is a Wisconsin corporation with a principal place of business in Fond du Lac, Wisconsin. Society provides insurance products and services in Illinois and elsewhere.

75.     Defendant Specialty Risk of America d/b/a Spriska ("Spriska") is a property and casualty insurance provider incorporated in Illinois with principal place of business in Springfield, Illinois. Spriska provides insurance products and services in Illinois and elsewhere.

76.     Defendant Starr Surplus Lines Insurance Company ("Starr Surplus Lines") is a property and casualty insurance provider incorporated in Texas with a principal place of business in New York, New York. Starr Surplus Lines provides insurance products and services throughout the United States, including in Illinois.

77.     Defendant Twin City Fire Insurance Company ("Twin City Fire"), which is an affiliate of The Hartford Financial Services Group, is a property and casualty insurance provider incorporated in Indiana with a principal place of business in Hartford, Connecticut. Twin City Fire provides insurance products and services throughout the United States, including in Illinois.

78.     Defendant Vigilant Insurance Company ("Vigilant"), which is an affiliate of Chubb Limited, is a New York corporation with a principal place of business in New York, New York. Vigilant provides insurance coverage nationally, including in Chicago, Illinois.

FILED DATE: 7/30/2020 9:01 PM    2020L008099

79.     Defendant Zurich American Insurance Company ("Zurich") is a New York corporation with a principal place of business in Schaumburg, Illinois. Zurich provides insurance coverage nationally, including in Illinois.

## FACTUAL ALLEGATIONS

### I.      The Shutdown and Reopening Orders

80.     In mid-March 2020, executive officials across the country issued a series of unprecedented Shutdown Orders.

81.     In Illinois, on March 16, 2020, Governor J. B. Pritzker ordered that "all businesses in the State of Illinois that offer food or beverages for on-premises consumption . . . *must suspend service for and may not permit on-premises consumption*." (Emphasis added.) Under this executive order, which was extended through the end of May, and Governor Pritzker's March 20, 2020 order, restaurants in Illinois were permitted to serve food and beverages only by means that could be "consumed off-premises," such as delivery, drive-through, or curbside pick-up. In addition, establishments offering carry-out service were required to "ensure that they have an environment where patrons maintain adequate social distancing" of at least six feet between each person, "including, but not limited to, when any customers are standing in line."

82.     The Shutdown Orders further mandated that restaurants in Illinois "take proactive measures to ensure compliance with [six feet] Social Distancing Requirements," including, among other things, "[d]esignating with signage, tape, or by other means six-foot spacing for employees and customers in line to maintain appropriate distance."

83.     In addition, on March 20, 2020, Governor Pritzker ordered that "[a]ll places of public amusement," whether indoors or outdoors, including museums and concert halls, be

FILED DATE: 7/30/2020 9:01 PM    2020L008099

closed to the public. The closure of such "places of public amusement" was in effect until June 26, 2020.

84.     State and local officials began a gradual, phased approach to reopen various industries, issuing executive orders that permitted particular industries and establishments to reopen with numerous, significant physical restrictions in place. On May 29, 2020, Governor Pritzker issued an executive order permitting on-premises food and beverage service only in *outdoor* spaces. Notwithstanding the Governor's May 29 order, the Commissioner of Health of the City of Chicago issued an order continuing to prohibit all on-premises service in Chicago until June 3, and did not begin to permit food and beverage service in outdoor spaces until then.

85.     Governor Pritzker's May 29 executive order permitted outdoor food and beverage service to resume, but only in accordance with Illinois Department of Commerce and Economic Opportunity (DCEO) guidance, which set forth a vast array of physical restrictions and requirements on restaurants. Under DCEO's "physical workspace" guidelines, establishments were required, among other things, to: *(a)* "configure space to allow for at least 6-ft. of distance between tables or other designated customer service areas"; *(b)* "[e]nsure that the area for take-out customers allows for at least 6-ft of separation from seated customers"; *(c)* "close all open congregate areas (e.g., waiting areas)," "all self-service food areas (e.g., buffets, salad bars, coffee station)," and "all self-service beverage stations"; *(d)* "eliminate table presets (e.g., table tents, menus, salt and pepper shakers, lemons, straws, shared condiments, etc.)"; and *(e)* "display signage at entry with face covering requirements, social distancing guidelines, and cleaning protocols[.]"

86.     On June 26, 2020, Governor Pritzker issued an executive order permitting restaurants to resume on-premises *indoor* food and beverage service, provided that

establishments offering such service follow DCEO guidance. Under DCEO's "[m]inimum guidelines," the maximum capacity for seated areas must be determined by "arranging seating" to provide at least six feet between all tables, while standing areas must be capped at a maximum occupancy of 25%.

87.     Restaurants providing indoor service were also impaired by extensive restrictions on their "physical workspaces" similar to those DCEO issued for the earlier, outdoor-only phase. For example, establishments were required to *(a)* "[e]nsure that the area for take-out patrons allows for at least 6-ft of separation from seated patrons"; *(b)* "use 6-feet markings on floor [in bar areas] to provide guidance on social distancing between unrelated parties"; *(c)* "configure any seating [in waiting areas] to be 6-ft apart to allow for social distancing"; *(d)* "[e]liminate any table presets (e.g., table tents, menus, ketchup bottles, salt and pepper shakers, lemons, straws, shared condiments, etc.)"; and *(e)* "display signage at entry and throughout workspace with face covering requirements, social distancing guidelines, cleaning protocols, and any reduced capacity limit[.]"

88.     In addition to the DCEO guidance for restaurants and bars, DCEO also issued "minimum guidelines" for the reopening of museums, effective June 26, 2020. Under these DCEO guidelines, "museums may operate public-facing areas of [the] establishment at no more than 25% of occupancy at any given time." In addition, museums were required, and continue to be required, to make a number of alterations to their "physical workspace." For example, museums must "display visual markers 6-ft. apart at attractions to designate where guests may stand to view exhibits"; "allow for 6-ft. spacing between occupied ticketing workstations [or] if not practical, install an impermeable barrier"; and close or modify "hands-on exhibits . . . to eliminate the hands-on component."

FILED DATE: 7/30/2020 9:01 PM   2020L008099

FILED DATE: 7/30/2020 9:01 PM    2020L008099

89.     With respect to the Plaintiffs here who own and operate dining establishments outside of Illinois, the Shutdown Orders separately in effect where Plaintiffs' other establishments are located also barred, limited, or impaired on-premises food and beverage service for restaurants, bars, and other establishments, and imposed various detrimental physical restrictions on the premises of those establishments. For instance, California Governor Gavin Newsom issued an executive order on March 19, 2020 that prohibited dining establishments in California from serving guests on their premises. Thereafter, pursuant to Governor Newsom's executive order, the California Department of Public Health initially allowed on-premises restaurant service to resume in May 2020 subject to various restrictions, including six-foot social distance requirements. However, on July 13, 2020, Governor Newsom ordered that restaurants across California must cease on-premises indoor dining operations.

90.     The Shutdown Orders, and the restrictive Reopening Orders that followed, are executive orders—not statutes, ordinances, regulations, or legislative acts. Pursuant to Governor Pritzker's executive orders, businesses in Illinois were required, and remain required, to follow the guidance published by the DCEO.

91.     The following Plaintiffs have each sustained direct, physical losses and/or damage to insured property as a result of these executive orders.

## II.     Plaintiffs Suffered Direct Physical Loss and/or Damage to Their Properties as a Result of the Shutdown and Reopening Orders.

### A.     Lettuce Entertain You

92.     Lettuce Entertain You is an independent, family-owned restaurant group based in Chicago that owns, operates, or licenses more than 130 establishments across 13 states, including many restaurants in Illinois. Founded in 1971 by Richard Melman and Jerry Orzoff with the opening of R.J. Grunts in Chicago's Lincoln Park neighborhood, today the company's award-

FILED DATE: 7/30/2020 9:01 PM    2020L008099

winning restaurants include more than 60 different dining concepts and employ more than 7,500 people.

93.     Since 1971, Lettuce Entertain You has created high quality, successful restaurants that cross a wide range of cuisines and service models, from fast-casual to Michelin-starred fine dining, from gourmet sushi to classic American steakhouses. The following is a small sampling of the restaurants in the Lettuce Entertain You family:

- **R.J. Grunts**, the very first Lettuce Entertain You restaurant, memorializes the funky style of the '70s with its style, décor, music, and all-American menu featuring "the world's first salad bar," burgers, and giant hand-scooped milkshakes.

- **RPM On the Water**, Lettuce Entertain You's most recent venture, is a dramatic four-level restaurant and event venue. It houses three separate venues including an upscale bi-level restaurant, a private event space (with a capacity of up to 300 people), and a casual concept—all with outdoor areas and expansive, breathtaking views of the Chicago River. The space also includes boat slips for guests arriving via waterway.

- **Beatrix**—a neighborhood coffeehouse, restaurant, and meeting place, with locations in River North, Streeterville, Fulton Market, and Oak Brook—highlights healthy comfort foods, locally roasted coffee, pastries made fresh daily, and craft cocktails.

- **Il Porcellino**, in the heart of River North, is where guests go for classic Italian-American fare, including house-made pastas crafted with fresh ingredients in a casual setting. Guests can also visit **Petterino's** for classic Italian dining, a prime steak, or seafood dishes, or **RPM Italian** for modern Italian dishes to be shared, fresh pastas made in-house daily, wild fish and seafood, and celebrated classics, among others.

FILED DATE: 7/30/2020 9:01 PM    2020L008099

- ***Mon Ami Gabi***—a classic French bistro located in the historic Belden-Stratford Hotel—features French onion soup, steak frites, and decadent profiteroles, and allows guests to indulge in unique dishes with a boutique French wine list.

- ***Wildfire***, with seven locations across the country, transports guest to a 1940s supper club—complete with lively spirit, jazz music, a hearth oven, and an open kitchen where guests can watch the chefs in action creating indulgent steaks and seafood while guests sip on martini flights or a handcrafted cocktail.

- ***Sushi-San and Ramen-San***, destinations for gourmet sushi and ramen respectively, feature made-to-order rolls, binchotan roasted meats, and noodles in hot broth against a backdrop of '90s hip hop and ice-cold beer.

- ***Ema***, a Mediterranean concept which showcases California-inspired cooking and focuses on spreads, dips and mezze, and other Mediterranean small plates meant for sharing. ***Aba***, located in Chicago's historic Fulton Market District, similarly features influences from all over the Mediterranean, including Israel, Lebanon, Turkey, and Greece, while the bar showcases rare Mediterranean-inspired wines and spirits.

- ***Shaw's Crab House***, which combines a jazzy, sophisticated seafood restaurant and a carefree, lively oyster bar, offers an unmatched selection of seasonal crab, top-grade fish and shellfish, and freshly-shucked oysters. Shaw's is a classy spot known for its high-quality food and large wine list.

94.     Until March 2020, Lettuce Entertain You served nearly 30,000 guests each day across its many inventive and inviting spaces. Many of those spaces also hosted private events—including corporate meetings and meals, parties with family and friends, even wedding receptions and other celebrations.

FILED DATE: 7/30/2020 9:01 PM    2020L008099

95.     As a direct result of the Shutdown Orders, Lettuce Entertain You has incurred direct physical loss and damage, and each and every one of its establishments has been rendered physically nonfunctional as restaurants. Beginning in mid-March 2020, due to the Shutdown Orders, each of Lettuce Entertain You's restaurants was required to cease on-premises dining and service. With their dining room spaces rendered physically nonfunctional for their intended purpose, many Lettuce Entertain You establishments closed their doors and remained closed for months because it was structurally and/or economically infeasible to operate. Those locations that remained open (or have reopened) for the limited purpose of providing carry-out or delivery service were required to make detrimental physical alterations to their premises—such as mounting physical barriers and signage, moving furniture, or placing markings on the premises' floors—to ensure adherence with the Shutdown and Reopening Orders.

96.     For example, some restaurants (such as Il Porcellino, Ramen-San, Sushi-San in River North, and Ema) closed their entire dining rooms and positioned tables as barriers to block off entrances and indoor space. Other restaurants (such as Mon Ami Gabi) converted once-bustling bar areas where patrons would linger and relax into transactional pick-up locations for delivery and carry-out orders—complete with physical partitions required by the orders' social distancing restrictions—and reduced the very tables where guests used to eat into mere "spacers." Yet other restaurants (including Il Porcellino, Beatrix Fulton Market, Bub City Rosemont, Ramen-San Fulton Market, and Quality Crab & Oyster Bah in Lincoln Park) actually modified the front of their restaurants, removed booths, and altered windows to service grab-and-go, carry-out, and delivery orders. These locations also installed patio barriers to direct the flow of guests and delivery personnel. Each and every one of Lettuce Entertain You's restaurants was required to make detrimental physical alterations to its premises.

FILED DATE: 7/30/2020 9:01 PM    2020L008099

97.     As a result of the restrictive Reopening Orders, each of Lettuce Entertain You's establishments remains physically impaired, and Lettuce Entertain You has been required to make substantial detrimental physical alterations to its premises. For example, beginning in mid-June 2020, some of Lettuce Entertain You's establishments have reopened for on-premises dining service—at the heavily reduced capacities required by the orders. As a result of the orders, these establishments were required to physically reconfigure outdoor and indoor dining spaces and materially and detrimentally alter their physical premises, including by physically separating spaces, removing tables and chairs, rearranging furniture and equipment, or erecting new physical structures and signage.

98.     For example, at many restaurants (such as Il Porcellino and Ramen-San) three-quarters of the tables have been rendered physically nonfunctional and are completely blocked off as of the filing of this Complaint. At Mon Ami Gabi, among other Lettuce Entertain You locations, the orders required removal of the makeshift waiting area that had been created near the now-dormant bar area. Wildfire, MBurger, and other restaurants were required to physically remove fifty percent of the seating, including all of the bar tables and bar stools. Joe's Seafood, Prime Steak & Stone Crab in Chicago, for another example, has removed 40 of its 54 tables in its main dining room and has blocked off every other booth as a result of social distancing requirements, while Bub City in Rosemont has eliminated seventy-five percent of its seating, including every other table and all of its bar stools. Other Lettuce Entertain You restaurants have had to physically impair their property by erecting physical barriers and partitions between booths (for example, at Big Bowl locations and elsewhere) and in dining rooms (at Shaw's Crab House, among others), and by closing off portions of dining rooms entirely (at Di Pescara, for example). The physical loss has even reached the very location where Lettuce Entertain You

22

FILED DATE: 7/30/2020 9:01 PM    2020L008099

began, as the forced closure of self-service and communal features has shut down the legendary salad bar at R.J. Grunts where Lettuce Entertain You launched more than four decades ago.

99.    The floorplans below, from Beatrix, Ramen-San, Wildfire, and RPM Italian, respectively—showing the many tables and/or dining spaces rendered nonfunctional due to the Shutdown and restrictive Reopening Orders—are illustrative examples of the physical loss and damage that the Lettuce Entertain You restaurants have suffered:



FILED DATE: 7/30/2020 9:01 PM   2020L008099



SPACE 1 - pizza
open for carryout
only on 5.26.2020

SPACE 2 - pizza &
coffee bar opened
6.30.2020 -
• INDOOR SEATING
10 ppl.
• PATIO SEATING FOR
12 ppl.

- GREEN X
NEW PICKUP
AREA.

24

FILED DATE: 7/30/2020 9:01 PM   2020L008099





FILED DATE: 7/30/2020 9:01 PM    2020L008099



100.    As a direct result of the Shutdown and Reopening Orders, Lettuce Entertain You has suffered substantial losses, in an amount that will be proven at trial.

101.    Lettuce Entertain You has at all relevant times had in place an all-risk insurance policy, entitled Premier Property Protector (No. YAC-L9L-471443-010), effective February 28, 2020, with Employers Insurance, an affiliate of Liberty Mutual. Under this Policy, Employers Insurance insured Lettuce Entertain You "against all risks of direct physical loss or damage[.]" In addition, Employers Insurance agreed to cover Lettuce Entertain You for its "actual loss sustained, as provided in the TIME ELEMENT COVERAGES and TIME ELEMENT COVERAGES AND LIMITATIONS, directly resulting from a loss of the type insured by this Policy[.]" Under the Policy, Employers Insurance also agreed to pay for "Extra Expense."

102.    In March 2020, Lettuce Entertain You submitted its notice of claim to Employers Insurance for covered losses, citing the Shutdown and Reopening Orders and the orders' prohibition of on-premises food service as the cause of loss.

103.    In April 2020, Employers Insurance denied coverage without any valid justification.

26

FILED DATE: 7/30/2020 9:01 PM    2020L008099

### B.    Manny's

104.    Manny's is Chicago's iconic Jewish delicatessen. Established in 1942, Manny's is a Chicago institution. It is family-owned and operated, and has been for four generations. In 1964, Manny's moved to its current location on South Jefferson Street in the South Loop, where it has been ever since. Prior to the Shutdown Orders, Manny's was a buzzing meeting place—where customers conducted business over breakfast, lunch, and dinner. Manny's was also a popular tourist destination, and has played host to many a celebrity, Mayor of Chicago, and even the President of the United States.

105.    Prior to the Shutdown Orders, Manny's operated a large 275-seat dining space that was regularly packed with customers. The heart of the premises—as shown in the photograph below, taken prior to the Shutdown Orders—is a long, cafeteria-style counter where customers waited in full lines to fill their trays. In addition, the premises had dozens of tables arranged for communal seating and several self-service areas for customers to serve themselves condiments and fountain drinks.



FILED DATE: 7/30/2020 9:01 PM   2020L008099

106.    As a direct result of the Shutdown Orders, Manny's incurred direct physical loss and damage and was rendered physically nonfunctional as a restaurant and deli. On March 17, 2020, due to the Shutdown Orders, Manny's was required to cease all in-person dining and service. Manny's then transitioned to an only carry-out and delivery model. In accordance with the Shutdown Orders, in order to remain open for the limited purpose of providing carry-out and delivery, Manny's was required to make detrimental physical alterations to its premises, such as mounting physical barriers, moving furniture, or placing markings on the premises' floors.

107.    For example, as a result of the Shutdown Orders' prohibition on on-premises service, Manny's physically removed chairs and tables from its dining spaces and cordoned off an area within the dining room space for customers to pick up carry-out orders. Manny's also stacked tables and chairs to create a limited path from the door to the deli counter. The photographs below, taken after the Shutdown Orders, show how Manny's physically and detrimentally altered its entire dining room space—including moving all of its dining room

furniture to nonfunctional positions—as a result of the Shutdown Orders.



FILED DATE: 7/30/2020 9:01 PM   2020L008099

FILED DATE: 7/30/2020 9:01 PM   2020L008099





FILED DATE: 7/30/2020 9:01 PM    2020L008099

108.    In June 2020, when restaurants in Chicago were permitted to resume on-premises food service in outdoor spaces only, Manny's erected large cement barriers to close off about one-third of its parking lot to make space for limited outdoor seating. With only these few tables outdoors, and no on-premises service permitted indoors, Manny's operated for weeks at a fraction of its usual dine-in capacity.

109.    As a result of the restrictive Reopening Orders, Manny's premises remain physically impaired, and Manny's has been required to make detrimental material alterations to its premises, including by physically separating spaces, removing tables and chairs, rearranging furniture and equipment, or erecting new physical structures and signage. For example, as Manny's reopened its indoor dining in late June 2020—at a heavily reduced capacity—Manny's installed plexiglass barriers to separate staff and customers, and closed all communal and self-service stations like beverage machines and cutlery stations. As a result of the orders' social distancing requirements, Manny's also erected physical barriers to divide its large dining room into four small spaces.

110.    As a direct result of the Shutdown and Reopening Orders, Manny's has suffered substantial losses in an amount that will be proven at trial.

111.    At all relevant times, Manny's had in place an all-risk insurance policy, entitled Businessowners Package (Policy No. BP19017911-0), effective July 1, 2019, with Society. Under this Policy, Society agreed to cover Manny's for all loss of Business Income resulting from a suspension of "'operations' during the 'period of restoration'" caused by "direct physical loss of or damage to covered property" at Manny's premises. Under the Policy, Society also agreed to pay for "Extra Expense."

31

FILED DATE: 7/30/2020 9:01 PM   2020L008099

112.    On March 16, 2020, Manny's submitted its notice of claim to Society for covered losses.

113.    On March 20, 2020, Society denied coverage without any valid justification.

**C.    Wow Bao**

114.    Wow Bao fuses centuries of traditional Asian cooking with modern Asian street food, bringing steamed buns, potstickers, rice bowls and more to the streets of Chicago. Wow Bao owns and operates six locations in Chicago, including three in the Loop and one in the iconic Water Tower Place mall.

115.    Prior to the issuance of the Shutdown Orders, Wow Bao's locations were filled with customers eating a meal on their lunch break, looking for a healthy casual dinner, or grabbing a bite while shopping. After ordering at the counter, customers could fill their drinks at the soda fountain, and then grab a countertop stool along one of the restaurants' windows or sit at one of the high or low top tables. Wow Bao's larger locations, while still modest in size, used clever design to create seating for dozens of people.

116.    As a direct result of the Shutdown Orders, Wow Bao's locations incurred direct physical loss and direct physical damage and were rendered physically nonfunctional as restaurants. In mid-March 2020, due to the Shutdown Orders, Wow Bao was required to cease all on-premises food and beverage service. With its dining spaces rendered physically nonfunctional for their intended purposes, Wow Bao temporarily closed multiple locations—one of which remains closed as of the filing of this Complaint. Certain locations remained open or later reopened for takeout and delivery only, but had to make detrimental physical alterations to the premises of its locations as a result of the Shutdown Orders' restrictions. For instance, Wow Bao physically roped off dining areas to prevent customers from accessing tables, installed plexiglass barriers to physically separate customers and staff, and installed signage to inform customers of

FILED DATE: 7/30/2020 9:01 PM    2020L008099

the Shutdown Orders' six-foot social-distancing requirements. As a result of the Shutdown Orders, Wow Bao locations that previously served in-restaurant diners and featured long lines of anxiously awaiting customers were reduced to a shell of their former selves.

117.    As a result of the restrictive Reopening Orders, the Wow Bao restaurants that have reopened for on-premises service—at the substantially reduced capacities required by the continued restrictions—remain physically impaired. Due to the continued social-distancing requirements, including that all tables must be at least six feet apart, many of Wow Bao's dining spaces and tables have been rendered non-functional, and Wow Bao has had to detrimentally rearrange what tables and other furniture remain. As a result, Wow Bao has suffered direct physical loss and damage to its premises.

118.    Due to the Shutdown and Reopening Orders, Wow Bao has suffered substantial losses, in an amount that will be proven at trial.

119.    At all relevant times, Wow Bao had in place an all-risk insurance policy entitled Property Choice Coverage (No. 10 UUN JA6952), effective June 1, 2019, with Hartford Fire, an affiliate of The Hartford Financial Services Group. Under this Policy, Hartford Fire agreed to cover Wow Bao for "the actual loss of Business Income" and "Extra Expense" resulting from a necessary interruption of Wow Bao's business caused by "direct physical loss of or direct physical damage to" Wow Bao's insured property.

120.    In April 2020, Wow Bao submitted its notice of claim to Hartford Fire for covered losses.

121.    In May 2020, Hartford Fire denied Wow Bao's claim without any valid justification.

FILED DATE: 7/30/2020 9:01 PM    2020L008099

### D.    Chicago Scoops

122.    Chicago Scoops is a franchise group that owns and operates Cold Stone Creamery and Rocky Mountain Chocolate Factory locations across United States, including many in Illinois. Starting as a single unit operator in 2014, Chicago Scoops currently owns and operates 43 Cold Stone Creamery locations—the largest Cold Stone Creamery franchisee in the country.

123.    Before the Shutdown Orders, Chicago Scoops' Cold Stone locations were busy pit stops for families on weekend walks or relaxing places to hangout for those who wanted to enjoy super premium ice cream, made fresh daily. Providing an ice cream experience—with premium ingredients mixed with candy, cakes, fruits or nuts on a frozen granite stone—and more than the ice cream customers could buy at the grocery store, many Chicago Scoops locations featured lines of customers waiting to purchase their selections and areas for customers to socialize in the store while they escaped a hot day with a cold treat.

124.    As a direct result of the Shutdown Orders, all Chicago Scoops' locations incurred direct physical loss and damage, and were rendered physically nonfunctional as ice cream parlors. Beginning in mid-March 2020, due to the Shutdown Orders, Chicago Scoops was required to cease all on-premises food and beverage service. All stores, including the three in Chicago, were forced to close for at least some period of time. Some of Chicago Scoops' locations, including in Chicago, remain closed to this day because it is structurally and/or economically infeasible to operate. The locations that did reopen weeks after the first Shutdown Orders have been rendered physically nonfunctional by virtue of the impact that the Shutdown Orders have had on their physical spaces. Some locations will be forced to close permanently. Those that were able to reopen have done so with limited capacity, more barriers, and a completely new layout, materially changing the physical nature of each location. The below photograph of one of Chicago Scoops' locations—showing furniture displaced, stacked, and

FILED DATE: 7/30/2020 9:01 PM    2020L008099

roped off, and social-distancing markings on the floor—is an illustrative example of the physical loss and damage to Chicago Scoops' property.



125.     As a result of the restrictive Reopening Orders, Chicago Scoops' locations have remained in a physically impaired state and have been required to make detrimental material alterations to their premises. Although the initial restrictive Reopening Orders allowed for some takeout and delivery, the physical restrictions impaired the function of Chicago Scoops's locations by preventing customers from entering the locations and having the customary ordering experience that is fundamental to the nature of the Chicago Scoops concept. Nor could customers take comfort from warm summer temperatures by sitting inside to enjoy their cold ice cream— which further impaired the function of the Chicago Scoops locations.

35

126. As a direct result of the Shutdown and Reopening Orders, Chicago Scoops has suffered substantial losses, in an amount that will be proven at trial.

127. At all relevant times, Chicago Scoops has had in place an all-risk commercial property insurance policy, entitled Deluxe Property Coverage (Policy Number P-630-3P037672-COF-19), effective November 17, 2019, with Charter Oak Fire. Under that Policy, Charter Oak Fire agreed to pay for "[t]he actual loss of Business Income [Chicago Scoops] sustain[s] due to the necessary 'suspension' of [its] 'operations' during the 'period of restoration'; and [t]he actual Extra Expense [it] incur[s] during the 'period of restoration'; caused by direct physical loss of or damage to" covered property.

128. In March 2020, Chicago Scoops submitted its notice of claim to Charter Oak Fire for covered losses.

129. In March 2020, Charter Oak Fire denied coverage to Chicago Scoops without any valid justification.

**E.     Epic Burger**

130. Epic Burger is a local company, operating eight locations across Chicagoland, that offers people an opportunity to eat non-processed, all natural food at a reasonable price. Giving thought to how food is raised, grown, transported, processed and packaged, Epic Burger aims to take the most iconic of American meals—hamburgers and french fries, as well as all natural chicken sandwiches, turkey burgers, and plant-based options—and prepare them in a way that is delicious but without using artificial colors and flavors, phosphates, preservatives, or other common additives.

131. Before the Shutdown Orders, individual diners, business professionals making deals, or families enjoying a meal out would order upon entering the location and then select from the many seat options in the inviting dining rooms —including in some locations booths,

FILED DATE: 7/30/2020 9:01 PM    2020L008099

individual or communal tables, cozy corners, or window seats. Self-serve fountain soda machines were available for those that did not choose one of Epic Burger's decadent milkshakes. Epic Burger's locations were designed to allow customers to enjoy quality food, in an atmosphere they enjoyed, at a pace they desired.

132.    As a direct result of the Shutdown Orders, Epic Burger's locations incurred direct physical loss and damage and were rendered non-functional as restaurants and local eateries. Beginning in mid-March 2020, due to the Shutdown Orders, Epic Burger was required to cease all on-premises food and beverage service. Epic Burger had to close all of its locations and completely rethink its business in light of the physical restrictions and impairments required to operate. At least two locations will be forced to remain closed. And although some locations in Chicago were able to offer take-out and delivery in a limited capacity, Epic Burger was forced to materially alter its operations and physical kitchen space by purchasing and utilizing new equipment to prepare food that would not be eaten immediately after being served at a table in the restaurant. In the dining rooms, in some cases, tables and chairs were rearranged as the Shutdown Orders rendered nonfunctional the areas where diners were previously served.

133.    As a result of the restrictive Reopening Orders, Epic Burger's locations remain physically impaired and have been required to make detrimental material physical alterations to their premises. Due to the Reopening Orders' spatial social-distancing restrictions, Epic Burger has had to purchase and deploy physical barriers, remove a wall, reconfigure and remove tables, and change the physical layout of stores. The maximum capacity inside these once busy restaurants was reduced dramatically, and vast amounts of square footage were rendered nonfunctional. The below floor plan of Epic Burger's North Avenue location—showing the many tables and/or dining spaces rendered nonfunctional due to the Shutdown and restrictive

37

FILED DATE: 7/30/2020 9:01 PM    2020L008099

Reopening Orders—is an illustrative example of the physical loss and damage that Epic Burger has suffered. (Epic Burger's other locations have incurred a similar percentage reduction in their functional dining spaces.)



134.    As a direct result of the Shutdown and Reopening Orders, Epic Burger has suffered substantial losses, in an amount that will be proven at trial.

135.    At all relevant times, Epic Burger has had in place an all-risk commercial property insurance policy, entitled Deluxe Property Coverage (Policy Number P-630-3P037672-COF-19), effective November 17, 2019, with Charter Oak Fire. Under that Policy, Charter Oak Fire agreed to pay for "[t]he actual loss of Business Income [Epic Burger] sustain[s] due to the

necessary 'suspension' of [its] 'operations' during the 'period of restoration'; and [t]he actual Extra Expense [it] incur[s] during the 'period of restoration'; caused by direct physical loss of or damage to" covered property.

136.     In March 2020, Epic Burger submitted its notice of claim to Charter Oak Fire for covered losses.

137.     In March 2020, Charter Oak Fire denied coverage to Epic Burger without any valid justification.

F.     **Footman Hospitality**

138.     Footman Hospitality is a Chicago-based hospitality group that strives to create authentic dining and drinking establishments that are memorable and focus on quality. Born out of a collaboration with an array of talented hospitality professionals, Footman operates six unique drink-forward concepts: Bangers & Lace, Bangers & Lace Chicago, Bucktown Dysfunctional Pub, Little Victories, Kite String Cantina, Spilt Milk, and Sparrow (together, "Footman Hospitality"). Each location is inspired by the company's namesake—the footman—who was charged with running the most precious and precarious tasks in a household and applied a relentless attention to detail to every task, from greeting guests to serving dinners, with a refined sense of style and a gracious demeanor.

139.     ***Bangers & Lace and Bangers & Lace Chicago*** (together, the "Bangers & Lace locations"), located in Evanston and Wicker Park respectively, are known as good places to eat as well as enjoy the curated craft beer selection. The Bangers & Lace locations feature the feel of a refined Midwestern lodge and offer draft beers from around the world in addition to an extensive bottle selection, boutique wines, and thoughtful cocktails. Each establishment is centered around its bar and inviting communal high-top seating.

39

FILED DATE: 7/30/2020 9:01 PM    2020L008099

140.     Until March 2020, the Bangers & Lace locations were bustling with patrons—some enjoying the refined food, others the hard-to-find drink—and buzzing with a lively atmosphere befitting a distinguished establishment.

141.     As a direct result of the Shutdown Orders, the Bangers & Lace locations incurred direct physical loss and damage and were rendered physically nonfunctional as a bar and a restaurant. As mandated by the Shutdown Orders, the Bangers & Lace locations ceased all in-person service in mid-March 2020 and thus shut their doors to all guests. The Bangers & Lace locations, reliant on maximizing capacity at their bars before the Shutdown Orders, serve only minimal food and could not sustain a carry-out and delivery only model.

142.     Thereafter, as a result of the restrictive Reopening Orders, the Bangers & Lace locations have remained physically impaired and have been required to make detrimental material alterations to their premises. The Bangers & Lace locations remained completely shuttered, without any functioning physical spaces, until late-June 2020, when the bars were able to reopen with severely limited capacity for in-person service. Due to the Reopening Orders' six-foot social-distancing and other spatial requirements, the Bangers & Lace locations had to remove all interior tables, install plexiglass barriers, remove barstools and high-top seating, and stack tables and chairs to block off certain areas of their physical spaces. Yet despite the many detrimental physical alterations to their premises that the Bangers & Lace locations were required to make, approximately eighty percent of the Bangers & Lace locations' seating is fixed, cannot be moved, and does not allow for the required six-foot separation—therefore, those seats have been rendered nonfunctional by the Reopening Orders' restrictions. Due to the physical impairment of their premises caused by the Shutdown and Reopening Orders, The Bangers & Lace locations are now operating at a fraction of their pre-Shutdown Order business.

143. **Bucktown Dysfunctional Pub** is a small, corner bar in the Bucktown neighborhood with a world-renowned beer garden. Allegedly established in 1932, the pub is one of the city's oldest and best-hidden gems and features a little something for everyone—perfect for a shot of inexpensive whiskey, a big basket of delicious, free popcorn, or a well-crafted cocktail.

144. Until March 2020, Bucktown Dysfunctional Pub was a thriving bar with approximately 50 seats and a friendly staff. Regulars and first-timers alike would gather for trivia night, karaoke Tuesdays, a Friday night dance party, and everything in between. Many a dog graced the patio along with its owner.

145. As a direct result of the Shutdown Orders, Bucktown Dysfunctional Pub incurred direct physical loss and damage and was rendered non-functional as a restaurant and bar. As mandated by the Shutdown Orders, Bucktown Dysfunctional Pub ceased all in-person service in mid-March 2020 and thus shut its doors to all guests. A drink-focused establishment, the pub was unable to sustain a carry-out and delivery only model. The restaurant and bar was forced to close entirely.

146. As a result of the restrictive Reopening Orders, Bucktown Dysfunctional Pub remains physically impaired, and the Pub has been required to make detrimental material alterations to its premises. The Pub remained completely shuttered without any functioning physical space until late-June 2020, when the Pub was able to reopen with the severely limited capacities permitted by the restrictive Reopening Orders. As a result of the orders, Bucktown Dysfunctional Pub removed all of its interior tables, removed seating on its beer garden patio to ensure the required physical distance between patrons, and erected physical barriers to separate customers and staff. Because all of Bucktown Dysfunctional Pub's interior seating is fixed and

immovable, the Reopening Orders' six-foot physical distancing requirements have rendered the Pub's indoor areas completely nonfunctional, leaving only the Pub's outdoor premises functional for its intended purpose. As a result, the Pub's bar and restaurant are now operating at a fraction of its pre-Shutdown Order business.

147.    ***Little Victories*** is a Wicker Park establishment that operates in the tradition of drinking and eating venues that have connected neighborhoods and neighbors across the city for generations. Serving as a gathering place for celebrating the big things that arise from the accumulation of small achievements, the location was opened in a former warehouse.

148.    Until March 2020, many patrons at Little Victories gathered around the huge centerpiece horseshoe bar surrounded by lots of seating, vintage-inspired booths, small tables around, and spots for guests to play billiards and darts. Nothing fancy, Little Victories offers good times, good music, friendly service, and simple classic cocktails along with a rotating selection of canned and draft beers featuring microbrews and craft beers from Chicago's many local breweries.

149.    As a direct result of the Shutdown Orders, Little Victories incurred direct physical loss and damage, and was rendered physically nonfunctional as a restaurant and bar. As mandated by the Shutdown Orders, Little Victories ceased all in-person service in mid-March 2020 and thus shut its doors to all guests.

150.    Thereafter, as a result of the restrictive Reopening Orders, Little Victories has remained in a physically impaired state and has been required to make detrimental material alterations to its premises. Little Victories remained completely shuttered without any functioning physical space until late-June 2020, when the bar was able to reopen with severely limited capacity for in-person service. As a result of the Shutdown Orders' required six-foot

42

social distancing, Little Victories removed tables both inside and from its small patio, installed plexiglass at the bar to keep guests separated from one another as well as from bar staff, removed the majority of its barstools and high-top seating, and stacked up tables and chairs to block off certain areas of the bar and the dining room. In addition, Little Victories had to place caution tape down to completely close off its billiards table and to stack up various tables and chairs to block off guest access to the bar's dart boards. Due to the physical impairment of its premises caused by the Shutdown and Reopening Orders, Little Victories is now operating at a fraction of its pre-Shutdown Order business.

151.     *Kite String Cantina* is a Roscoe Village mainstay that fuses taquitos with bubbler cocktails. A bright neon kite hangs over the space's large bar where guests can snack on chips and dip, taquitos made on an old-fashioned grill, tropical cocktails from a bubbler machine, dozens of draft beers, and other craft cocktails.

152.     Until March 2020, Kite String Cantina hosted diners and drinkers alike in a small but upbeat atmosphere, and hosted many private events.

153.     As a direct result of the Shutdown Orders, Kite String Cantina incurred direct physical loss and damage, and was rendered physically nonfunctional as a restaurant and bar. As mandated by the Shutdown Orders, Kite String Cantina ceased all on-premises service in mid-March 2020 and thus shut its doors to all guests.

154.     Thereafter, as a result of the restrictive Reopening Orders, Kite String Cantina has remained physically impaired and has been required to make detrimental material alterations to its premises. Because all of Kite String Cantina's interior seating is fixed and immovable, the Reopening Orders' six-foot physical distancing requirements have rendered its indoor areas completely nonfunctional for their intended purpose—on-premises food and beverage service.

43

As a result, as of the filing of this Complaint, Kite String Cantina operates only for carryout service. To ensure adherence with the Reopening Orders' restrictions while providing carryout-only service, Kite String Cantina has had to make a number of detrimental physical alterations to its premises—such as mounting physical barriers, moving furniture, or placing markings on the premises' floors. For instance, Kite String Cantina was required to remove all interior tables and install plexiglass barriers at the bar. Due to the physical impairment of its premises caused by the Shutdown and Reopening Orders, Kite String Cantina is currently operating at a fraction of pre-Shutdown Order business.

155.    ***Spilt Milk*** is a neighborhood tavern housed in a building that was formerly a 1920s pharmacy. The bar has an old-school look—with its distinctive rich wood bar and large outdoor space with picnic table seating—that sets the stage for the menu's crafty cocktails, snacks, and pub food.

156.    Until March 2020, Spilt Milk's nearly 100 seats served as a great neighborhood tavern while offering a level of product and hospitality that also made it an easy destination spot. Consistent with the saying, "Don't cry over spilt milk," patrons and staff did not take themselves too seriously and kept the environment fun—especially during "Family Meal Monday."

157.    As a direct result of the Shutdown Orders, Spilt Milk incurred direct physical loss and damage and was rendered physically nonfunctional as a bar and eatery. As mandated by the Shutdown Orders, Spilt Milk ceased all on-premises service in mid-March 2020 and thus shut its doors to all guests.

158.    Thereafter, as a result of the restrictive Reopening Orders, Spilt Milk has remained physically impaired and has been required to make detrimental material alterations to its premises. Spilt Milk remained completely shuttered without any functioning physical space

FILED DATE: 7/30/2020 9:01 PM    2020L008099

until late-June 2020, when it was able to reopen with severely limited capacity for on-premises service. Because Spilt Milk's interior bar seating is fixed and immovable, the Reopening Orders' six-foot physical distancing requirements continue to render its indoor bar areas nonfunctional—leaving only Spilt Milk's outdoor premises functional for their intended purpose, and the outdoor premises are themselves restricted to very limited outdoor seating. In addition, as a result of the Reopening Orders, Spilt Milk has had to remove all interior tables and install plexiglass barriers. Due to the physical impairment of its premises caused by the Shutdown and Reopening Orders, Spilt Milk is operating at a fraction of pre-Shutdown Order business.

159.    *Sparrow* is a unique cocktail bar with a 1930s art deco, Cubano feel. Inspired by the great hotel lobby bars of Chicago, the bar's menu is rum-themed with an eye to the details: 1930s-era rum focused cocktails lead the offerings along with a rotating list of classics, a small European focused wine list, and 10 rotating drafts. Since opening its doors over four years ago, Sparrow remains iconic in its look, service, and offerings.

160.    Until March 2020, Sparrow had been a hot spot in the Gold Coast neighborhood, attracting a diverse mix of customers looking to escape to a sophisticated time and to congregate around a lobby bar that has been restored after 75 years.

161.    As a direct result of the Shutdown Orders, Sparrow incurred direct physical loss and damage and was rendered physically non-functional as a bar. In mid-March 2020, in adherence with the Shutdown Orders, Sparrow shut down all access to its bar space and, as a result of the orders' prohibition on on-premises service, physically lost all of its square footage for its intended function. With the bar closed, Sparrow was rendered nonfunctional for months.

162.    Thereafter, as a result of the restrictive Reopening Orders, Sparrow has remained physically impaired and has been required to make detrimental material alterations to its

45

FILED DATE: 7/30/2020 9:01 PM    2020L008099

premises. Sparrow remained completely shuttered, without any functioning physical space, until late-June 2020, when it was able to reopen but only subject to severe restrictions on its physical space. In accordance with the Reopening Orders' spatial restrictions, in order to reopen for on-premises service, Sparrow was required, among other alterations, to physically separate spaces, rearrange tables and chairs, reconfigure furniture and equipment, or erect new physical structures. For example, Sparrow had to remove most of its interior tables, install plexiglass at its bar, remove all of its bar seating, and stack tables and chairs to block off certain seats that cannot be separated by the requisite six feet of physical space. Due to the physical impairment of its premises caused by the Shutdown and Reopening Orders, Sparrow is currently operating at a fraction of its pre-Shutdown Order business.

163.     As a result of the Shutdown and Reopening Orders, each Footman entity—Bangers & Lace, Bangers & Lace Chicago, Bucktown Dysfunctional Pub, Kite String Cantina, Little Victories, Spilt Milk, and Sparrow—has suffered substantial losses in an amount that will be proven at trial.

164.     Each Footman Entity has at all relevant times had in place an all-risk insurance policy with Society, entitled Businessowners Package Policy (for Bangers & Lace, No. TRM 585294-5, effective July 22, 2019; for Bangers & Lace Chicago, No. BP18023993-7, effective September 29, 2019; for Bucktown Dysfunctional Pub, No. TRM 586233-5, effective September 22, 2019; for Kite String Cantina, No. BP19033951-0, effective September 29, 2019; for Little Victories, No. BP19047795-0, effective December 13, 2019; for Spilt Milk, No. BP16007045-4, effective February 25, 2020; and for Sparrow, No. TRM 588812-5, effective February 23, 2020). Under each Policy, Society agreed to pay "for direct physical loss of or damage to" covered property "caused by or resulting from any Covered Cause of Loss," which is defined as "direct

FILED DATE: 7/30/2020 9:01 PM     2020L008099

FILED DATE: 7/30/2020 9:01 PM   2020L008099

physical loss" unless the loss is excluded or limited. In addition, Society agreed to pay for all "loss of Business Income" sustained due to a necessary suspension of operations, or a suspension caused by "direct physical loss of or damage to" each of Footman's insured properties. In addition, Society also agreed to pay for "Extra Expense."

165.    In March 2020, each Footman entity—Bangers & Lace, Bangers & Lace Chicago, Bucktown Dysfunctional Pub, Kite String Cantina, Little Victories, Spilt Milk, and Sparrow— submitted its notice of claim to Society Insurance for covered losses.

166.    In April 2020, Society denied coverage for each Footman entity—Bangers & Lace, Bangers & Lace Chicago, Bucktown Dysfunctional Pub, Kite String Cantina, Little Victories, Spilt Milk, and Sparrow—without any valid justification.

### G.    Gibsons Restaurant Group

167.    A Chicago-based institution and major independent restaurant group, Gibsons Restaurant Group operates eight concepts with 13 locations across three states. Gibsons Restaurant Group has earned praise as an industry leader in hospitality, quality, and value. The following is a sampling of the restaurants in the Gibsons Restaurant Group:

- ***Gibsons Bar & Steakhouse***, with locations in Chicago, Rosemont, and Oak Brook, has been an iconic Chicago steakhouse since partners Hugo Ralli and Steve Lombardo opened its doors in May of 1989. The classic American steakhouse is the first in the country to be awarded its own USDA certification program. Gibsons Bar & Steakhouse's Prime Angus Beef is featured along with fresh fish, classic cocktails, an extensive wine list and exceptional service.

- ***Gibsons Italia***, operating at 233 N. Canal Street in Chicago, is built on tradition and elegance, but with a modern feel. The menu pairs the chef-driven tastes of

47

FILED DATE: 7/30/2020 9:01 PM    2020L008099

Italy with the fine quality of Gibsons Bar & Steakhouse and a world-class selection of beef.

- *LUXBAR* is Chicago's Gold Coast bar and restaurant serving all-American, feel-good food and handcrafted cocktails since 2005. The quintessential American bar, LuxBar features seasonal and classic cocktails made from freshly pressed juices, premium ice, house-made shrubs, and an extensive selection of spirits that runs especially deep in whiskey and bourbon. An extensive spirits menu, a thoughtful, approachable wine list, and craft and local beer menu make the bar a go-to spot for casual, mid-week drinks and bites with friends, watching weekend sports and post-shopping.

- *Quartino* is a bustling downtown Chicago restaurant and wine bar noted for its distinctive Italian small plates menu, vintage décor, and attentive, personable service staff. The menu features Italy's regional specialties including artisanal salumi, Neapolitan thin-crust pizza, house-made pasta, and seasonal dishes. Menu items are meant to be shared and offer a unique dining experience.

- *Hugo's Frog Bar & Fish House*, with locations in Chicago, Naperville, Des Plaines, and Philadelphia, opened its Chicago doors in 1997 and is one of the city's finest seafood restaurants. Hugo's receives its seafood daily and is Chicago's destination spot for fresh oysters, crudos, frog legs, lobster, and fish, as well as Gibsons Prime Angus steaks and chops. Hugo's also boasts extensive wine and cocktail lists, as well as signature desserts.

- *ChiSox Bar & Grill*, located directly across from Guaranteed Rate Field, is a great place to meet friends and family before, during, and after a ball game. The

FILED DATE: 7/30/2020 9:01 PM    2020L008099

restaurant has more than 70 TVs and a state of the art sound system to bring all the action right inside.

168.     Until the Shutdown Orders, the Gibsons Restaurant Group restaurants were thriving with large lunch and dinner crowds. Each of its locations is large—with the smallest location in Illinois measuring roughly 6,000 square feet and the largest, 15,700 square feet. Prior to the Shutdown Orders, each Gibsons Restaurant Group location could seat hundreds of guests at one time.

169.     As a direct result of the Shutdown Orders, each of the restaurants in the Gibsons Restaurant Group suffered direct physical loss and damage and were rendered physically nonfunctional as restaurants and bars. Beginning in mid-March 2020, each restaurant was required to cease on-premises dining and service. With their dining room spaces rendered physically nonfunctional for their intended purpose, some Gibsons Restaurant Group establishments closed their doors and remained closed for months because it was structurally and/or economically infeasible to operate. Those locations that remained open (or have reopened) for the limited purpose of providing carry-out or delivery service were required to make detrimental physical alterations to their premises—such as mounting physical barriers and signage, moving furniture, or placing markings on the premises' floors—to ensure adherence with the Shutdown and Reopening Orders.

170.     As a result of the restrictive Reopening Orders, each of the Gibsons Restaurant Group establishments remains physically impaired, and each has been required to make substantial detrimental physical alterations to its premises. For example, beginning in June 2020, some of the restaurants in the Gibsons Restaurant Group have reopened for on-premises dining service—at the heavily reduced capacities required by the orders. For example, prior to the

FILED DATE: 7/30/2020 9:01 PM    2020L008099

Shutdown and Reopening Orders, Gibsons Italia and Quartino both operated with a maximum capacity of approximately 500 guests. Now, as a result of the Reopening Orders' spatial restrictions, roughly seventy-five percent of those locations' seating capacity has been rendered physically nonfunctional. Each and every one of Gibsons Restaurant Group's locations has incurred a substantial reduction in its functional dining space due to the Reopening Orders' restrictions. In addition, as a result of the Reopening Orders, Gibsons Restaurant Group's establishments were required to physically reconfigure outdoor and indoor dining spaces and materially and detrimentally alter their physical premises, including by physically separating spaces, removing tables and chairs, rearranging furniture and equipment, or erecting new physical structures and signage. In accordance with the Reopening Orders' requirements, Gibsons Restaurant Group's restaurants have also installed plexiglass barriers between tables to keep guests physically separated and some of its restaurants have fully removed windows to increase fresh air circulation.

171.    As a direct result of the Shutdown and Reopening Orders, Gibsons Restaurant Group has suffered substantial losses, in an amount that will be proven at trial.

172.    Gibsons Restaurant Group has at all relevant times had in place an all-risk insurance policy, entitled Commercial Property Coverage Policy (No. RS 9128453-09), effective May 1, 2019, with Argonaut. The Policy directs that Argonaut will pay for "direct physical loss of or damage to" Gibsons Restaurant Group's property caused by or resulting from any "Covered Cause of Loss," defined as "direct physical loss unless the loss is excluded or limited in this policy." Argonaut agreed to cover Gibsons Restaurant Group for loss of Business Income sustained due to the necessary "suspension" of its operations during the "period of restoration,"

FILED DATE: 7/30/2020 9:01 PM   2020L008099

where the suspension is caused by "direct physical loss of or damage to" property at covered premises. In addition, Argonaut also agreed to pay for "Extra Expense."

173.    In March 2020, Gibsons Restaurant Group submitted its notice of claim to Argonaut for covered losses.

174.    In March 2020, Argonaut denied coverage without any valid justification.

**H.      Noodles & Company**

175.    Noodles & Company is a restaurant group that operates and franchises more than 480 fast-casual eateries in 30 states, including more than 40 locations in Illinois alone.

176.    Started in 1995 with a single location and a simple concept—to serve fresh food fast—Noodles & Company has grown dramatically over the past two decades. Today, Noodles & Company offers noodle dishes from around the world, salads and soups, all in one restaurant. Each dish is inspired by the individuality, creativity and cultural heritage of cuisines from around the globe, and carefully hand-made to a guest's specifications using only the freshest ingredients. Noodles & Company is proud to use real food and real cooking for real flavors.

177.    Noodles & Company's eateries offer a cozy spot to share a meal with friends and family, with locations that serve as the perfect place to get together with loved ones and share a moment around the table. Accordingly, Noodles & Company locations have intimate dining rooms with plush booths and comfy seats. Locations in Illinois, for example, on average have under 75 seats indoors and those that have outdoor seating can accommodate an average an additional 20 guests. Each Noodles & Company location has one service counter where customers wait in line, place their orders, and pay. The restaurants also have communal self-service areas for fountain drinks, cutlery, and condiments. The images below depict examples of what Noodles & Company locations looked like prior to March 2020:

FILED DATE: 7/30/2020 9:01 PM   2020L008099





178.     As a direct result of the Shutdown Orders, Noodles & Company incurred direct

physical loss and damage, as hundreds of its locations were materially and physically impaired in

their intended function: on-premises food service and dining. In mid-March, all Noodles &

52

FILED DATE: 7/30/2020 9:01 PM   2020L008099

Company locations closed their doors to all in-person dining and moved to service only for delivery, curbside delivery, or pick-up orders. To accommodate this model, Noodles & Company eateries physically blocked off or barricaded dining rooms with stacked tables and chairs so that customers could not access them, and installed plexiglass to serve as a physical barrier between patrons and employees. The images below are illustrative of some of the physical impairments that Noodles & Company's various locations have suffered as a result of the Shutdown Orders:





FILED DATE: 7/30/2020 9:01 PM    2020L008099

179.    As a result of the restrictive Reopening Orders, Noodles & Company has remained in a physically impaired state and has been required to make detrimental material alterations to its premises. Those Noodles & Company locations that have re-opened for limited in-person dining are operating at less than half of their usual capacity limits. Those restaurants have had to stack tables in non-functional arrangements and physically tape off tables and chairs to keep seating six feet apart and accommodate the mandated reduced capacity. The communal self-service stations where guests would normally get fountain beverages, cutlery, and condiments have also been rendered non-functional by virtue of the Shutdown and Reopening Orders.

180.    As a direct result of the Shutdown and Reopening Orders, Noodles & Company has suffered substantial losses, in an amount that will be proven at trial.

181.    Noodles & Company has at all relevant times had in place all-risk insurance policies, entitled All Risk Coverage (Policy Nos. ES441 and ER857), effective April 1, 2019 and April 1, 2020, respectively, with Affiliated FM Insurance. Under these Policies, Affiliated FM Insurance is to cover Noodles & Company property "against ALL RISKS OF PHYSICAL LOSS OR DAMAGE" except as excluded in the Policy. Affiliated FM Insurance also agreed under these Policies to cover Noodles & Company for all "Business Interruption loss" as a "direct result of physical loss or damage" to Noodles & Company property. In addition, Affiliated FM also agreed to pay for "Extra Expense."

182.    In March 2020, Noodles & Company submitted its notice of claim to Affiliated FM Insurance for covered losses.

FILED DATE: 7/30/2020 9:01 PM   2020L008099

183.    Affiliated FM Insurance, on information and belief, is expected to deny coverage without any valid justification.

**I.      Harbor Chicago**

184.    Harbor Chicago opened in January 2020 in Chicago's South Loop neighborhood, bringing an upscale seafood dining concept to a community eager for new eateries. Harbor Chicago offers high-quality interpretations of classic American cuisine, with a locally-sourced menu inspired by the Great Lakes region. Harbor Chicago's goal was to become a neighborhood staple, and it was well on its way to doing so until the Shutdown Orders were issued.

185.    Before the Shutdown Orders, Harbor Chicago was a 168-seat establishment that consisted of a main dining room, a bar area, and two private dining rooms. One of Harbor Chicago's private dining rooms was a full-service venue for private functions, containing a private bar and an intimate reception setting. The other private room provided a more formal environment for sit-down lunch or dinner service. An elevated bar area, just steps from the restaurant's front door, provided a casual alternative (with high-top tables and bar stools) to the more formal main dining room.

186.    As a direct result of the Shutdown Orders, Harbor Chicago incurred direct physical loss and damage, and was rendered physically nonfunctional as a restaurant, bar, and private dining room space. Beginning in mid-March 2020, due to the Shutdown Orders, Harbor Chicago was required to cease all on-premises food and beverage service. With its dining room and bar spaces rendered physically nonfunctional for their intended purposes, Harbor Chicago closed its doors and remained completely closed for weeks because it was structurally and/or economically infeasible to operate. Harbor Chicago eventually reopened for takeout only, but had to physically reconfigure its interior dining spaces, including by physically rearranging furniture, such as moving tables, chairs, and other fixtures intended for in-restaurant dining out

of service to convert areas of the premises into takeout staging, storage, and pick-up areas. In addition, Harbor Chicago physically marked off tables as nonfunctional in accordance with the Shutdown Orders' ban on on-premises food and beverage service.

187.    As a result of the restrictive Reopening Orders, Harbor Chicago remains physically impaired and has been required to make substantial detrimental physical alterations to its premises. In June 2020, when restaurants in Chicago were permitted to resume on-premises food service in outdoor spaces only, Harbor Chicago was required to physically alter its façade by keeping its large front French doors, which previously stayed closed, open during service. As a result of the orders' restrictive outdoor-dining and social-distancing requirements—including that all tables be placed at least six feet apart—Harbor Chicago's functional dining space was reduced, for weeks, to only three tables, seating a total of only 10 patrons at a time.

188.    Even after limited indoor on-premises dining was permitted in late-June 2020, due to the Shutdown and Reopening Orders' continued spatial restrictions, only a small portion of Harbor Chicago's indoor space has been functional for in-restaurant dining. As of the filing of this Complaint, the restaurant's total maximum capacity is currently reduced from 168 guests to approximately 40 guests. In addition, due to the continued social-distancing requirements, including the mandate that all tables and unrelated parties at bar areas be at least six feet apart, Harbor Chicago has had to detrimentally rearrange the restaurant's furniture and equipment, and erect physical barriers between tables. Pursuant to the Shutdown and Reopening Orders' prohibitions on large group gatherings, Harbor Chicago's private dining rooms remain nonfunctional for their intended purpose of serving private parties.

189.    As a direct result of the Shutdown and Reopening Orders, Harbor Chicago has suffered substantial losses, in an amount that will be proven at trial.

56

FILED DATE: 7/30/2020 9:01 PM     2020L008099

190.    At all relevant times, Harbor Chicago has had in place an all-risk commercial property insurance policy, entitled Businessowners Policy (BP18042212-1), effective January 10, 2020, with Society. Under this Policy, Society agreed to cover Harbor Chicago for "the actual loss of Business Income [it] sustain[s] due to the necessary suspension of [its] 'operations' during the 'period of restoration,'" where "[t]he suspension [was] caused by direct physical loss of or damage to covered property at the described premises." In addition, Society also agreed to pay for "Extra Expense."

191.    In May 2020, Harbor Chicago submitted its notice of claim to Society for covered losses.

192.    In June 2020, Society denied coverage to Harbor Chicago without any valid justification

**J.      Third Coast Hospitality**

193.    Third Coast Hospitality is a family owned and operated collection of restaurants and event venues that presents the Chicago experience, reimagined. Started as a single-location family business, Third Coast Hospitality has grown into a multistate operation that features seven attractive venues that can hold formal and informal events of 20 or galas of 2,000. From industrial to ornate, historic to cutting edge, transformative to stylized, Third Coast Hospitality venues are perfect for a night out, corporate event, major celebration, and more.

194.    Third Coast Hospitality operates five distinct concepts, each with its own personality and unique style.

- ***Old Crow Smokehouse*** brings barbeque styles from the Carolinas, Memphis, Kansas City, and Texas. The menu features Southern cocktails at its large and friendly bar and a communal dining experience. The Old Crow Smokehouse

57

FILED DATE: 7/30/2020 9:01 PM    2020L008099

locations, in Wrigleyville and River North in Chicago as well as in California, also feature live country music on weekend nights.

- *Moe's Cantina* has two Chicago locations that boast authentic Northern Mexican cuisine in Chicago's Wrigleyville and River North neighborhoods. Moe's features delicious Mexican cuisine based on generations-old family recipes from Third Coast Hospitality's founder. Guests love the signature cocktails and lively atmosphere at Moe's.

- *Cava Room* sits in Chicago's River North neighborhood, on the second floor of Moe's Cantina, and melds accents, culture, and art with a Spanish flair in a lively yet intimate space. With hand-painted murals, dazzling chandeliers, and vintage Spanish-rustic furniture, Cava Room gives guests the room to join for live DJs, creative cocktails, and mingling in its Spanish lounge.

- *Encanto* also sits nestled in Moe's Cantina in River North. With a mezcal-focused cocktail list and tapas on the menu, Encanto has joined the burgeoning agave scene in River North. This bar and tapas spot draws influence from the history, culture, and layers of flavor of mescal, and dedicates its business to sustainability and supporting those who put care and attention into the production of tequila and agave.

- *Tunnel* is Chicago's premier lounge and sits nestled above the River North location of Old Crow Smokehouse. The space can host up to 575 guests in its nearly 5,000 square feet with a retractable roof that opens to a view of the Chicago skyline.

FILED DATE: 7/30/2020 9:01 PM    2020L008099

195.    Until March 2020, each Third Coast Hospitality venue was buzzing with guests and brimming with activity. In addition to daily food and drink service, the venues hosted intimate gatherings, live events (dozens each week), private parties, meetings, business functions, and celebrations. Prior to the Shutdown Orders, Third Coast's venues were regularly filled with customers standing shoulder-to-shoulder enjoying drinks from the bar, sharing food, or singing along to the venues' live music.

196.    As a direct result of the Shutdown Orders, Third Coast Hospitality's venues have incurred direct physical loss and damage and all were rendered non-functional for their intended purpose. All of Third Coast Hospitality's venues completely closed to all in-person service in mid-March, 2020. A handful of Third Coast Hospitality's restaurants shifted to a carry-out and delivery only model, but each venue's core function—hosting crowds and lively groups in large dining rooms, bars, and event spaces—was impaired in its entirety. Moreover, as a result of the Shutdown Orders' limitations on gatherings, all live music events have been cancelled at Third Coast Hospitality's venues, as have more than 120 large events.

197.    Thereafter, as a result of the restrictive Reopening Orders, Third Coast Hospitality's venues have remained in a physically impaired state. In early-June, Third Coast Hospitality was able to reopen its outdoor dining areas at a drastically reduced capacity. In late-June, Third Coast Hospitality's concepts were reopened for indoor dining at a mere 25% of their maximum capacities. For example, the River North location of Old Crow Smokehouse normally has 707 seats on its first floor and can seat another 125 guests on its rooftop—now, it can only seat 133 guests on its first floor and 90 on the rooftop. Throughout, Third Coast Hospitality venues have had to close all of bars for seating and remove bar area tables and chairs. More importantly, as a result of the orders, Third Coast Hospitality venues may not host the large and

diverse events that are the company's bread and butter—and the venues thus cannot function for their intended purpose.

198.     As a direct result of the Shutdown and Reopening Orders, Third Coast Hospitality has suffered substantial losses, in an amount that will be proven at trial.

199.     Third Coast Hospitality has at all relevant times had in place an all-risk insurance policy, entitled Property Coverage Form (Policy No. SLSTPTY11266620), effective February 22, 2020 with insurer Starr Surplus Lines. The Policy includes as Additional Named Insureds the array of Third Coast Hospitality venues—including Old Crow Smokehouse, Moe's Cantina, Tunnel, Cava Room, and Encanto. Under the Policy, each of Third Coast Hospitality's venues are insured "against all risks of direct physical loss or damage to covered property," except as excluded or limited by the Policy. Starr Surplus Lines also agreed to pay for all loss "directly resulting from necessary interruption" of Third Coast Hospitality's business operation "caused by direct physical loss or damage to real or personal property" covered under the Policy. In addition, Starr Surplus Lines also agreed to pay for "Extra Expense."

200.     In May 2020, Third Coast Hospitality submitted its notice of claim, covering each of its venues, to Starr Surplus Lines for covered losses.

201.     On information and belief, Starr Surplus Lines is expected to deny coverage without any valid justification.

**K.     Hubbard Inn**

202.     Hubbard Inn is one of the most well-known restaurants in Chicago's River North neighborhood. Hubbard Inn is a neighborhood staple, located just steps from many business and famous eateries—in the center of River North's nightclub scene. It offers contemporary upscale dining as well as an electric cocktail lounge. Hubbard Inn provides guests a unique European club atmosphere in the heart of a Midwestern city.

60

203. Before the Shutdown Orders—and after $1.4 million in renovations—Hubbard Inn reopened late last year to immense fanfare. Its multi-story renovated premises held up to 760 guests at one time. The large first-floor interior space featured a central oval-shaped bar—which was regularly crowded with guests standing shoulder-to-shoulder—surrounded by many intimate, secluded booths. The second floor consisted of a festive, party-focused lounge and cocktail bar, named Blue Violet, which featured an elevated DJ booth and was a popular venue for birthdays, bachelorette parties, and other special occasion celebrations.

204. As a direct result of the Shutdown Orders, Hubbard Inn incurred direct physical loss and damage and was rendered non-functional as a restaurant, bar, and nightclub. In mid-March 2020, due to the Shutdown Orders, Hubbard Inn was required to cease all in-person dining and service. With its dining and bar spaces rendered physically nonfunctional for their intended purpose, Hubbard Inn closed its doors in March and remained completely closed for approximately three months.

205. Due to the numerous restrictions in the Reopening Orders, Hubbard Inn's premises remain physically impaired, and Hubbard Inn has been required to make detrimental physical alterations to its premises. For example, in June 2020, when restaurants in Chicago were permitted to resume on-premises food service in outdoor spaces only, Hubbard Inn was required to make substantial physical modifications to its outdoor premises—including erecting a new patio and rearranging furniture and equipment—as a result of the orders' requirement that all tables be placed at least six feet apart. Then in late-June 2020, due to the Shutdown and Reopening Orders' continued restrictions, Hubbard Inn was permitted to reopen only a small portion of its indoor space for in-restaurant dining. As a result of the orders' social distancing requirements, Hubbard Inn's maximum occupancy has been reduced to a fraction of its former

FILED DATE: 7/30/2020 9:01 PM    2020L008099

FILED DATE: 7/30/2020 9:01 PM    2020L008099

760-guest capacity. In addition, Hubbard Inn has had to erect plexiglass barriers and other physical structures as a result of the orders. The six-foot social-distancing and other requirements that remain in place have rendered much of Hubbard Inn's second-floor nonfunctional for its intended purpose of serving as a dance floor and group congregation space.

206.    As a direct result of the Shutdown and Reopening Orders, Hubbard Inn has suffered substantial losses, in an amount that will be proven at trial.

207.    At all relevant times, Hubbard Inn has had in place an all-risk commercial property insurance policy, to wit Policy Number: BKS(20) 54 82 95 63, effective July 26, 2019, with Ohio Security, an affiliate of Liberty Mutual. Under that Policy, Ohio Security agreed to pay for "the actual loss of Business Income [Hubbard Inn] sustain[s] due to the necessary 'suspension' of [its] 'operations' during the 'period of restoration,'" where the "'suspension' [was] caused by direct physical loss of or damage to property" at the covered premises. In addition, Ohio Security also agreed to pay for "Extra Expense."

208.    In March 2020, Hubbard Inn submitted its notice of claim to Ohio Security for covered losses.

209.    On March 30, 2020, Ohio Security denied coverage to Hubbard Inn without any valid justification.

### L.    Tandoor Char House

210.    Tandoor Char House is a family owned and operated restaurant in Chicago's Lincoln Park neighborhood that serves a unique Indian and Pakistani fusion cuisine based on family recipes. Faraz Sardharia, the owner of Tandoor Char House, and his brother Fahim Sardharia, learned from their mother and father how to use the finest Indian and Pakistani ingredients and techniques to create Tandoor Char House's one-of-a-kind blended cuisine. Their goal was to create an intimate and exclusive dining space.

FILED DATE: 7/30/2020 9:01 PM    2020L008099

211.    Until mid-March 2020, Tandoor Char House was a small but busy restaurant with a 40-seat dining room. Prior to the Shutdown Orders, Tandoor Char House was so busy, it had to institute a two-hour time limit for tables. The restaurant would serve approximately 100 to 120 guests per weekend night. The dining room consisted of more than a dozen tables spaced close together to maximize seating in the restaurant's small space.

212.    As a direct result of the Shutdown Orders, Tandoor Char House incurred direct physical loss and damage and was rendered physically nonfunctional as a restaurant. In mid-March 2020, due to the Shutdown Orders, Tandoor Char House was required to cease all on-premises dining and service. As a result, Tandoor Char House closed its dining room. The restaurant's dining room remains closed as of the filing of this Complaint—now shuttered for more than four months.

213.    With its premises rendered nonfunctional for their intended purpose—on-premises food and beverage service—Tandoor Char House transitioned to a takeout-only business. Under the Shutdown Orders, in order to remain open for the limited purpose of providing takeout service, Tandoor Char House was required to make material physical alterations to its premises. Tandoor Char House had to physically repurpose its dining room space, including by physically rearranging furniture, equipment, and other aspects of its premises to serve as takeout staging and storage areas.

214.    Thereafter, as a result of the restrictive Reopening Orders, Tandoor Char House remains physically impaired, and it has been required to make additional detrimental physical alterations to its premises. Tandoor Char House reopened its patio for outdoor dining in July 2020—subject to the orders' severe restrictions on the patio's physical space, including the requirement that all tables be six feet apart. As a result of the spatial restrictions, Tandoor Char

FILED DATE: 7/30/2020 9:01 PM    2020L008099

House was required, among other things, to physically separate spaces, remove tables and chairs, or rearrange furniture and equipment.

215.    As a direct result of the Shutdown and restrictive Reopening Orders, Tandoor Char House has suffered substantial losses, in an amount that will be proven at trial.

216.    Tandoor Char House has at all relevant times had in place an all-risk insurance policy, entitled Businessowners Policy (No. BP41552), effective March 25, 2020, with Illinois Casualty. Under this Policy, Illinois Casualty agreed to cover Tandoor Char House for "loss of Business Income" sustained during a necessary suspension of operations during a period of restoration, where the suspension was caused by "direct physical loss of or damage to" Tandoor Char House's covered property. In addition, Illinois Casualty also agreed to pay for "Extra Expense."

217.    In May 2020, Tandoor Char House submitted its notice of claim to Illinois Casualty for covered losses.

218.    In May 2020, Illinois Casualty denied coverage without any valid justification.

**M.    HVAC Pub**

219.    HVAC Pub is a staple of Chicago's Wrigleyville neighborhood that Chicagoans and tourists alike—especially fans of the Chicago Cubs—flock to for live music, good food, and a lively sports bar atmosphere. HVAC Pub prides itself on being a pillar of the Wrigleyville community.

220.    Before the Shutdown Orders, HVAC Pub was a 340-seat establishment that consisted of a sports bar, private event spaces, and a large elevated stage with multiple floors overlooking it, where guests congregated to watch live music performances. HVAC Pub typically hosted a concert every weekend, headlined by a "battle of the bands" type performance,

where two well-known music groups "battled" late into the night. HVAC Pub provided a uniquely Chicago live music experience.

221.    As a direct result of the Shutdown Orders, HVAC Pub incurred direct physical loss and damage, and was rendered physically nonfunctional as a bar and live music venue. Beginning in mid-March 2020, due to the Shutdown Orders, HVAC Pub was required to cease all on-premises food and beverage service and was also required to cease all concert performances. With its bar and concert venue spaces rendered physically nonfunctional for their intended purposes, HVAC Pub closed its doors for months.

222.    In late-June 2020, HVAC Pub reopened for on-premises food and beverage service—at the heavily reduced capacities required by the restrictive Reopening Orders. As a result of these Orders, HVAC Pub's premises remain physically impaired, and HVAC Pub has been required to make detrimental physical alterations to its premises. For example, HVAC Pub physically reconfigured its premises to convert its indoor dining space into outdoor dining— detrimentally rearranging the restaurant's furniture and equipment, inside and out—as a result of the Shutdown and Reopening Orders' requirements, including that all tables and unrelated parties at bar areas be at least six feet apart. Due to the Shutdown and Reopening Orders' social distancing requirements, HVAC Pub's maximum occupancy has been reduced to a fraction of its former 340-guest capacity. Pursuant to the Shutdown and Reopening Orders' restrictions and prohibitions on large group gatherings, HVAC Pub's concert space remains nonfunctional as of the filing of this Complaint.

223.    As a direct result of the Shutdown and Reopening Orders, HVAC Pub has suffered substantial losses, in an amount that will be proven at trial.

224. At all relevant times HVAC Pub has had in place an all-risk insurance policy, entitled Businessowners Policy (Policy Number BP37220) effective February 20, 2020, with Illinois Casualty. Under this Policy, Illinois Casualty agreed to cover HVAC Pub "for the actual loss of Business Income [it] sustain[s] due to the necessary suspension of [its] 'operations' during the 'period of restoration,'" where "[t]he suspension [was] caused by direct physical loss of or damage to property at the described 'premises.'" In addition, Illinois Casualty also agreed to pay for "Extra Expense."

225. In March 2020, HVAC Pub submitted its notice of claim to Illinois Casualty for covered losses.

226. In March 2020, Illinois Casualty denied coverage to HVAC Pub without any valid justification.

**N.      L3 Hospitality**

227. L3 Hospitality is a restaurant group that operates four different restaurants in Chicago and Evanston. Originating in Palo Alto, California, L3 Hospitality's goal is simple: to provide good food that is also good for you. L3 Hospitality creates delicious dishes served by friendly people in attractive environments, and has a strong sense of duty to the communities it serves.

228. ***Lyfe Kitchen***, one of L3 Hospitality's two restaurant concepts, is a fast-casual restaurant focusing on healthy and fresh food. Lyfe Kitchen operates at three locations in Chicago's River North, Gold Coast, and Streeterville neighborhoods. ***Next of Kin***, L3 Hospitality's second concept, is a restaurant and casual café combination in Evanston. Featuring a robust menu for breakfast, lunch, and dinner, L3 Hospitality's eateries also offer a selection of unique desserts and beverages.

66

FILED DATE: 7/30/2020 9:01 PM    2020L008099

FILED DATE: 7/30/2020 9:01 PM   2020L008099

229.    Prior to the Shutdown Orders, L3 Hospitality's restaurants were filled with customers during the lunch and dinner rush hours. Each of L3 Hospitality's locations boasts roughly 3,000 to 5,000 square feet, each with a large kitchen and seating for about 100 guests at a combination of tables, booths, and patio spaces.

230.    As a direct result of the Shutdown Orders, each of L3 Hospitality's locations incurred direct physical loss and damage and were rendered physically nonfunctional as restaurants. In mid-March 2020, due to the Shutdown Orders, L3 Hospitality was required to cease all on-premises food and beverage service. With its dining spaces rendered physically nonfunctional for their intended purposes, L3 Hospitality closed all of its locations except for Lyfe Kitchen in Streeterville, which remained open for limited carryout and delivery service only. In accordance with the Shutdown Orders, in order to remain open for the limited purpose of providing carry-out and delivery, Lyfe Kitchen was required to make detrimental physical alterations to its premises. L3 Hospitality had to completely reconfigure this location, such as by installing plexiglass barriers by the counter; moving tables and other furniture out of the dining space and into storage; and reconfiguring the routes of customer traffic flow.

231.    As a result of the restrictive Reopening Orders, each of L3 Hospitality's locations remain physically impaired and it has been required to make substantial detrimental physical alterations to each of its locations' premises. For example, in mid-June 2020, L3 Hospitality began to gradually reopen its locations for on-premises dining service—at the heavily reduced capacities required by the Reopening Orders. As a result of the orders' spatial social-distancing restrictions, L3 Hospitality's establishments were required to physically reconfigure outdoor and indoor dining spaces and detrimentally alter their physical premises, including by repositioning POS stations, moving tables and chairs into storage, and rearranging furniture to ensure the

67

required six feet between every table. For those tables that could not be removed but were rendered nonfunctional due to the social-distancing requirements, L3 Hospitality had to physically block them off and designate them as nonfunctioning.

232. The physical impairments to L3 Hospitality's premises, including those mentioned above, have had a dramatic detrimental impact on its establishments: each of its restaurants had an average of 100 seats available to serve guests before the Shutdown and Reopening Orders went into effect—now, as a result of the six-foot social distancing requirements, seventy-five percent of those seats and dozens of tables are entirely nonfunctional.

233. As a direct result of the Shutdown and Reopening Orders, L3 Hospitality has suffered substantial losses, in an amount that will be proven at trial.

234. At all relevant times, L3 Hospitality had in place an all-risk insurance policy, entitled Commercial Protector Policy (Policy No. BZS (20) 56 83 22 49), effective July 24, 2019, with Ohio Security, an affiliate of Liberty Mutual. Under the Policy, Ohio Security agreed to pay for all "loss of Business Income" sustained during a period of suspension of L3 Hospitality's operations caused by "direct physical loss of or damage to" its insured property. In addition, Ohio Security agreed to pay for "Extra Expense."

235. In March 2020, L3 Hospitality submitted its notice of claim to Ohio Security for covered losses.

236. In March 2020, Ohio Security denied coverage without any valid justification.

**O.      Smyth & The Loyalist**

237. Smyth & The Loyalist operates two eateries in Chicago's West Loop neighborhood: Smyth and The Loyalist. The owners of Smyth & The Loyalist have worked at some of the most famous and well-known Chicago-area restaurants. Smyth is a 95-seat fine-dining restaurant inspired by the owners' time in Virginia. Smyth is the owners' primary

FILED DATE: 7/30/2020 9:01 PM    2020L008099

restaurant, providing guests with an extensive and hand-picked tasting menu and more modern atmosphere. The Loyalist is a 91-seat neighborhood bar and restaurant with French inspiration, well known for its award-winning burger. The Loyalist was created to be a more casual locale, with an upscale neighborhood bar feel.

238.    Before the Shutdown Orders, Smyth & The Loyalist was able to welcome scores of visitors through its doors to try its tasty menus and famous burger. The Loyalist is located in the basement below Smyth. Prior to the Shutdown Orders, when customers walked down the stairs to the entrance, they were greeted by a host and directed to the bar or one of the restaurant's many tables, booths, and high-top tables for group seating. Because of The Loyalist's relatively small square footage, the tables were placed in close proximity to one another to maximize capacity.

239.    As a direct result of the Shutdown Orders, Smyth & The Loyalist incurred direct physical loss and damage, and both Smyth and The Loyalist were rendered physically nonfunctional as restaurants and private event spaces. Beginning in mid-March 2020, due to the Shutdown Orders, Smyth & The Loyalist was required to cease all on-premises food and beverage service at both of its restaurants.

240.    The Shutdown Orders forced Smyth & The Loyalist to alter its physical space to be compatible with permitted takeout-only service. As the restaurants began to open in late June 2020, the layout of the dining room was physically altered to provide a consistent directional flow and prevent lines and other ways of congregating. Smyth and The Loyalist have gone from a maximum capacity of over 90 guests each to a *combined* maximum capacity of no more than 25 guests, with only 14 people allowed inside at each location.

69

FILED DATE: 7/30/2020 9:01 PM    2020L008099

241.    As a result of the restrictive Reopening Orders, Smyth & The Loyalist remains physically impaired and has been required to make substantial detrimental physical alterations to both restaurants' premises. The restaurants' bar areas are now restricted to preparing and packaging takeout orders and remain physically nonfunctional for their intended purposes. The tables and chairs, formerly organized throughout the dining space, have been moved and stacked against the walls, shrinking the space that is functional to prepare orders. Furniture intended for on-premises dining has been replaced by rolling racks storing disposable containers and other items for takeout service. And in adherence with the Shutdown and restrictive Reopening Orders, Smyth & The Loyalist has erected signs to redirect the physical routes for customer traffic around the restaurants' premises.

242.    The restaurants' 6,700 square-foot space is no longer physically functional as a restaurant and a private event space. For example, the host stand, formerly inside the premises, has been physically moved outside, and tables, once clustered together, have now been physically moved to be at least six feet apart in every direction. While Smyth now has a patio, the Reopening Orders' spatial restrictions drastically reduced the space that would otherwise be available for seating and required erecting physical barriers.

243.    As a direct result of the Shutdown and restrictive Reopening Orders, Smyth & The Loyalist has suffered substantial losses, in an amount that will be proven at trial.

244.    At all relevant times, Smyth & The Loyalist has had in place an all-risk commercial property insurance policy, entitled Commercial Property Coverage (No. ECP 039 65 99), effective July 26, 2019, with Cincinnati. Under the Policy, Cincinnati would pay for "the actual loss of 'Business Income'" and the "Extra Expense" that Smyth & The Loyalist "sustain[s] due to the necessary 'suspension' of [its] 'operations' during the 'period of

70

restoration,'" where "[t]he 'suspension' [was] caused by direct 'loss' to property at a 'premises' caused by or resulting from any Covered Cause of Loss."

245.    In March 2020, Smyth & The Loyalist submitted its notice of claim to Cincinnati for covered losses.

246.    In June 2020, Cincinnati denied coverage to Smyth & The Loyalist without any valid justification.

**P.    Mac Parent**

247.    Mac Parent operates two unique but classic American dining concepts with 80 locations across 27 states, including Illinois.

248.    ***Sullivan's Steakhouse***, the first concept, offers an unforgettable fine-dining steakhouse experience complete with the sounds of jazz music and a friendly, familiar atmosphere. Sullivan's is rooted in rich traditions, but with a lively twist. The vibrant neighborhood locations feature the finest steaks, seafood, and cocktails, set against an elegant and carefully tailored backdrop.

249.    Until March 2020, each Sullivan's Steakhouse location served hundreds of guests each day—couples out for a night on the town, families celebrating special events, and individuals seeking to unwind in rarefied chophouse air. The image below depicts a typical Sullivan's restaurant primed for service:

71

FILED DATE: 7/30/2020 9:01 PM 2020L008099



250.    ***Romano's Macaroni Grill***, the second concept, specializes in polished yet casual Italian-American cuisine. The first Macaroni Grill was founded by restauranteur Phillip Romano in 1988. Driven by a belief that flavors and details make the meal, Romano's Macaroni Grill crafts its menu from key ingredients from small, family-owned Italian farms and still carries out that menu with the same attention to detail that Phil Romano gave when he wrote the original recipe book.

251.    Until March 2020, each Macaroni Grill location served hundreds of guests—individuals, families, coworkers, and friends—offering a chef-driven, evolving menu rooted in Italian tradition and infused with inventive, modern flavors. The image included below depicts a typical Macaroni Grill dining room before the Shutdown Orders went into effect:

FILED DATE: 7/30/2020 9:01 PM    2020L008099



252.    As a direct result of the Shutdown Orders, Sullivan's Steakhouse and Macaroni Grill incurred direct physical loss and damage and were rendered non-functional as restaurants. Beginning in mid-March, every Sullivan's Steakhouse and Macaroni Grill location completely closed all in-person dining services. Although most locations remained open only for limited carry-out and delivery service, to facilitate this limited operation under the Shutdown Orders, Macaroni Grill and Sullivan's locations reintroduced a curbside option for carry-out orders. In addition, in adherence with the Shutdown Orders' requirements, these locations installed plexiglass to create physical barriers for any customers or delivery personnel coming inside the restaurants. Some of the restaurants also cordoned off bar areas to prevent access to those physical spaces. The dining room at each and every Sullivan's Steakhouse and Macaroni Grill lay dormant, ceasing to function as intended as a curated dine-in restaurant.

253.    Thereafter, as a result of the restrictive Reopening Orders, Sullivan's Steakhouse and Macaroni Grill remain physically impaired and have been required to make detrimental material alterations to their premises. The majority of locations remained closed for on-premises

FILED DATE: 7/30/2020 9:01 PM    2020L008099

dining until June 2020, and then could reopen in-restaurant dining services only subject to the Reopening Orders' severe restrictions on restaurant capacity and the physical space that is available for its intended function: serving guests on the restaurant premises. To maintain capacity reductions and/or social-distancing requirements, each Mac Parent restaurant has had to (among other things): cordon off bar areas, revise floor plans and layouts to account for the square footage lost within the locations, or designate tables as nonfunctioning. These impairments have been dramatic: at Macaroni Grill locations, for example, dozens upon dozens of tables with hundreds of seats have been rendered nonfunctional. Due to the impairments caused by the Shutdown and Reopening Orders, the Sullivan's Steakhouse and Macaroni Grill locations now open are operating as a fraction of their pre-Shutdown Order selves.

254.    As a direct result of the Shutdown and Reopening Orders, Mac Parent (via Sullivan's Steakhouse and Macaroni Grill) has suffered substantial losses, in an amount that will be proven at trial.

255.    Through Mac Parent, each Sullivan's Steakhouse and Macaroni Grill location has at all relevant times had in place an all-risk insurance policy, Leading Edge All-Risk General Property (Policy No. NAP 2002449-01), effective April 17, 2019 with insurer North American Elite. The Policy insures "all risks of direct physical loss or damage to" any insured property. In addition, North American Elite agreed to cover Mac Parent for "Actual Loss Sustained" at Sullivan's Steakhouse and Macaroni Grill locations during the "Period of Liability" from "direct physical loss or damage" at any of the Policy's covered locations. North American Elite also agreed to pay for "Extra Expense."

FILED DATE: 7/30/2020 9:01 PM    2020L008099

256.    In June 2020, Mac Parent submitted to North American Elite a notice of claim covering all insured entities including Sullivan's Steakhouse and Macaroni Grill for covered losses.

257.    On information and belief, North American Elite is expected to deny coverage without any valid justification.

### Q.    The DuSable Museum of African American History

258.    The DuSable Museum is dedicated to the study and conservation of African-American history, culture, and art in Chicago. Founded in 1961, it quickly became a staple of the world-renowned Chicago museum landscape. The museum is located in Washington Square Park, on the South Side of the city, and is affiliated with the Smithsonian.

259.    Before the Shutdown Orders, the DuSable Museum welcomed visitors from all over the world to view some of the most acclaimed works of African-American artists, including the Thomas Miller mosaics. In addition to its recent exhibition expansion, the museum has an auditorium that hosts community-related events, such as a jazz and blues music series, poetry readings, film screenings, and other cultural events. The museum has five large exhibition rooms that house invaluable works of art. Prior to the Shutdown Orders, these rooms could hold hundreds of visitors at a time. The DuSable Museum also has private event spaces, which, prior to the Shutdown Orders, were regularly booked for corporate and other events, with space for up to 800 guests.

260.    As a direct result of the Shutdown Orders, the DuSable Museum incurred direct physical loss and damage, and was rendered physically nonfunctional as a museum and private event space. Beginning in mid-March 2020, due to the Shutdown Orders, the DuSable Museum was required to close its doors to the public. As a result, the DuSable Museum was forced to

FILED DATE: 7/30/2020 9:01 PM    2020L008099

cancel several private and public events that had been scheduled for its large and small
auditoriums.

261.    As a result of the restrictive Reopening Orders, the DuSable Museum remains
physically impaired and has been required to make substantial detrimental physical alterations to
its premises. As a result of the orders, the museum has been forced to shut down many of its
exhibitions that contain audio/visual content during which visitors utilized communal headsets.
Due to the restrictive Reopening Orders, including the six-foot social distancing requirements,
substantial space within the museum has been rendered nonfunctional. In addition, as a result of
the Reopening Orders' restrictions, the DuSable Museum must install plexiglass on every
counter that customers approach, affix plastic partitions to ensure required social distance and
one-way movement, and post signs and markings to ensure that visitors understand the social
distancing requirements.

262.    As a direct result of the Shutdown and restrictive Reopening Orders, the DuSable
Museum has suffered substantial losses, in an amount that will be proven at trial.

263.    At all relevant times, the DuSable Museum has had in place an all-risk
commercial property insurance policy, entitled Cultural Institutions Insurance Program (No.
3589-21-25 WUC), effective October 21, 2019, with Vigilant. Under that Policy, Vigilant agreed
to cover the DuSable Museum for "the actual business income loss [it] incur[s] due to the actual
impairment of [its] operations" and "extra expense" incurred where "[t]his actual or potential
impairment of operations" is "caused by or result[s] from direct physical loss or damage by a
covered peril to property."

264.    In April 2020, the DuSable Museum submitted its notice of claim to Vigilant for
covered losses.

FILED DATE: 7/30/2020 9:01 PM    2020L008099

265.    In May 2020, Vigilant denied coverage to the DuSable Museum without any valid justification.

**R.    Old Grounds Social**

266.    Old Grounds Social is a neighborhood sports bar in the heart of Chicago's Lincoln Park neighborhood. Offering bar and board games, nightly events, and private event space, Old Grounds Social provides Chicago with a place to get quality BBQ, listen to good music, and watch live sports on its 30 TVs.

267.    Before the Shutdown Orders, Old Grounds Social's interior space, with a maximum capacity of 142, was packed with crowds of people surrounding fixed booths throughout the interior of the bar, as music played overhead. The space was designed so guests could move around, either to get a drink at the bar or meet up with friends. In the summer, particularly on days the Cubs were playing, Old Grounds Social's patio was full, with a maximum capacity of 54, as fans of Chicago summers played darts, pool, and many of the other large games scattered throughout the bar.

268.    As a direct result of the Shutdown Orders, Old Grounds Social incurred direct physical loss and damage, and was rendered physically nonfunctional as a restaurant, bar, and private event space. Beginning in mid-March 2020, due to the Shutdown Orders, Old Grounds Social was required to cease all on-premises food and beverage service. While Old Grounds Social's patio was able to open in June 2020, its functional patio space was heavily reduced to the orders' restrictions. Its patio was limited to less than 30 people because the tables and chairs had to be physically reconfigured as a result of requirements mandating that tables be spaced at least six feet apart. Indeed, due to this physical distancing requirement, Old Grounds Social had to permanently cut and shorten its bar by about six feet in order to provide the requisite spacing

between tables: an example of direct, permanent, physical damage to Old Grounds Social's property that will be detrimental to its long-term business.

269.    As a result of the restrictive Reopening Orders, Old Grounds Social has remained physically impaired and has been required to make substantial detrimental physical alterations to its premises. Because the booths within Old Grounds Social are fixed and immovable, the Reopening Orders required Old Grounds Social to install plexiglass partitions between each booth. Even with these physical partitions, however, many booths have become nonfunctional as dining areas because, under the Reopening Orders, guests cannot be seated in adjoining booths and must be sufficiently spaced apart. Old Grounds Social has also had to remove essential items from its large bar games area, typically complete with a dart board and pool table. Due to the Reopening Orders' restrictions, the bar games area has been rendered off-limits to guests—*i.e.*, the space is nonfunctional for its intended purpose.

270.    As a direct result of the Shutdown and Reopening Orders, Old Grounds Social has suffered substantial losses, in an amount that will be proven at trial.

271.    At all relevant times, Old Grounds Social has had in place all-risk commercial property insurance policies, both entitled Commercial Policy Program (No. 00711-69369), effective June 1, 2019 and June 1, 2020, with Badger Mutual. Under that Policy, Badger Mutual agreed to pay for "the actual loss of Business Income [Old Grounds Social] sustain[s] due to the necessary suspension of [its] operations during the period of restoration," where "[t]he suspension [was] caused by direct physical loss of or damage to property at the described premises." In addition, Badger Mutual also agreed to pay for "Extra Expense."

272.    In March 2020, Old Grounds Social submitted its notice of claim to Badger Mutual for covered losses.

FILED DATE: 7/30/2020 9:01 PM    2020L008099

FILED DATE: 7/30/2020 9:01 PM    2020L008099

273.    In March 2020, Badger Mutual denied coverage to Old Grounds Social without any valid justification.

**S.    Peggy Notebaert Nature Museum**

274.    The Chicago Academy of Sciences, which operates as the Peggy Notebaert Nature Museum, was founded in 1857, so that enthusiasts and experts alike could study and share plant and animal specimens they collected. The museum continues to build on its legacy of natural history education and strives to create a positive relationship between people and nature through collaborations, education, research and collections, exhibitions, and public forums to grow its region's urban connection to the world of nature and science.

275.    Before the Shutdown Orders, families and visitors came to the Peggy Notebaert Nature Museum to see the various exhibits the museum offered, including the Butterfly Haven, Hands on Habitat, Riverworks, and Wilderness Walk. Upon arrival and purchasing a ticket, guests were invited to roam around the museum in whichever direction they wished. The self-curated layout included hands-on exhibits and play areas for children ages eight and under. The museum also has several large private event areas, which provided space for unique weddings, birthdays, and corporate events. These spaces included a south gallery (240 guest capacity), a terrace (240 guest capacity), and a ravine and lobby area (210 guest capacity). Overall, the museum could host events of up to 1,200 people.

276.    As a direct result of the Shutdown Orders, the Peggy Notebaert Nature Museum incurred direct physical loss and damage, and was rendered physically nonfunctional as a nature museum and private event space. Beginning in mid-March 2020, due to the Shutdown Orders, the Peggy Notebaert Nature Museum was required to close its door to visitors, and it remains closed as of the filing of this Complaint. A temporary exhibit at the museum contained live animals and needed to be terminated early, with the exhibit and related animals being returned to

the original owners. In addition, because the museum remains shuttered, it has not been able to host school field trips and summer camps.

277.     As a result of the restrictive Reopening Orders, the Peggy Notebaert Nature Museum remains physically impaired and has been required to make substantial detrimental physical alterations to its premises in order to meet the requirements for reopening to the public. As a result of the orders' restrictions, the Peggy Notebaert Nature Museum has had to reconfigure all of its public spaces. The museum is working to adapt as many exhibits as possible to the Reopening Orders' prohibition on hands-on exhibits. But many of the museum's exhibits are inherently too hands-on to be functional without this component. The museum continues to undergo extensive renovations as a result of the restrictive Reopening Orders. For example, the museum is removing the existing gift shop and café and reducing its seating associated with the café. It is also erecting guest traffic control barriers that reduce the space within the museum and has closed entire exhibits that are rendered nonfunctional due to the orders' requirements. In addition, the museum has installed plexiglass and other barriers to ensure that visitors follow social distancing requirements. As much as half of the museum's exhibit space has been diminished or rendered completely nonfunctional because of changes required by the Shutdown and restrictive Reopening Orders.

278.     In addition, the Peggy Notebaert Nature Museum has substantial private event space at which weddings, receptions, and other large public events were planned. These events have been canceled due to the Shutdown Orders, costing the museum several substantial deposits.

279.    As a direct result of the Shutdown and restrictive Reopening Orders, the Peggy Notebaert Nature Museum has suffered substantial losses, in an amount that will be proven at trial.

280.    At all relevant times the Peggy Notebaert Nature Museum has had in place an all-risk commercial property insurance policy, entitled Common Policy (No. EPP 049 73 42/EBA 049 73 42), effective July 1, 2018, with Cincinnati. Under the Policy, Cincinnati agreed to cover the Peggy Notebaert Nature Museum for "the actual loss of 'Business Income' … [it] sustain[s] due to the necessary 'suspension' of [its] 'operations' during the 'period of restoration,'" where "[t]he 'suspension' [was] caused by direct 'loss' to property at a 'premises' caused by or resulting from any Covered Cause of Loss." In addition, Cincinnati also agreed to cover "Extra Expense."

281.    In June 2020, the Peggy Notebaert Nature Museum submitted its notice of claim to Cincinnati for covered losses.

282.    In July 2020, Cincinnati denied coverage to the Peggy Notebaert Nature Museum without any valid justification.

**T.    Robert's Pizza**

283.    Robert's Pizza is a pizzeria and bar with more than 250 seats located in Chicago's Streeterville neighborhood. Started by a New York native, Robert Garvey, Robert's Pizza blends a dough recipe twenty years in the making, authentic brick ovens, and top-quality ingredients.

284.    Before the Shutdown Orders, Robert's Pizza successfully opened by the Chicago River in the spring of 2019. With its expansive riverside outdoor patio, Robert's Pizza was positioned to do well in the warming months in the spring and summer, scheduling several events, including some for St. Patrick's Day. The restaurant has a large bar surrounded by several tables, one main dining room with several tables for small groups, along with large

FILED DATE: 7/30/2020 9:01 PM    2020L008099

booths and long tables meant for large group dining and private events. Robert's Pizza has two outdoor patio spaces that overlook pristine areas of the city, including its magnificent waterfront.

285.    As a direct result of the Shutdown Orders, Robert's Pizza incurred direct physical loss and damage, and was rendered physically nonfunctional as a restaurant and private event space. Beginning in mid-March 2020, as a result of the Shutdown Orders, Robert's Pizza was required to cease all on-premises food and beverage service. Robert's Pizza was forced to close its bars and dining room, and halt its efforts to open the patio, rendering the spaces physically nonfunctional for their intended purposes. As a result of the Shutdown Orders, Robert's Pizza physically reorganized the interior space for the limited to-go orders that were placed, including by moving tables and chairs to create a prepping station in the main dining area. Robert's Pizza also reorganized its food preparation and cooking operation, including by moving its large kitchen equipment to accommodate the increased focus on to-go orders. The storage of non-functional indoor and outdoor seating rendered large portions of Robert's Pizza inaccessible. Additionally, Robert's Pizza closed off the bar area that had been rendered nonfunctional.

286.    Thereafter, as a result of the restrictive Reopening Orders, Robert's Pizza has remained in a physically impaired state and has been required to make detrimental material alterations to its premises. While the patio was allowed to open in a limited capacity in early June 2020, and limited indoor seating was allowed in late June 2020, Robert's Pizza is prohibited from returning the furniture and physical structures to their originally intended purposes.

287.    As a direct result of the Shutdown and restrictive Reopening Orders, Robert's Pizza has suffered substantial losses, in an amount that will be proven at trial.

288.    At all relevant times, Robert's Pizza has had in place an all-risk commercial property insurance policy, entitled Businessowners Policy (No. BP18012594-1), effective May

FILED DATE: 7/30/2020 9:01 PM    2020L008099

FILED DATE: 7/30/2020 9:01 PM    2020L008099

16, 2019, with Society. Under the Policy, Society agreed to pay for "the actual loss of Business Income [Robert's Pizza] sustain[s] due to the necessary suspension of [its] 'operations' during the 'period of restoration,'" where "[t]he suspension [was] caused by direct physical loss of or damage to covered property at the described premises." In addition, Society also agreed to pay for "Extra Expense."

289.    In March 2020, Robert's Pizza submitted its notice of claim to Society for covered losses.

290.    In March 2020, Society denied coverage to Robert's Pizza without any valid justification.

### U.    Fast Sandwich

291.    Fast Sandwich owns and operates 31 Jimmy John's sandwich shops—21 in the Chicago metropolitan area and 10 in Florida. Fast Sandwich prides itself on serving delicious, made-from-scratch sandwiches to business professionals who need a quick meal during the workday.

292.    Prior to the issuance of the Shutdown Orders, Fast Sandwich's locations—including those located in downtown Chicago—were packed with customers ordering their lunches at the counter and sitting down to eat at the restaurants' tables. Some locations had as many as 30 tables. Even the smaller of Fast Sandwich's restaurants held a dozen or more guests at once.

293.    As a direct result of the Shutdown Orders, Fast Sandwich's locations incurred direct physical loss and damage, and were rendered non-functional as restaurants. In mid-March 2020, with their dining room spaces rendered physically nonfunctional for their intended purpose, Fast Sandwich closed all of its locations in both Illinois and Florida, stacking tables on top of chairs, where they would remain for months. All of its locations remained completely

83

closed as a result of the Shutdown Orders until mid-May, at which point Fast Sandwich reopened certain locations for the limited function of providing takeout and delivery service. More than a third of Fast Sandwich's restaurants remained completely closed until early July 2020. As Fast Sandwich began to reopen some locations solely for takeout and delivery, each of these locations had to physically mark its tables "off limits" because the Shutdown Orders prohibited any on-premises food service. In addition, the locations that reopened for takeout and delivery had to install signage informing customers of the Shutdown Orders' six-foot social-distancing requirements. As a result of the Shutdown Orders, locations that previously fit dozens of customers at a time were reduced to a fraction of their previous permitted occupancy.

294.    As a direct result of the Shutdown and restrictive Reopening Orders, Fast Sandwich has suffered substantial losses, in an amount that will be proven at trial.

295.    At all relevant times, Fast Sandwich had in place two all-risk insurance policies, entitled Commercial Protector Policy (No. BZS (20) 58 08 26 30) (the "Illinois Policy") and Commercial Property Policy (No. BKS (20) 58 03 23 04) (the "Florida Policy"), both effective July 30, 2019, with Ohio Security, an affiliate of Liberty Mutual. Under the Illinois and Florida Policies, Ohio Security agreed to pay for the "actual loss of Business Income" and "Extra Expense" resulting from a period of suspension caused by the "direct physical loss of or damage to" Fast Sandwich's insured property.

296.    In March 2020, Fast Sandwich submitted its notice of claim to Ohio Security under both its Illinois and Florida Policies for covered losses.

297.    In March 2020, Ohio Security denied Fast Sandwich's claim under the Illinois Policy without any valid justification. In April 2020, Ohio Security denied Fast Sandwich's claim under the Florida Policy without any valid justification.

FILED DATE: 7/30/2020 9:01 PM    2020L008099

### V.    Roti

298.    Roti owns and operates 42 quick-service, casual dining restaurant locations across several states, serving fresh Mediterranean food. Roti has locations in Illinois, Washington D.C., Maryland, Minnesota, New York, Texas, and Virginia. Roti was created to share the founders' love of the Mediterranean's delicious flavors, wholesome ingredients, and bright spices. Roti's menu is rich in vegetables, olive oil, whole grains, and lean protein, providing customers with delicious and healthy food. Roti sources high-quality ingredients, prepares them simply, and serves them with pride.

299.    Roti locations are small, averaging a capacity of about 65 people. Roti customers enter the restaurant and approach a counter, where they place and then collect their orders. The customers can then take their food to the open-spaced communal area to eat at one of the restaurant's tables, booths, and high-top group seating. The space also includes communal self-service areas, such as beverage machines and utensil and napkin dispenser stations. The images below depict examples of Roti dining rooms in operation before March 2020:



FILED DATE: 7/30/2020 9:01 PM    2020L008099





FILED DATE: 7/30/2020 9:01 PM    2020L008099

300.    As a direct result of the Shutdown Orders, Roti has incurred direct physical loss and damage and the vast majority of their restaurants were rendered physically nonfunctional as restaurants. As of mid-March 2020, all but nine of Roti's locations were closed. Barring two additional restaurants that resumed business after they originally closed, the remaining 31 locations *remain* completely closed and nonfunctional. For the five locations in Chicago that remained open only for carryout and delivery service, the dining room spaces were rendered physically nonfunctional as a result of the Shutdown Orders' ban on on-premises food and beverage service. Those five locations in Chicago were opened in early-June for outdoor dining—at the severely limited capacities required by the restrictive Reopening Orders. Roti also reopened select other locations, in accordance with the restrictive Reopening Orders in late-June, to limited on-premises dining services. However, given the small capacity of Roti's space, most of Roti's dining room and seating remain physically nonfunctional for their intended purposes.

301.    As a result of the restrictive Reopening Orders, Roti has remained in a physically impaired state and has been required to make detrimental material alterations to its premises. Roti has had to physically remove or stack tables and chairs to ensure proper six-foot social distancing as required by the Shutdown and restrictive Reopening Orders. Many of the tables not removed are communal seating spaces, like high-top tables or counter-like seating, much of which has also been rendered physically nonfunctional. Roti has marked off tables that are nonfunctional with placards to maintain the required spatial distancing. In addition, Roti has physically changed its space, including by erecting plexiglass barriers and reconfiguring furniture. Finally, Roti has marked their physical space with floor stickers and hanging signs to direct customers' physical movement on the premises and to enforce required social distancing. The images below depict some of these physical changes at a representative location, including

FILED DATE: 7/30/2020 9:01 PM    2020L008099

the removal of tables and chairs from the dining rooms to provide the required distance between customers and marking certain tables as off-limits to maintain the required capacity limitations and social distance:





FILED DATE: 7/30/2020 9:01 PM    2020L008099

302.     As a direct result of the Shutdown and restrictive Reopening Orders, Roti has suffered substantial losses, in an amount that will be proven at trial.

303.     Roti has at all relevant times had in place an all-risk insurance policy, entitled Special Business Common Policy (No. P-630-6G219733-COF-20), effective January 1, 2020 with Charter Oak Fire. Under this Policy, Charter Oak Fire agreed to pay for "direct physical loss of or damage to" Roti's property "caused by or resulting from a Covered Cause of Loss," defined as "RISKS OF DIRECT PHYSICAL LOSS unless the loss is excluded. . . ." Charter Oak Fire also agreed to cover Roti for all loss of Business Income Roti sustains due to the necessary suspension of operations during a period of restoration, "caused by direct physical loss of or damage to" Roti's property. In addition, Charter Oak Fire agreed in the Policy to pay for "Extra Expense."

304.     In March 2020, Roti submitted its notice of claim to Charter Oak Fire for covered losses, citing the Shutdown Orders as the cause of loss.

305.     In April 2020, Charter Oak Fire denied coverage without any valid justification.

**W.     Urban Plates**

306.     Urban Plates prides itself on serving real food, made from scratch with sustainably sourced ingredients. The company's 19 locations across the country offer food that is not only tasty, but also good for the body, the spirit, and the environment at an affordable price point.

307.     Prior to the issuance of the Shutdown Orders, Urban Plates' locations frequently had lines of people out the door. As customers entered, they would progress through the different food stations, where chefs would serve selections of wholesome entrees, hand-tossed salads, hand-carved sandwiches, hot and cold sides, and scratch-made desserts. Customers ordered and dined in a setting where they could see their food being prepared, have a voice in customizing it

89

to their individual tastes, and took comfort in the dining-out experience feeling a lot like dining

at home.

308.     As a direct result of the Shutdown Orders, Urban Plates' locations incurred direct

physical loss and damage and were rendered non-functional as restaurants. Six locations closed

for several weeks, four of which (including those in malls, such as in the Washington, D.C.

metropolitan area) remain closed today. The locations which remained open or later reopened for

takeout and delivery were forced to completely change the essence of the Urban Plates

experience because the Shutdown Orders prohibited any on-premises food service. As a result of

the Shutdown Orders Urban Plates' service model had to be changed from one where the

customer walks the line and ordering at the individual stations to ordering at the register. The

chefs' stations—where guests had previously interacted with employees to make their food

selections—were physically blocked off, and large swaths of the premises that had previously

featured customers and employees were rendered non-functional. At those registers, each

location also installed a permanent plexiglass barrier at the counter to physically separate

customers from cashiers. The change in service system adversely impacted the consumer

experience.

309.     In addition, the locations that reopened for delivery and takeout service had to

install signage and floor markings informing customers of the Shutdown Orders' six-foot social-

distancing requirements. As a result of the Shutdown Orders, locations that previously

accommodated long lines of customers and groups of seated diners were reduced to a fraction of

their previously permitted occupancy. Likewise, when locations were permitted to resume on-

premises food service in outdoor spaces, the restrictive Reopening Orders required Urban Plates

90

FILED DATE: 7/30/2020 9:01 PM   2020L008099

to make detrimental physical alterations to its locations' premises, including placing all tables at least six feet from any other table.

310.    When Urban Plates resumed dine-in operations at some locations, they were forced to make detrimental physical alterations to their premises, including cutting interior walls to facilitate having food runners deliver food to the table as a result of change in service system where a customer orders at the point of sale instead of at the food stations, taking out half of the tables in the dining rooms and outdoor patios, changing configuration of the food service lines, installing and supplementing kitchen display systems, installing plexiglass barriers, and installing floor markers to keep customers apart.

311.    As a result of the Shutdown and Reopening Orders, Urban Plates has suffered substantial losses, in an amount that will be proven at trial.

312.    Urban Plates has at all relevant times had in place an all-risk insurance policy, entitled Property Portfolio Protection (No. CPO 5723964-00), effective December 1, 2019 with insurer Zurich. In the policy, Zurich agreed to pay for "the actual loss of 'business income'" resulting from a necessary suspension of Urban Plates' business and any "extra expense" Urban Plates incurred caused by "direct physical loss of or damage to" Urban Plates' insured property.

313.    In March 2020 Urban Plates notified Zurich of its claim for covered losses.

314.    In May 2020, Zurich denied coverage to Urban Plates without any valid justification.

X.    **Well Done Hospitality Group**

315.    The Well Done Hospitality Group owns or operates three French-inspired fine dining restaurants in the Loop in Chicago: Cochon Volant Brasserie, Francois Frankie, and Taureaux Tavern. Well Done's locations provide an elevated yet inviting French-inspired dining atmosphere that caters to both business and casual clientele in the Loop. Well Done's restaurants

FILED DATE: 7/30/2020 9:01 PM    2020L008099

offer unique dining experiences, like François Frankie's carousel bar that gently spins while guests enjoy hand-crafted cocktails or Taureaux Tavern's outdoor pergola.

316.     Before the Shutdown Orders, Cochon Volant Brasserie, Francois Frankie, and Taureaux Tavern welcomed a diverse clientele for business lunches, pre-theater meals, and after work gatherings for dinner and events. Cochon Volant Brasserie included tightly packed high-top tables in the bar area and a dining room consisting of smaller café style tables and booths. Francois Frankie included elegant plush seating that lined a dining room filled with tables for small groups and large parties alike. Taureaux Tavern included an elegant and expansive bar surrounded by small intimate tabletops inside and an outdoor patio that could hold large private events. These restaurants consistently served over 1,000 tables per day.

317.     As a direct result of the Shutdown Orders, Well Done's locations incurred direct physical loss and damage, and were rendered physically nonfunctional as restaurants. Beginning in mid-March 2020, due to the Shutdown Orders, Well Done was required to cease all on-premises food and beverage service at its locations. Well Done's restaurants removed furniture from their interior spaces, added plexiglass to host stands and other areas where take-out food could be ordered or picked up, and designated areas with non-movable furniture as nonfunctional.

318.     As a result of the restrictive Reopening Orders, Well Done's locations remain physically impaired and Well Done has been required to make substantial detrimental physical alterations to its premises. Among other things, each restaurant now has substantially limited physical space—both inside and on the patio—for tables, chairs, and other fixtures. Plexiglass has been mounted to separate certain interior areas, impairing the physical space itself, the routes for customer traffic, and the restaurant's functionality. For example, due to the Reopening

FILED DATE: 7/30/2020 9:01 PM    2020L008099

Orders' spatial restrictions, François Frankie's carousel bar now can seat only 10 guests, whereas the space could hold 40 guests prior to the Shutdown and Reopening Orders.

319.    In accordance with the Reopening Orders' restrictions, at each of its locations, Well Done has had to severely reduce the amount of physical space that is available for its intended function: serving guests on the premises. For example, Taureaux Tavern could once seat 193 guests inside and another 46 outside. Now, under the orders' social-distancing spatial requirements, the restaurant is limited to 48 guests inside and only 23 on the patio. Likewise, François Frankie could seat 175 guests in its indoor dining room and 26 guests on the patio before the Shutdown and Reopening Orders went into effect. Now, however, the restaurant can seat only 44 patrons inside and 13 outside. As an illustrative example, the images below show a comparison of both Taureaux Tavern's and François Frankie's floorplans—*i.e.*, the physical space available for serving guests—before the Shutdown Orders went into effect and after the Reopening Orders' social distancing and other spatial requirements:

FILED DATE: 7/30/2020 9:01 PM   2020L008099

*Taureaux Tavern Bar Area Pre-Shutdown Orders:*



*Taureaux Tavern Bar Area Post-Shutdown and Reopening Orders:*



FILED DATE: 7/30/2020 9:01 PM    2020L008099

*Taureaux Tavern Main Dining Room Pre-Shutdown Orders:*



*Taureaux Tavern Main Dining Room Post-Shutdown and Reopening Orders:*



FILED DATE: 7/30/2020 9:01 PM   2020L008099

*François Frankie Main Dining Room Pre-Shutdown Orders:*



*François Frankie Main Dining Room Post-Shutdown and Reopening Orders:*



320.    The above images illustrate the detrimental physical reconfiguration that Well Done has had to make to its locations—and the physical impairment its restaurants' premises have suffered—as a result of the Shutdown and Reopening Orders. (Cochon Volant Brasserie has

96

FILED DATE: 7/30/2020 9:01 PM   2020L008099

incurred a similar percentage reduction in its functional dining space, and has had to implement physical alterations to its premises comparable to those at the other Well Done locations depicted above.)

321.     As a direct result of the Shutdown and restrictive Reopening Orders, Well Done's locations have suffered substantial losses, in an amount that will be proven at trial.

322.     At all relevant times, Well Done has had in place an all-risk commercial property insurance policy, entitled Commercial Line Policy (Policy Number: ZBC D219122 03) effective April 10, 2020, with Citizens Insurance, an affiliate of The Hanover Insurance Group, Inc. Under the Policy, Citizens Insurance agreed to pay for "the actual loss of business income" Well Done sustains due to the "necessary 'suspension' of [its] 'operations' during the 'period of restoration,'" where the suspension is caused by "direct physical loss of or damage to property at premises" covered under the Policy. In addition, Citizens Insurance also agreed to pay for "Extra Expense."

323.     In March 2020, Well Done submitted its notice of claim to Citizens Insurance for covered losses.

324.     In March 2020, Citizens Insurance denied coverage to Well Done without any valid justification.

**Y.      Mixed Greens**

325.     Mixed Greens has two locations in Chicago's Loop and River North neighborhoods. At Mixed Greens, customers choose from a wide array of ingredients to custom design salads, or select one of Mixed Greens' signature salads or sandwiches. Customers can also avail themselves of self-service options, including soup.

326.     Before the Shutdown Orders, Mixed Greens catered to fast-casual business lunches and individuals looking for healthy dinner fare. Patrons would order at a counter by

selecting from a myriad of salad and sandwich options, which an employee would mix together to the customer's specifications. After picking up the entrée, patrons would continue through the space passing open racks of chips, a soup station, other pre-made items, a self-service soda fountain, and a flatware station where the customer would pick up whatever items they need to enjoy their meal before proceeding to a cashier's station to pay for the meal.

327.    As a direct result of the Shutdown Orders, both Mixed Greens locations incurred direct physical loss and physical damage, and were rendered physically nonfunctional as restaurants. Beginning in mid-March 2020, due to the Shutdown Orders, Mixed Greens was required to cease all on-premises food and beverage service at its locations. Mixed Greens has continued to offer take-out and delivery, but was required to make substantial detrimental physical alterations to its premises to do so. Among other things, both restaurants closed areas that held stations for soup, chips, and drinks, and installed plexiglass to physically separate customers and employees.

328.    As a direct result of the restrictive Reopening Orders, Mixed Greens locations remain physically impaired and Mixed Greens has been required to make substantial detrimental physical alterations to its locations' premises. In accordance with the Reopening Orders' spatial restrictions, in order to reopen for on-premises dining, both Mixed Greens locations were required, among other alterations, to physically separate spaces, rearrange tables and chairs, reconfigure furniture and equipment, or erect new physical structures.

329.    As a direct result of the Shutdown and restrictive Reopening Orders, Mixed Greens has suffered substantial losses, in an amount that will be proven at trial.

330.    At all relevant times, Mixed Greens has had in place an all-risk commercial property insurance policy, entitled Spectrum Policy (Policy Number: 83 SBA AC4738 SA)

FILED DATE: 7/30/2020 9:01 PM      2020L008099

effective January 1, 2020, with Twin City Fire, an affiliate of The Hartford Financial Services Group. Under the Policy, Twin City Fire agreed to pay for "the actual loss of Business Income [Mixed Greens] sustain[s] due to the necessary suspension of [its] 'operations' during the 'period of restoration,'" where "[t]he suspension [was] caused by direct physical loss of or physical damage to property at the 'scheduled premises.'" In addition, Twin City Fire also agreed to pay for "Extra Expense."

331.     In July 2020, Mixed Greens submitted its notice of claim to Twin City Fire for covered losses.

332.     On information and belief, Twin City Fire is expected to deny coverage to Mixed Greens without any valid justification.

**Z.     Dough Bros**

333.     Dough Bros, in Chicago's Streeterville neighborhood, recreates the New York corner pizza experience in Chicago by offering slices of New York style pizza, sub sandwiches, and salads.

334.     Prior to the Shutdown, Dough Bros was a small tightly packed space on State Street that catered to a quick-lunch groups and the late night crowd. The restaurant had a crowded line where patrons walk through before placing an order at the counter for a pizza or sandwich. Customers also had the option of selecting from a refrigerator of beverages or a self-service soda fountain. The back of the restaurant contained communal counters and tables to maximize the amount of patrons that could sit in a small space.

335.     As a direct result of the Shutdown Orders, Dough Bros incurred direct physical loss and damage, and was rendered physically nonfunctional as a restaurant. Beginning in mid-March 2020, due to the Shutdown Orders, Dough Bros was required to cease all on-premises food and beverage service. Dough Bros continued to offer take-out and delivery, but was

99

required to make substantial detrimental physical alterations to its premises to do so. Among other things, Dough Bros decommissioned the self-service station for chips and drinks, and installed plexiglass to physically separate customers and employees.

336.    As a direct result of the restrictive Reopening Orders, Dough Bros remains physically impaired and has been required to maintain the substantial detrimental physical alterations to its premises discussed above. In accordance with the Reopening Orders' spatial restrictions, in order to reopen for on-premises dining, Dough Bros was required, among other alterations, to rearrange tables and chairs, reconfigure furniture and equipment, or erect new physical structures.

337.    As a direct result of the Shutdown and restrictive Reopening Orders, Dough Bros has suffered substantial losses, in an amount that will be proven at trial.

338.    At all relevant times, Dough Bros has had in place an all-risk commercial property insurance policy, entitled Spectrum Policy (Policy Number: 83 SBA AC4737 SA) effective January 1, 2020, with Twin City Fire, an affiliate of The Hartford Financial Services Group. Under the Policy, Twin City Fire agreed to "pay for the actual loss of Business Income [Dough Bros] sustain[s] due to the necessary suspension of [its] 'operations' during the 'period of restoration,'" where "[t]he suspension [was] caused by direct physical loss of or physical damage to property at the 'scheduled premises.'" In addition, Twin City Fire also agreed in the Policy to pay for "Extra Expense."

339.    In July 2020, Dough Bros submitted its notice of claim to Twin City Fire for covered losses.

340.    On information and belief, Twin City Fire is expected to deny coverage to Dough Bros without any valid justification.

FILED DATE: 7/30/2020 9:01 PM    2020L008099

FILED DATE: 7/30/2020 9:01 PM    2020L008099

### AA.    Golden Corral Franchisees

341.    Golden Five, GC Bloomingdale, and RFR (together, the "Golden Corral Franchisees") own and operate 12 Golden Corral franchises. Golden Five has one location in Tinley Park, Illinois; GC Bloomingdale has one location in Bloomingdale, Illinois; and RFR operates ten locations across Illinois, Missouri, and Colorado. Golden Corral is known for its unlimited buffet for breakfast, lunch, and dinner, featuring home-style menus and a family-friendly dining experience.

342.    Prior to the issuance of the Shutdown Orders, the Golden Corral Franchisees' locations were filled with guests strolling through one of their three food bars—filling up on salad at one, sirloin steaks at another, and rolls and sweets at the third. Before the Shutdown Orders, each of their locations could hold at least 275 guests, who were free to leave one of the restaurants' many tables for as many helpings of the buffet as they wanted, whenever they wished.

343.    As a direct result of the Shutdown Orders, the Golden Corral Franchisees' locations incurred direct physical loss and damage, and were rendered physically nonfunctional as restaurants and buffets. In mid-March 2020, with their dining rooms and buffet spaces rendered physically nonfunctional for their intended purpose, the Golden Corral Franchisees closed their doors. Golden Five and RFR reopened their locations for short periods of time for the limited function of providing takeout and delivery service, but then closed again after finding it was structurally and/or economically infeasible to operate. GC Bloomingdale's location never opened for limited takeout and delivery service due to structural and/or economic barriers to operation. Due to the Shutdown Orders, the Golden Corral Franchisees' Illinois locations remained closed for more than three months.

344. Even as they began to reopen for on-premises dining, the restrictive Reopening Orders left the Golden Corral Franchisees' locations physically impaired and required them to make many detrimental physical alterations to their premises. The orders' spatial restrictions required the Golden Corral Franchisees to, among other things, physically separate spaces, rearrange and remove furniture and equipment, and erect new physical structures. For example, each of the Golden Corral Franchisees' locations installed stanchion barriers around their buffets to restrict access, blocked off every other table by removing tables or chairs or using caution tape to mark the space physically off limits, and many eliminated their self-serve drink stations. Some locations were forced to move to a "cafeteria style" service where guests were no longer able to serve themselves at the buffet, materially altering the very essence of the Golden Corral experience. Others installed plexiglass barriers in front of cashier stations at the front of the restaurant and between booths. As a result of the Shutdown and Reopening Orders, all of the Golden Corral Franchisees' restaurants, which previously fit hundreds of customers each, were reduced to a fraction of their previous permitted occupancy.

345. As a direct result of the Shutdown and restrictive Reopening Orders, the Golden Corral Franchisees have suffered substantial losses, in an amount that will be proven at trial.

346. At all relevant times, Golden Five had in place an all-risk insurance policy entitled Special Property Coverage (No. 76 SBW RU2017), effective December 23, 2019, with Sentinel, an affiliate of The Hartford Financial Services Group. Under the Policy, Sentinel agreed to pay for the "actual loss of Business Income" and "Extra Expense" resulting from a period of suspension caused by the "direct physical loss of or physical damage to" Golden Five's insured property.

347. In March 2020, Golden Five submitted its notice of claim to Sentinel.

348.    In March 2020, Sentinel denied Golden Five's claim without any valid justification.

349.    At all relevant times, GC Bloomingdale had in place an all-risk insurance policy entitled Special Property Coverage (No. 83 SBA AD0471 DV), effective April 1, 2019, with Twin City Fire, an affiliate of The Hartford Financial Services Group. Under the Policy, Twin City Fire agreed to pay for the "actual loss of Business Income" and "Extra Expense" resulting from a period of suspension caused by the "direct physical loss of or physical damage to" GC Bloomingdale's insured property.

350.    In March 2020, GC Bloomingdale submitted its notice of claim to Twin City Fire.

351.    In March 2020, Twin City Fire denied GC Bloomingdale's claim without any valid justification.

352.    At all relevant times, RFR had in place an all-risk insurance policy entitled Commercial Property Coverage (No. 80-BP-003313730-9), effective November 1, 2019, with Secura. Under the Policy, Secura agreed to pay for the "actual loss of Business Income" and "Extra Expense" resulting from a period of suspension caused by the "direct physical loss of or damage to" RFR's insured property.

353.    In March 2020, RFR submitted its notice of claim to Secura.

354.    In March 2020, Secura denied RFR's claim without any valid justification.

**BB.    Joy District**

355.    Joy District is a multi-tier nightclub in Chicago's River North neighborhood. With local DJs, themed parties, and bottle service, Joy District had become a dance party hotspot and destination for local and visiting celebrities. Prior to the Shutdown Orders, Joy District could hold more than 800 people at once.

FILED DATE: 7/30/2020 9:01 PM    2020L008099

FILED DATE: 7/30/2020 9:01 PM    2020L008099

356.     Until mid-March 2020, Joy District served as a hip, energetic New American restaurant & cocktail bar with a roof deck and late-night dancing. Joy District offered two full bars, 13 tables, and hypnotizing floating light fixtures. On its first floor, Joy District operated as a lively, ultramodern sports parlor. A high-energy atmosphere with elevated bar fare, Parlay at Joy District served as a gathering spot for sports lovers.

357.     As a direct result of the Shutdown Orders, Joy District incurred direct physical loss and damage and was rendered physically nonfunctional as a restaurant, bar, and nightclub. In mid-March 2020, due to the Shutdown Orders, Joy District was required to cease all on-premises dining and service—forcing Joy District to completely close the location.

358.     As a result of the restrictive Reopening Orders, Joy District remains physically impaired and has been required to make detrimental physical alterations to its premises. Only a small portion of Joy District can be physically accessed by guests, and Joy District installed plexiglass in between all booths and group seating areas. While it was able to open outdoor seating in mid-June, the outside patio remains physical impaired as seating remains limited and all seating is spaced at least six feet apart.

359.     As a direct result of the Shutdown and restrictive Reopening Orders, Joy District has suffered substantial losses, in an amount that will be proven at trial.

360.     Joy District has at all relevant times had in place an all-risk insurance policy, entitled Commercial Package (No. 10-2020-3245), effective June 9, 2020, with Spriska. Under this Policy, Spriska agreed to cover Joy District for "[e]arnings, rents, and extra expense" during "the restoration period when [Joy District's] business is necessarily interrupted by direct physical loss to" Joy District's property.

FILED DATE: 7/30/2020 9:01 PM    2020L008099

361.     In March 2020, Joy District submitted its notice of claim to Spriska for covered losses.

362.     In June 2020, Spriska denied coverage without any valid justification.

**CC.     The Dime**

363.     The Dime is a lively sports bar with creative pub eats and craft cocktails, offering happy hours and lots of TVs. Prior to the Shutdown Orders, The Dime offered communal space for guests at its bar and surrounding high-tops, as well as secluded larger group seating.

364.     Until mid-March 2020, The Dime was packed on weekends and weekday nights alike. A favorite of Lincoln Park residents, sports fans from any team could watch Monday Night Football, the Premier League, or the NBA.

365.     As a direct result of the Shutdown Orders, The Dime incurred direct physical loss and damage and was rendered physically nonfunctional as a restaurant. In mid-March 2020, due to the Shutdown Orders, The Dime was required to cease all on-premises dining and service.

366.     As a result of the restrictive Reopening Orders, The Dime remains physically impaired and has also been required to make additional detrimental physical alterations to its premises. Only a fraction of The Dime's square footage is available for visitors.  While The Dime was able to open up outdoor seating after the July 4th holiday, it needed to reconfigure its entire physical layout and make changes to its physical seating arrangement. In addition, The Dime installed plexiglass in between all booths and group seating.

367.     As a direct result of the Shutdown and restrictive Reopening Orders, The Dime has suffered substantial losses, in an amount that will be proven at trial.

368.     The Dime has at all relevant times had in place an all-risk insurance policy, entitled Commercial Policy (No. 00754-34304), effective September 5, 2019, with Badger Mutual Insurance. Under this Policy, Badger Mutual agreed to cover The Dime for "loss of

FILED DATE: 7/30/2020 9:01 PM    2020L008099

Business Income" sustained during a necessary suspension of operations during a period of restoration, where the suspension was caused by "direct physical loss of or damage to" The Dime's covered property. In addition, Badger Mutual also agreed to pay for "Extra Expense."

369.     In March 2020, The Dime submitted its notice of claim to Badger Mutual for covered losses.

370.     In March 2020, Badger Mutual denied coverage without any valid justification.

**DD.    Juliet's**

371.     Juliet's is an Italian inspired restaurant and sports bar. Embracing and celebrating the rich history of the downtown Joliet, Illinois building where it is located—which was constructed in the 1890's—Juliet's is named after the city it calls home.

372.     Until mid-March 2020, Juliet's offered a superior fine dining experience, traditional Italian cuisine and a welcoming atmosphere for sports fans. It was a neighborhood hub in a large Chicago suburb that catered to families, business lunches, and groups of friends grabbing a sit-down dinner.

373.     As a direct result of the Shutdown Orders, Juliet's incurred direct physical loss and damage and was rendered physically nonfunctional as a restaurant. In mid-March 2020, due to the Shutdown Orders, Juliet's was required to cease all on-premises dining and service and closed entirely.

374.     Thereafter, as a result of the restrictive Reopening Orders, Juliet's remains physically impaired, and it has been required to make additional detrimental physical alterations to its premises. The vast majority of Juliet's physical space is off limits to diners. In addition, Juliet's installed plexiglass in between all booths and group seating. While it was able to open a portion of its existing patio in early June, Juliet's was forced to alter the physical layout to space tables, with the remaining portion of the physical space continuing to be nonfunctional.

FILED DATE: 7/30/2020 9:01 PM   2020L008099

375.     As a direct result of the Shutdown and restrictive Reopening Orders, Juliet's has suffered substantial losses, in an amount that will be proven at trial.

376.     Juliet's has at all relevant times had in place an all-risk insurance policy, entitled Businessowners Policy (No. BP36833), effective September 14, 2019, with Illinois Casualty. Under this Policy, Illinois Casualty agreed to cover Juliet's for "loss of Business Income" sustained during a necessary suspension of operations during a period of restoration, where the suspension was caused by "direct physical loss of or damage to" Juliet's covered property. In addition, Illinois Casualty also agreed to pay for "Extra Expense."

377.     In March 2020, Juliet's submitted its notice of claim to Illinois Casualty for covered losses.

378.     In March 2020, Illinois Casualty denied coverage without any valid justification.

**EE.     Happy's Bamboo Bar**

379.     Happy's Bamboo Bar is one of Chicago's most popular night clubs located in the heart of Lincoln Park.

380.     Until mid-March 2020, Happy's Bamboo Bar provided guests with a unique dual room experience, with distinct atmospheres in the location's front and back rooms. The location played host to formal parties, informal gatherings, and some of Chicago's top DJs.

381.     As a direct result of the Shutdown Orders, Happy's Bamboo Bar incurred direct physical loss and damage and was rendered nonfunctional as a restaurant and bar. In mid-March 2020, due to the Shutdown Orders, Happy's Bamboo Bar was required to cease all on-premises dining and service and closed entirely.

382.     Thereafter, as a result of the restrictive Reopening Orders, Happy's Bamboo Bar remains physically impaired and large swaths of the location's physical space remains non-functional.

FILED DATE: 7/30/2020 9:01 PM    2020L008099

383.     As a direct result of the Shutdown and restrictive Reopening Orders, Happy's Bamboo Bar has suffered substantial losses, in an amount that will be proven at trial.

384.     Happy's Bamboo Bar has at all relevant times had in place an all-risk insurance policy, entitled Businessowners Policy (No. BP42552), effective October 22, 2019, with Illinois Casualty. Under this Policy, Illinois Casualty agreed to cover Happy's Bamboo Bar for "loss of Business Income" sustained during a necessary suspension of operations during a period of restoration, where the suspension was caused by "direct physical loss of or damage to" Happy's Bamboo Bar's covered property. In addition, Illinois Casualty also agreed to pay for "Extra Expense."

385.     In March 2020, Happy's Bamboo Bar submitted its notice of claim to Illinois Casualty for covered losses.

386.     In March 2020, Illinois Casualty denied coverage without any valid justification.

**FF.     Emporium Arcade Bar**

387.     Emporium Fulton Market, Emporium Logan Square, and Emporium Wicker Park (together, "Emporium Arcade Bar") each own and operate an Emporium Arcade Bar location in Chicago. Emporium Arcade Bar is one of Chicago's most innovative entertainment destinations. As a combined arcade, bar, and live events venue, Emporium Arcade Bar offers everything from classic arcade games to pinball, a full stage, and some of the best spots in the city for events large and small.

388.     Prior to mid-March 2020, the Emporium Arcade Bar locations offered arcade games from the last thirty years with a very large bar that was passionately curated with choice craft beer selections, an innovative cocktail list, and a robust whiskey selection. The large-capacity venues are each unique, but all boasted a wide selection of video games, pinball, and table games, and regularly hosted live music, DJs, movies, and many other types of events. Each

FILED DATE: 7/30/2020 9:01 PM    2020L008099

of the three Emporium Arcade Bar venues was also a favorite for private events and hosted everything from small, intimate birthday parties and karaoke and trivia, to large group events like company parties, fundraisers, concerts, watch parties, tournaments and bar crawls. The locations range from roughly 5,000 square feet to roughly 9,000 square feet, but all featured a lively atmosphere that played to a relatively younger crowd of bar-goers looking for a unique scene. The image below depicts a typical crowd at one of the Emporium Arcade Bar locations prior to March 2020:



389.    As a direct result of the Shutdown Orders, all three Emporium Arcade Bar locations incurred direct physical loss and damage and were rendered completely nonfunctional as bars and arcades. As of mid-March 2020, as a result of the Shutdown Orders' directives, Emporium Arcade Bar completely closed its bars and arcades to all customers, physically losing

all of its space across its three locations for their intended purposes. Despite the restrictive

Reopening Orders, each Emporium Arcade Bar location has remained in a physically impaired

state. Focused on communal gathering at the bar and the visitors moving throughout the

establishment's video game consoles and table games, each Emporium Arcade Bar location has

been unable to reopen to the public. Their doors have now been shuttered for more than four

months. Once reliant on maximizing the capacity in each space—about 300 people for each

location—and packing the bar, arcade, and dance floor full, each Emporium Arcade Bar location

has been completely dormant.

390.     At all relevant times, each Emporium Arcade Bar location had in place an all-risk

commercial property insurance policy, entitled Businessowners Policy (for Emporium Fulton

Market, Policy No. ROP 586135-7, effective September 1, 2019; for Emporium Logan Square,

Policy Nos. TRM584655-5 and TRM584655-6, effective June 17, 2019 and June 17, 2020,

respectively; and for Emporium Wicker Park, Policy No. BP19046837-8, effective January 5,

2020) with Society. Under that Policy, Society agreed to pay for "the actual loss of Business

Income" that each Emporium Arcade Bar location sustains during a necessary suspension of its

business caused by "direct physical loss of or damage to" its covered property. In addition,

Society also agreed to pay for "Extra Expense."

391.     In March and April 2020, each Emporium Arcade Bar location submitted notices

of claim to Society for covered losses.

392.     In April 2020, Society denied coverage to each Emporium Arcade Bar location

without any valid justification.

FILED DATE: 7/30/2020 9:01 PM          2020L008099

FILED DATE: 7/30/2020 9:01 PM   2020L008099

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION—DECLARATORY JUDGMENT
### Pursuant to 735 ILCS 5/2-701
### All Plaintiffs Against All Defendants

393.    Plaintiffs incorporate and reallege each of the allegations set forth in Paragraphs 1 through 392 as if fully set forth herein.

394.    The Policies described in Paragraphs 1–392 are valid and fully enforceable insurance contracts. The Policies provide for business interruption coverage for business income losses and extra expense Plaintiffs sustained as a result of the interruption of business caused by a covered cause of loss.

395.    Plaintiffs submitted claims for the business income losses and extra expense sustained as a result of the Shutdown and Reopening Orders, a covered cause of loss.

396.    Almost all Plaintiffs were denied business interruption coverage based on the Defendant Insurers' position that, among other things, Plaintiffs had not suffered any direct physical loss or damage to their covered properties as a result of the Shutdown or Reopening Orders. The few Plaintiffs still waiting to hear from their insurers reasonably expect them to deny coverage without valid justification.

397.    An actual, justiciable controversy exists between the parties concerning the construction of the terms "direct physical loss of or damage to" covered property (or, in some Policies, "direct physical loss or damage to," or "direct physical loss of or physical damage to," insured property).

398.    As a result of this controversy, Plaintiffs seek a declaration from the Court rejecting the Defendant Insurers' position that the Shutdown and Reopening Orders did not cause direct physical loss or damage to Plaintiffs' insured properties.

FILED DATE: 7/30/2020 9:01 PM    2020L008099

WHEREFORE, Plaintiffs respectfully pray that the Court declare, as set forth above in Count 1, that the Shutdown and Reopening Orders caused direct physical loss of and/or damage to Plaintiffs' insured properties, and grant any and all other relief as this Court may deem just and proper.

### SECOND THROUGH FORTY THIRD CAUSES OF ACTION—BREACH OF CONTRACT

### SECOND CAUSE OF ACTION—BREACH OF CONTRACT
### Bangers & Lace v. Society

399.    Bangers & Lace incorporates and realleges each of the allegations set forth above as if fully set forth herein.

400.    Bangers & Lace and Society have an enforceable insurance coverage agreement pursuant to which Society agreed to provide "all-risk" insurance coverage to Bangers & Lace, to wit Businessowners Package (Policy No. TRM 585294-5). Bangers & Lace agreed to, and in fact did, pay insurance premiums under the agreement, and in return Society agreed to cover Bangers & Lace for all "loss of Business Income" sustained due to a necessary suspension of operations, or a suspension caused by "direct physical loss of or damage to" Bangers & Lace's insured property. Under the Policy, Society also agreed to pay for Bangers & Lace's "Extra Expense."

401.    Bangers & Lace has sustained direct physical loss and/or damage from a covered cause of loss under the parties' agreement.

402.    Bangers & Lace performed all of its obligations under the parties' agreement, including by notifying Society of a covered cause of loss under the agreement, and any conditions precedent have been satisfied, waived, excused, or are otherwise inapplicable.

112

FILED DATE: 7/30/2020 9:01 PM    2020L008099

403.    Society breached the parties' agreement by improperly denying its coverage obligations under the agreement or otherwise repudiating its obligation to cover Bangers & Lace's losses, as expressly required under the parties' agreement.

404.    Bangers & Lace has sustained damage as a result of Society's breach of contract in an amount to be proven at trial.

WHEREFORE, Bangers & Lace respectfully prays that the Court enter judgment in its favor and against Society on the breach of contract claim set forth above in Count 2, in an amount to be proven at trial, plus pre-judgment interest, and grant any and all other relief as this Court may deem just and proper.

### THIRD CAUSE OF ACTION—BREACH OF CONTRACT
### Bangers & Lace Chicago v. Society

405.    Bangers & Lace Chicago incorporates and realleges each of the allegations set forth above as if fully set forth herein.

406.    Bangers & Lace Chicago and Society have an enforceable insurance coverage agreement pursuant to wich Society agreed to provide "all-risk" insurance coverage to Bangers & Lace Chicago, to wit Businessowners Package (Policy No. BP18023993-7). Bangers & Lace Chicago agreed to, and in fact did, pay insurance premiums under the agreement, and in return Society agreed to cover Bangers & Lace Chicago for all "loss of Business Income" sustained due to a necessary suspension of operations, or a suspension caused by "direct physical loss of or damage to" Bangers & Lace Chicago's insured property. Under the Policy, Society also agreed to pay for Bangers & Lace's "Extra Expense."

407.    Bangers & Lace Chicago has sustained direct physical loss and/or damage from a covered cause of loss under the parties' agreement.

FILED DATE: 7/30/2020 9:01 PM    2020L008099

408.     Bangers & Lace Chicago performed all of its obligations under the parties' agreement, including by notifying Society of a covered cause of loss under the agreement, and any conditions precedent have been satisfied, waived, excused, or are otherwise inapplicable.

409.     Society breached the parties' agreement by improperly denying its coverage obligations under the agreement or otherwise repudiating its obligation to cover Bangers & Lace Chicago's losses, as expressly required under the parties' agreement.

410.     Bangers & Lace Chicago has sustained damage as a result of Society's breach of contract in an amount to be proven at trial.

WHEREFORE, Bangers & Lace Chicago respectfully prays that the Court enter judgment in its favor and against Society on the breach of contract claim set forth above in Count 3, in an amount to be proven at trial, plus pre-judgment interest, and grant any and all other relief as this Court may deem just and proper.

### FOURTH CAUSE OF ACTION—BREACH OF CONTRACT
### Bucktown Dysfunctional Pub v. Society

411.     Bucktown Dysfunctional Pub incorporates and realleges each of the allegations set forth above as if fully set forth herein.

412.     Bucktown Dysfunctional Pub and Society have an enforceable insurance coverage agreement pursuant to which Society agreed to provide "all-risk" insurance coverage to Bucktown Dysfunctional Pub, to wit Businessowners Package (Policy No. TRM 586233-5). Bucktown Dysfunctional Pub agreed to, and in fact did, pay insurance premiums under the agreement, and in return Society agreed to cover Bucktown Dysfunctional Pub for all "loss of Business Income" sustained due to a necessary suspension of operations, or a suspension caused by "direct physical loss of or damage to" Bucktown Dysfunctional Pub's insured property. Under the Policy, Society also agreed to pay for Bucktown Dysfunctional's "Extra Expense."

114

FILED DATE: 7/30/2020 9:01 PM    2020L008099

413.    Bucktown Dysfunctional Pub has sustained direct physical loss and/or damage from a covered cause of loss under the parties' agreement.

414.    Bucktown Dysfunctional Pub performed all of its obligations under the parties' agreement, including by notifying Society of a covered cause of loss under the agreement, and any conditions precedent have been satisfied, waived, excused, or are otherwise inapplicable.

415.    Society breached the parties' agreement by improperly denying its coverage obligations under the agreement or otherwise repudiating its obligation to cover Bucktown Dysfunctional Pub's losses, as expressly required under the parties' agreement.

416.    Bucktown Dysfunctional Pub has sustained damage as a result of Society's breach of contract in an amount to be proven at trial.

WHEREFORE, Bucktown Dysfunctional Pub respectfully prays that the Court enter judgment in its favor and against Society on the breach of contract claim set forth above in Count 4, in an amount to be proven at trial, plus pre-judgment interest, and grant any and all other relief as this Court may deem just and proper.

### FIFTH CAUSE OF ACTION—BREACH OF CONTRACT
### Chicago Scoops v. Charter Oak Fire

417.    Chicago Scoops incorporates and realleges each of the allegations set forth above as if fully set forth herein.

418.    Chicago Scoops and Charter Oak Fire have an enforceable insurance coverage agreement pursuant to which Charter Oak Fire agreed to provide "all-risk" insurance coverage to Chicago Scoops, to wit Deluxe Property Coverage (Policy No. P-630-3P037672-COF-19). Chicago Scoops agreed to, and in fact did, pay insurance premiums under the agreement, and in return Charter Oak Fire agreed to cover Chicago Scoops for "[t]he actual loss of Business Income [Chicago Scoops] sustain[s] due to the necessary 'suspension' of [its] 'operations' during

115

FILED DATE: 7/30/2020 9:01 PM  2020L008099

the 'period of restoration'; and [t]he actual Extra Expense [it] incur[s] during the 'period of restoration'; caused by direct physical loss of or damage to" its covered property.

419.    Chicago Scoops has sustained direct physical loss and/or damage from a covered cause of loss under the parties' agreement.

420.    Chicago Scoops performed all of its obligations under the parties' agreement, including by notifying Charter Oak Fire of a covered cause of loss under the agreement, and any conditions precedent have been satisfied, waived, excused, or are otherwise inapplicable.

421.    Charter Oak Fire breached the parties' agreement by improperly denying its coverage obligations under the agreement or otherwise repudiating its obligation to cover Chicago Scoops' losses, as expressly required under the parties' agreement.

422.    Chicago Scoops has sustained damage as a result of Charter Oak Fire's breach of contract in an amount to be proven at trial.

WHEREFORE, Chicago Scoops respectfully prays that the Court enter judgment in its favor and against Charter Oak Fire on the breach of contract claim set forth above in Count 5, in an amount to be proven at trial, plus pre-judgment interest, and grant any and all other relief as this Court may deem just and proper.

### SIXTH CAUSE OF ACTION—BREACH OF CONTRACT
### The Dime v. Badger Mutual

423.    The Dime incorporates and realleges each of the allegations set forth above as if fully set forth herein.

424.    The Dime and Badger Mutual have an enforceable insurance coverage agreement pursuant to which Badger Mutual agreed to provide "all-risk" insurance coverage to The Dime, to wit Commercial Policy (No. 00754-34304). The Dime agreed to, and in fact did, pay insurance premiums under the agreement, and in return Badger Mutual agreed to cover The

FILED DATE: 7/30/2020 9:01 PM    2020L008099

Dime for "loss of Business Income" sustained during a necessary suspension of operations during a period of restoration, where the suspension was caused by "direct physical loss of or damage to" The Dime's covered property. In addition, Badger Mutual also agreed to pay for "Extra Expense."

425.    The Dime has sustained direct physical loss and/or damage from a covered cause of loss under the parties' agreement.

426.    The Dime performed all of its obligations under the parties' agreement, including by notifying Badger Mutual of a covered cause of loss under the agreement, and any conditions precedent have been satisfied, waived, excused, or are otherwise inapplicable.

427.    Badger Mutual breached the parties' agreement by improperly denying its coverage obligations under the agreement or otherwise repudiating its obligation to cover The Dime's losses, as expressly required under the parties' agreement.

428.    The Dime has sustained damage as a result of Badger Mutual's breach of contract in an amount to be proven at trial.

WHEREFORE, The Dime respectfully prays that the Court enter judgment in its favor and against Badger Mutual on the breach of contract claim set forth above in Count 6, in an amount to be proven at trial, plus pre-judgment interest, and grant any and all other relief as this Court may deem just and proper.

## SEVENTH CAUSE OF ACTION—BREACH OF CONTRACT
### Dough Bros v. Twin City Fire

429.    Dough Bros incorporates and realleges each of the allegations set forth above as if fully set forth herein.

430.    Dough Bros and Twin City Fire have an enforceable insurance coverage agreement pursuant to which Twin City Fire agreed to provide "all-risk" insurance coverage to

117

Dough Bros, to wit Spectrum Policy (Policy Number: 83 SBA AC4737 SA). Dough Bros agreed to, and in fact did, pay insurance premiums under the agreement, and in return Twin City Fire agreed to cover Dough Bros for "the actual loss of Business Income [Dough Bros] sustain[s] due to the necessary suspension of [its] 'operations' during the 'period of restoration,'" where "[t]he suspension [was] caused by direct physical loss of or physical damage to" Dough Bros' insured property. Under the Policy, Twin City Fire also agreed to pay for Dough Bros' "Extra Expense."

431.    Dough Bros has sustained direct physical loss and/or damage from a covered cause of loss under the parties' agreement.

432.    Dough Bros performed all of its obligations under the parties' agreement, including by notifying Twin City Fire of a covered cause of loss under the agreement, and any conditions precedent have been satisfied, waived, excused, or are otherwise inapplicable.

433.    Twin City Fire is reasonably anticipated to breach the parties' agreement by improperly denying its coverage obligations under the agreement or otherwise repudiating its obligation to cover Dough Bros' losses, as expressly required under the parties' agreement.

434.    Dough Bros has sustained damage as a result of Twin City Fire's breach of contract in an amount to be proven at trial.

WHEREFORE, Dough Bros respectfully prays that the Court enter judgment in its favor and against Twin City Fire on the breach of contract claim set forth above in Count 7, in an amount to be proven at trial, plus pre-judgment interest, and grant any and all other relief as this Court may deem just and proper.

### EIGHTH CAUSE OF ACTION—BREACH OF CONTRACT
### The DuSable Museum v. Vigilant

435.    The DuSable Museum incorporates and realleges each of the allegations set forth above as if fully set forth herein.

118

436.    The DuSable Museum and Vigilant have an enforceable insurance coverage agreement pursuant to which Vigilant agreed to provide "all-risk" insurance coverage to The DuSable Museum, to wit Cultural Institutions Insurance Program (No. 3589-21-25 WUC). The DuSable Museum agreed to, and in fact did, pay insurance premiums under the agreement, and in return Vigilant agreed to cover The DuSable Museum for "the actual business income loss [it] incur[s] due to the actual impairment of [its] operations," where "[t]his actual or potential impairment of operations" is "caused by or result[s] from direct physical loss or damage by a covered peril to" The DuSable Museum's insured property. Under the Policy, Vigilant also agreed to pay for The DuSable Museum's "Extra Expense."

437.    The DuSable Museum has sustained direct physical loss and/or damage from a covered cause of loss under the parties' agreement.

438.    The DuSable Museum performed all of its obligations under the parties' agreement, including by notifying Vigilant of a covered cause of loss under the agreement, and any conditions precedent have been satisfied, waived, excused, or are otherwise inapplicable.

439.    Vigilant breached the parties' agreement by improperly denying its coverage obligations under the agreement or otherwise repudiating its obligation to cover The DuSable Museum's losses, as expressly required under the parties' agreement.

440.    The DuSable Museum has sustained damage as a result of Vigilant's breach of contract in an amount to be proven at trial.

WHEREFORE, The DuSable Museum respectfully prays that the Court enter judgment in its favor and against Vigilant on the breach of contract claim set forth above in Count 8, in an amount to be proven at trial, plus pre-judgment interest, and grant any and all other relief as this Court may deem just and proper.

119

FILED DATE: 7/30/2020 9:01 PM   2020L008099

## NINTH CAUSE OF ACTION—BREACH OF CONTRACT
### Emporium Fulton Market v. Society

441.    Emporium Fulton Market incorporates and realleges each of the allegations set forth above as if fully set forth herein.

442.    Emporium Fulton Market and Society have an enforceable insurance coverage agreement pursuant to which Society agreed to provide "all-risk" insurance coverage to Emporium Fulton Market, to wit Businessowners Package (Policy No. ROP 586135-7). Emporium Fulton Market agreed to, and in fact did, pay insurance premiums under the agreement, and in return Society agreed to cover Emporium Fulton Market for all "loss of Business Income" sustained during a necessary suspension of operations, caused by "direct physical loss of or damage to" Emporium Fulton Market's insured property. Under the Policy, Society also agreed to pay for "Extra Expense."

443.    Emporium Fulton Market has sustained direct physical loss and/or damage from a covered cause of loss under the parties' agreement.

444.    Emporium Fulton Market performed all of its obligations under the parties' agreement, including by notifying Society of a covered cause of loss under the agreement, and any conditions precedent have been satisfied, waived, excused, or are otherwise inapplicable.

445.    Society breached the parties' agreement by improperly denying its coverage obligations under the agreement or otherwise repudiating its obligation to cover Emporium Fulton Market's losses, as expressly required under the parties' agreement.

446.    Emporium Fulton Market has sustained damage as a result of Society's breach of contract in an amount to be proven at trial.

WHEREFORE, Emporium Fulton Market respectfully prays that the Court enter judgment in its favor and against Society on the breach of contract claim set forth above in Count

9, in an amount to be proven at trial, plus pre-judgment interest, and grant any and all other relief as this Court may deem just and proper.

## TENTH CAUSE OF ACTION—BREACH OF CONTRACT
### Emporium Logan Square v. Society

447.    Emporium Logan Square incorporates and realleges each of the allegations set forth above as if fully set forth herein.

448.    Emporium Logan Square and Society have an enforceable insurance coverage agreement pursuant to which Society agreed to provide "all-risk" insurance coverage to Emporium Logan Square, to wit Businessowners Package (Policy Nos. TRM584655-5 and TRM584655-6). Emporium Logan Square agreed to, and in fact did, pay insurance premiums under the agreement, and in return Society agreed to cover Emporium Logan Square for all "loss of Business Income" sustained during a necessary suspension of operations, caused by "direct physical loss of or damage to" Emporium Logan Square's insured property. Under the Policy, Society also agreed to pay for "Extra Expense."

449.    Emporium Logan Square has sustained direct physical loss and/or damage from a covered cause of loss under the parties' agreement.

450.    Emporium Logan Square performed all of its obligations under the parties' agreement, including by notifying Society of a covered cause of loss under the agreement, and any conditions precedent have been satisfied, waived, excused, or are otherwise inapplicable.

451.    Society breached the parties' agreement by improperly denying its coverage obligations under the agreement or otherwise repudiating its obligation to cover Emporium Logan Square's losses, as expressly required under the parties' agreement.

452.    Emporium Logan Square has sustained damage as a result of Society's breach of contract in an amount to be proven at trial.

121

WHEREFORE, Emporium Logan Square respectfully prays that the Court enter judgment in its favor and against Society on the breach of contract claim set forth above in Count 10, in an amount to be proven at trial, plus pre-judgment interest, and grant any and all other relief as this Court may deem just and proper.

### ELEVENTH CAUSE OF ACTION—BREACH OF CONTRACT
### Emporium Wicker Park v. Society

453.    Emporium Wicker Park incorporates and realleges each of the allegations set forth above as if fully set forth herein.

454.    Emporium Wicker Park and Society have an enforceable insurance coverage agreement pursuant to which Society agreed to provide "all-risk" insurance coverage to Emporium Wicker Park, to wit Businessowners Package (Policy No. BP19046837-8). Emporium Wicker Park agreed to, and in fact did, pay insurance premiums under the agreement, and in return Society agreed to cover Emporium Wicker Park for all "loss of Business Income" sustained during a necessary suspension of operations, caused by "direct physical loss of or damage to" Emporium Wicker Park's insured property. Under the Policy, Society also agreed to pay for "Extra Expense."

455.    Emporium Wicker Park has sustained direct physical loss and/or damage from a covered cause of loss under the parties' agreement.

456.    Emporium Wicker Park performed all of its obligations under the parties' agreement, including by notifying Society of a covered cause of loss under the agreement, and any conditions precedent have been satisfied, waived, excused, or are otherwise inapplicable.

457.    Society breached the parties' agreement by improperly denying its coverage obligations under the agreement or otherwise repudiating its obligation to cover Emporium Wicker Park's losses, as expressly required under the parties' agreement.

122

FILED DATE: 7/30/2020 9:01 PM   2020L008099

458.    Emporium Wicker Park has sustained damage as a result of Society's breach of contract in an amount to be proven at trial.

WHEREFORE, Emporium Wicker Park respectfully prays that the Court enter judgment in its favor and against Society on the breach of contract claim set forth above in Count 11, in an amount to be proven at trial, plus pre-judgment interest, and grant any and all other relief as this Court may deem just and proper.

### TWELFTH CAUSE OF ACTION—BREACH OF CONTRACT
### Epic Burger v. Charter Oak Fire

459.    Epic Burger incorporates and realleges each of the allegations set forth above as if fully set forth herein.

460.    Epic Burger and Charter Oak Fire have an enforceable insurance coverage agreement pursuant to which Charter Oak Fire agreed to provide "all-risk" insurance coverage to Epic Burger, to wit Deluxe Property Coverage (Policy No. P-630-3P037672-COF-19). Epic Burger agreed to, and in fact did, pay insurance premiums under the agreement, and in return Charter Oak Fire agreed to cover Epic Burger for "[t]he actual loss of Business Income [Epic Burger] sustain[s] due to the necessary 'suspension' of [its] 'operations' during the 'period of restoration'; and [t]he actual Extra Expense [it] incur[s] during the 'period of restoration'; caused by direct physical loss of or damage to" its covered property.

461.    Epic Burger has sustained direct physical loss and/or damage from a covered cause of loss under the parties' agreement.

462.    Epic Burger performed all of its obligations under the parties' agreement, including by notifying Charter Oak Fire of a covered cause of loss under the agreement, and any conditions precedent have been satisfied, waived, excused, or are otherwise inapplicable.

FILED DATE: 7/30/2020 9:01 PM    2020L008099

463.    Charter Oak Fire breached the parties' agreement by improperly denying its coverage obligations under the agreement or otherwise repudiating its obligation to cover Epic Burger's losses, as expressly required under the parties' agreement.

464.    Epic Burger has sustained damage as a result of Charter Oak Fire's breach of contract in an amount to be proven at trial.

WHEREFORE, Epic Burger respectfully prays that the Court enter judgment in its favor and against Charter Oak Fire on the breach of contract claim set forth above in Count 12, in an amount to be proven at trial, plus pre-judgment interest, and grant any and all other relief as this Court may deem just and proper.

### THIRTEENTH CAUSE OF ACTION—BREACH OF CONTRACT
### Fast Sandwich v. Ohio Security

465.    Fast Sandwich incorporates and realleges each of the allegations set forth above as if fully set forth herein.

466.    Fast Sandwich and Ohio Security have enforceable insurance coverage agreements pursuant to which Ohio Security agreed to provide "all-risk" insurance coverage to Fast Sandwich, to wit Commercial Protector Policy (Policy No. BZS (20) 58 08 26 30) and Commercial Property Policy (Policy No. BKS (20) 58 03 23 04). Fast Sandwich agreed to, and in fact did, pay insurance premiums under these agreements, and in return Ohio Security agreed to cover Fast Sandwich for "actual loss of Business Income" and "Extra Expense" resulting from a period of suspension caused by the "direct physical loss of or damage to" Fast Sandwich's insured property.

467.    Fast Sandwich has sustained direct physical loss and/or damage from a covered cause of loss under the parties' agreements.

468.    Fast Sandwich performed all of its obligations under the parties' agreements, including by notifying Ohio Security of a covered cause of loss under the agreements, and any conditions precedent have been satisfied, waived, excused, or are otherwise inapplicable.

469.    Ohio Security breached the parties' agreements by improperly denying its coverage obligations under the agreements or otherwise repudiating its obligations to cover Fast Sandwich's losses, as expressly required under the parties' agreements.

470.    Fast Sandwich has sustained damage as a result of Ohio Security's breaches of contract in an amount to be proven at trial.

WHEREFORE, Fast Sandwich respectfully prays that the Court enter judgment in its favor and against Ohio Security on the breach of contract claim set forth above in Count 13, in an amount to be proven at trial, plus pre-judgment interest, and grant any and all other relief as this Court may deem just and proper.

### FOURTEENTH CAUSE OF ACTION—BREACH OF CONTRACT
### GC Bloomingdale v. Twin City Fire

471.    GC Bloomingdale incorporates and realleges each of the allegations set forth above as if fully set forth herein.

472.    GC Bloomingdale and Twin City Fire have an enforceable insurance coverage agreement pursuant to which Twin City Fire agreed to provide "all-risk" insurance coverage to GC Bloomingdale, to wit Special Property Coverage (No. 83 SBA AD0471 DV). GC Bloomingdale agreed to, and in fact did, pay insurance premiums under the agreement, and in return Twin City Fire agreed to cover GC Bloomingdale for the "actual loss of Business Income" and "Extra Expense" resulting from a period of suspension caused by the "direct physical loss of or physical damage to" GC Bloomingdale's insured property.

125

FILED DATE: 7/30/2020 9:01 PM    2020L008099

473.     GC Bloomingdale has sustained direct physical loss and/or damage from a covered cause of loss under the parties' agreement.

474.     GC Bloomingdale performed all of its obligations under the parties' agreement, including by notifying Twin City Fire of a covered cause of loss under the agreement, and any conditions precedent have been satisfied, waived, excused, or are otherwise inapplicable.

475.     Twin City Fire breached the parties' agreement by improperly denying its coverage obligations under the agreement or otherwise repudiating its obligation to cover GC Bloomingdale's losses, as expressly required under the parties' agreement.

476.     GC Bloomingdale has sustained damage as a result of Twin City Fire's breach of contract in an amount to be proven at trial.

WHEREFORE, GC Bloomingdale respectfully prays that the Court enter judgment in its favor and against Twin City Fire on the breach of contract claim set forth above in Count 14, in an amount to be proven at trial, plus pre-judgment interest, and grant any and all other relief as this Court may deem just and proper.

### FIFTEENTH CAUSE OF ACTION—BREACH OF CONTRACT
### Gibsons Restaurant Group v. Argonaut

477.     Gibsons Restaurant Group incorporates and realleges each of the allegations set forth above as if fully set forth herein.

478.     Gibsons Restaurant Group and Argonaut have an enforceable insurance coverage agreement pursuant to which Argonaut agreed to provide "all-risk" insurance coverage to Gibsons, to wit Commercial Property Coverage Policy (Policy No. RS 9128453-09). Gibsons Restaurant Group agreed to, and in fact did, pay insurance premiums under the agreement, and in return Argonaut agreed to cover Gibsons Restaurant Group for loss of Business Income sustained due to the necessary "suspension" of Gibsons Restaurant Group's operations during the

"period of restoration," where the suspension is caused by "direct physical loss of or damage to" Gibsons Restaurant Group's insured property. Under the Policy, Argonaut also agreed to pay for "Extra Expense."

479.     Gibsons Restaurant Group has sustained direct physical loss and/or damage from a covered cause of loss under the parties' agreement.

480.     Gibsons Restaurant Group performed all of its obligations under the parties' agreement, including by notifying Argonaut of a covered cause of loss under the agreement, and any conditions precedent have been satisfied, waived, excused, or are otherwise inapplicable.

481.     Argonaut breached the parties' agreement by improperly denying its coverage obligations under the agreement or otherwise repudiating its obligation to cover Gibsons Restaurant Group's losses, as expressly required under the parties' agreement.

482.     Gibsons Restaurant Group has sustained damage as a result of Argonaut's breach of contract in an amount to be proven at trial.

WHEREFORE, Gibsons Restaurant Group respectfully prays that the Court enter judgment in its favor and against Argonaut on the breach of contract claim set forth above in Count 15, in an amount to be proven at trial, plus pre-judgment interest, and grant any and all other relief as this Court may deem just and proper.

### SIXTEENTH CAUSE OF ACTION—BREACH OF CONTRACT
### Golden Five v. Sentinel

483.     Golden Five incorporates and realleges each of the allegations set forth above as if fully set forth herein.

484.     Golden Five and Sentinel have an enforceable insurance coverage agreement pursuant to which Sentinel agreed to provide "all-risk" insurance coverage to Golden Five, to wit Special Property Coverage (No. 76 SBW RU2017). Golden Five agreed to, and in fact did, pay

127

FILED DATE: 7/30/2020 9:01 PM    2020L008099

insurance premiums under the agreement, and in return Sentinel agreed to cover Golden Five for the "actual loss of Business Income" and "Extra Expense" resulting from a period of suspension caused by the "direct physical loss of or physical damage to" Golden Five's insured property.

485. Golden Five has sustained direct physical loss and/or damage from a covered cause of loss under the parties' agreement.

486. Golden Five performed all of its obligations under the parties' agreement, including by notifying Sentinel of a covered cause of loss under the agreement, and any conditions precedent have been satisfied, waived, excused, or are otherwise inapplicable.

487. Sentinel breached the parties' agreement by improperly denying its coverage obligations under the agreement or otherwise repudiating its obligation to cover Golden Five's losses, as expressly required under the parties' agreement.

488. Golden Five has sustained damage as a result of Sentinel's breach of contract in an amount to be proven at trial.

WHEREFORE, Golden Five respectfully prays that the Court enter judgment in its favor and against Sentinel on the breach of contract claim set forth above in Count 16, in an amount to be proven at trial, plus pre-judgment interest, and grant any and all other relief as this Court may deem just and proper.

### SEVENTEENTH CAUSE OF ACTION—BREACH OF CONTRACT
### Happy's Bamboo Bar v. Illinois Casualty

489. Happy's Bamboo Bar incorporates and realleges each of the allegations set forth above as if fully set forth herein.

490. Happy's Bamboo Bar and Illinois Casualty have an enforceable insurance coverage agreement pursuant to which Illinois Casualty agreed to provide "all-risk" insurance coverage to Happy's Bamboo Bar, to wit Businessowners Policy (No. BP42552). Happy's

FILED DATE: 7/30/2020 9:01 PM    2020L008099

Bamboo Bar agreed to, and in fact did, pay insurance premiums under the agreement, and in return Illinois Casualty agreed to cover Happy's Bamboo Bar for "loss of Business Income" sustained during a necessary suspension of operations during a period of restoration, where the suspension was caused by "direct physical loss of or damage to" Happy's Bamboo Bar's insured property. In addition, Illinois Casualty also agreed to pay for "Extra Expense."

491.    Happy's Bamboo Bar has sustained direct physical loss and/or damage from a covered cause of loss under the parties' agreement.

492.    Happy's Bamboo Bar performed all of its obligations under the parties' agreement, including by notifying Illinois Casualty of a covered cause of loss under the agreement, and any conditions precedent have been satisfied, waived, excused, or are otherwise inapplicable.

493.    Illinois Casualty breached the parties' agreement by improperly denying its coverage obligations under the agreement or otherwise repudiating its obligation to cover Happy's Bamboo Bar's losses, as expressly required under the parties' agreement.

494.    Happy's Bamboo Bar has sustained damage as a result of Illinois Casualty's breach of contract in an amount to be proven at trial.

WHEREFORE, Happy's Bamboo Bar respectfully prays that the Court enter judgment in its favor and against Illinois Casualty on the breach of contract claim set forth above in Count 17, in an amount to be proven at trial, plus pre-judgment interest, and grant any and all other relief as this Court may deem just and proper.

### EIGHTEENTH CAUSE OF ACTION—BREACH OF CONTRACT
### Harbor Chicago v. Society

495.    Harbor Chicago incorporates and realleges each of the allegations set forth above as if fully set forth herein.

129

FILED DATE: 7/30/2020 9:01 PM    2020L008099

496.     Harbor Chicago and Society have an enforceable insurance coverage agreement pursuant to which Society agreed to provide "all-risk" insurance coverage to Harbor Chicago, to wit Businessowners Policy (Policy No. BP18042212-1). Harbor Chicago agreed to, and in fact did, pay insurance premiums under the agreement, and in return Society agreed to cover Harbor Chicago for "the actual loss of Business Income [it] sustain[s] due to the necessary suspension of [its] 'operations' during the 'period of restoration,'" where "[t]he suspension [was] caused by direct physical loss of or damage to" Harbor Chicago's insured property. Under the Policy, Society also agreed to pay for Harbor Chicago's "Extra Expense."

497.     Harbor Chicago has sustained direct physical loss and/or damage from a covered cause of loss under the parties' agreement.

498.     Harbor Chicago performed all of its obligations under the parties' agreement, including by notifying Society of a covered cause of loss under the agreement, and any conditions precedent have been satisfied, waived, excused, or are otherwise inapplicable.

499.     Society breached the parties' agreement by improperly denying its coverage obligations under the agreement or otherwise repudiating its obligation to cover Harbor Chicago's losses, as expressly required under the parties' agreement.

500.     Harbor Chicago has sustained damage as a result of Society's breach of contract in an amount to be proven at trial.

WHEREFORE, Harbor Chicago respectfully prays that the Court enter judgment in its favor and against Society on the breach of contract claim set forth above in Count 18, in an amount to be proven at trial, plus pre-judgment interest, and grant any and all other relief as this Court may deem just and proper.

130

FILED DATE: 7/30/2020 9:01 PM    2020L008099

### NINETEENTH CAUSE OF ACTION—BREACH OF CONTRACT
### Hubbard Inn v. Ohio Security

501.     Hubbard Inn incorporates and realleges each of the allegations set forth above as if fully set forth herein.

502.     Hubbard Inn and Ohio Security have an enforceable insurance coverage agreement pursuant to which Ohio Security agreed to provide "all-risk" insurance coverage to Hubbard Inn, to wit Common Policy (Policy No. BKS(20) 54 82 95 63). Hubbard Inn agreed to, and in fact did, pay insurance premiums under the agreement, and in return Ohio Security agreed to cover Hubbard Inn for "the actual loss of Business Income [Hubbard Inn] sustain[s] due to the necessary 'suspension' of [its] 'operations' during the 'period of restoration,'" where the "'suspension' [is] caused by direct physical loss of or damage to" Hubbard Inn's insured property. Under that Policy, Ohio Security also agreed to pay for Hubbard Inn's "Extra Expense."

503.     Hubbard Inn has sustained direct physical loss and/or damage from a covered cause of loss under the parties' agreement.

504.     Hubbard Inn performed all of its obligations under the parties' agreement, including by notifying Ohio Security of a covered cause of loss under the agreement, and any conditions precedent have been satisfied, waived, excused, or are otherwise inapplicable.

505.     Ohio Security breached the parties' agreement by improperly denying its coverage obligations under the agreement or otherwise repudiating its obligation to cover Hubbard Inn's losses, as expressly required under the parties' agreement.

506.     Hubbard Inn has sustained damage as a result of Ohio Security's breach of contract in an amount to be proven at trial.

FILED DATE: 7/30/2020 9:01 PM    2020L008099

WHEREFORE, Hubbard Inn respectfully prays that the Court enter judgment in its favor and against Ohio Security on the breach of contract claim set forth above in Count 19, in an amount to be proven at trial, plus pre-judgment interest, and grant any and all other relief as this Court may deem just and proper.

## TWENTIETH CAUSE OF ACTION—BREACH OF CONTRACT
### HVAC Pub v. Illinois Casualty

507.    HVAC Pub incorporates and realleges each of the allegations set forth above as if fully set forth herein.

508.    HVAC Pub and Illinois Casualty have an enforceable insurance coverage agreement pursuant to which Illinois Casualty agreed to provide "all-risk" insurance coverage to HVAC Pub, to wit Businessowners Policy (Policy No. BP37220). HVAC Pub agreed to, and in fact did, pay insurance premiums under the agreement, and in return Illinois Casualty agreed to cover HVAC Pub for "for the actual loss of Business Income [it] sustain[s] due to the necessary suspension of [its] 'operations' during the 'period of restoration,'" where "[t]he suspension [was] caused by direct physical loss of or damage to" HVAC Pub's insured property. Under this Policy, Illinois Casualty also agreed to pay for HVAC Pub's "Extra Expense."

509.    HVAC Pub has sustained direct physical loss and/or damage from a covered cause of loss under the parties' agreement.

510.    HVAC Pub performed all of its obligations under the parties' agreement, including by notifying Illinois Casualty of a covered cause of loss under the agreement, and any conditions precedent have been satisfied, waived, excused, or are otherwise inapplicable.

511.    Illinois Casualty breached the parties' agreement by improperly denying its coverage obligations under the agreement or otherwise repudiating its obligation to cover HVAC Pub's losses, as expressly required under the parties' agreement.

FILED DATE: 7/30/2020 9:01 PM    2020L008099

512.    HVAC Pub has sustained damage as a result of Illinois Casualty's breach of contract in an amount to be proven at trial.

WHEREFORE, HVAC Pub respectfully prays that the Court enter judgment in its favor and against Illinois Casualty on the breach of contract claim set forth above in Count 20, in an amount to be proven at trial, plus pre-judgment interest, and grant any and all other relief as this Court may deem just and proper.

## TWENTY FIRST CAUSE OF ACTION—BREACH OF CONTRACT
### Joy District v. Spriska

513.    Joy District incorporates and realleges each of the allegations set forth above as if fully set forth herein.

514.    Joy District and Spriska have an enforceable insurance coverage agreement pursuant to which Spriska agreed to provide "all-risk" insurance coverage to Joy District, to wit Commercial Package (No. 10-2020-3245). Joy District agreed to, and in fact did, pay insurance premiums under the agreement, and in return Spriska agreed to cover Joy District for its "[e]arnings, rents, and extra expense" during "the restoration period when [Joy District's] business is necessarily interrupted by direct physical loss to" Joy District's property.

515.    Joy District has sustained direct physical loss to its property from a covered cause of loss under the parties' agreement.

516.    Joy District performed all of its obligations under the parties' agreement, including by notifying Spriska of a covered cause of loss under the agreement, and any conditions precedent have been satisfied, waived, excused, or are otherwise inapplicable.

517.    Spriska breached the parties' agreement by improperly denying its coverage obligations under the agreement or otherwise repudiating its obligation to cover Joy District's losses, as expressly required under the parties' agreement.

518.     Joy District has sustained damage as a result of Spriska's breach of contract in an amount to be proven at trial.

WHEREFORE, Joy District respectfully prays that the Court enter judgment in its favor and against Spriska on the breach of contract claim set forth above in Count 21, in an amount to be proven at trial, plus pre-judgment interest, and grant any and all other relief as this Court may deem just and proper.

### TWENTY SECOND CAUSE OF ACTION—BREACH OF CONTRACT
### Juliet's v. Illinois Casualty

519.     Juliet's incorporates and realleges each of the allegations set forth above as if fully set forth herein.

520.     Juliet's and Illinois Casualty have an enforceable insurance coverage agreement pursuant to which Illinois Casualty agreed to provide "all-risk" insurance coverage to Juliet's, to wit Businessowners Policy (No. BP36833). Juliet's agreed to, and in fact did, pay insurance premiums under the agreement, and in return Illinois Casualty agreed to cover Juliet's for "loss of Business Income" sustained during a necessary suspension of operations during a period of restoration, where the suspension was caused by "direct physical loss of or damage to" Juliet's insured property. In addition, Illinois Casualty also agreed to pay for "Extra Expense."

521.     Juliet's has sustained direct physical loss and/or damage from a covered cause of loss under the parties' agreement.

522.     Juliet's performed all of its obligations under the parties' agreement, including by notifying Illinois Casualty of a covered cause of loss under the agreement, and any conditions precedent have been satisfied, waived, excused, or are otherwise inapplicable.

FILED DATE: 7/30/2020 9:01 PM    2020L008099

523. Illinois Casualty breached the parties' agreement by improperly denying its coverage obligations under the agreement or otherwise repudiating its obligation to cover Juliet's losses, as expressly required under the parties' agreement.

524. Juliet's has sustained damage as a result of Illinois Casualty's breach of contract in an amount to be proven at trial.

WHEREFORE, Juliet's respectfully prays that the Court enter judgment in its favor and against Illinois Casualty on the breach of contract claim set forth above in Count 22, in an amount to be proven at trial, plus pre-judgment interest, and grant any and all other relief as this Court may deem just and proper.

## TWENTY THIRD CAUSE OF ACTION—BREACH OF CONTRACT
### Mixed Greens v. Twin City Fire

525. Mixed Greens incorporates and realleges each of the allegations set forth above as if fully set forth herein.

526. Mixed Greens and Twin City Fire have an enforceable insurance coverage agreement pursuant to which Twin City Fire agreed to provide "all-risk" insurance coverage to Mixed Greens, to wit Spectrum Policy (Policy No. 83 SBA AC4738 SA). Mixed Greens agreed to, and in fact did, pay insurance premiums under the agreement, and in return Twin City Fire agreed to cover Mixed Greens for "the actual loss of Business Income [Mixed Greens] sustain[s] due to the necessary suspension of [its] 'operations' during the 'period of restoration,'" where "[t]he suspension [was] caused by direct physical loss of or physical damage to" Mixed Greens' insured property. Under the Policy, Twin City Fire also agreed to pay for Mixed Greens' "Extra Expense."

527. Mixed Greens has sustained direct physical loss and/or damage from a covered cause of loss under the parties' agreement.

FILED DATE: 7/30/2020 9:01 PM    2020L008099

528.     Mixed Greens performed all of its obligations under the parties' agreement, including by notifying Twin City Fire of a covered cause of loss under the agreement, and any conditions precedent have been satisfied, waived, excused, or are otherwise inapplicable.

529.     Twin City Fire is reasonably anticipated to breach the parties' agreement by improperly denying its coverage obligations under the agreement or otherwise repudiating its obligation to cover Mixed Greens' losses, as expressly required under the parties' agreement.

530.     Mixed Greens has sustained damage as a result of Twin City Fire's breach of contract in an amount to be proven at trial.

WHEREFORE, Mixed Greens respectfully prays that the Court enter judgment in its favor and against Twin City Fire on the breach of contract claim set forth above in Count 23, in an amount to be proven at trial, plus pre-judgment interest, and grant any and all other relief as this Court may deem just and proper.

### TWENTY FOURTH CAUSE OF ACTION—BREACH OF CONTRACT
### Kite String Cantina v. Society

531.     Kite String Cantina incorporates and realleges each of the allegations set forth above as if fully set forth herein.

532.     Kite String Cantina and Society have an enforceable insurance coverage agreement pursuant to which Society agreed to provide "all-risk" insurance coverage to Kite String Cantina, to wit Businessowners Package (Policy No. BP19033951-0). Kite String Cantina agreed to, and in fact did, pay insurance premiums under the agreement, and in return Society agreed to cover Kite String Cantina for all "loss of Business Income" sustained due to a necessary suspension of operations, or a suspension caused by "direct physical loss of or damage to" Kite String Cantina's insured property. Under the Policy, Society also agreed to pay for Kite String Cantina's "Extra Expense."

136

FILED DATE: 7/30/2020 9:01 PM   2020L008099

533.    Kite String Cantina has sustained direct physical loss and/or damage from a covered cause of loss under the parties' agreement.

534.    Kite String Cantina performed all of its obligations under the parties' agreement, including by notifying Society of a covered cause of loss under the agreement, and any conditions precedent have been satisfied, waived, excused, or are otherwise inapplicable.

535.    Society breached the parties' agreement by improperly denying its coverage obligations under the agreement or otherwise repudiating its obligation to cover Kite String Cantina's losses, as expressly required under the parties' agreement.

536.    Kite String Cantina has sustained damage as a result of Society's breach of contract in an amount to be proven at trial.

WHEREFORE, Kite String Cantina respectfully prays that the Court enter judgment in its favor and against Society on the breach of contract claim set forth above in Count 24, in an amount to be proven at trial, plus pre-judgment interest, and grant any and all other relief as this Court may deem just and proper.

## TWENTY FIFTH CAUSE OF ACTION—BREACH OF CONTRACT
### L3 Hospitality v. Ohio Security

537.    L3 Hospitality incorporates and realleges each of the allegations set forth above as if fully set forth herein.

538.    L3 Hospitality and Ohio Security have an enforceable insurance coverage agreement pursuant to which Ohio Security agreed to provide "all-risk" insurance coverage to L3 Hospitality, to wit Commercial Protector Policy (Policy No. BZS (20) 56 83 22 49). L3 Hospitality agreed to, and in fact did, pay insurance premiums under the agreement, and in return Ohio Security agreed to cover L3 Hospitality for all "loss of Business Income" sustained during a period of suspension of L3 Hospitality's operations caused by "direct physical loss of or

FILED DATE: 7/30/2020 9:01 PM    2020L008099

damage to" L3 Hospitality's insured property. In addition, Ohio Security agreed under the Policy to pay for L3 Hospitality's "Extra Expense."

539.    L3 Hospitality has sustained direct physical loss and/or damage from a covered cause of loss under the parties' agreement.

540.    L3 Hospitality performed all of its obligations under the parties' agreement, including by notifying Ohio Security of a covered cause of loss under the agreement, and any conditions precedent have been satisfied, waived, excused, or are otherwise inapplicable.

541.    Ohio Security breached the parties' agreement by improperly denying its coverage obligations under the agreement or otherwise repudiating its obligation to cover L3 Hospitality's losses, as expressly required under the parties' agreement.

542.    L3 Hospitality has sustained damage as a result of Ohio Security's breach of contract in an amount to be proven at trial.

WHEREFORE, L3 Hospitality respectfully prays that the Court enter judgment in its favor and against Ohio Security on the breach of contract claim set forth above in Count 25, in an amount to be proven at trial, plus pre-judgment interest, and grant any and all other relief as this Court may deem just and proper.

## TWENTY SIXTH CAUSE OF ACTION—BREACH OF CONTRACT
### Lettuce Entertain You v. Employers Insurance

543.    Lettuce Entertain You incorporates and realleges each of the allegations set forth above as if fully set forth herein.

544.    Lettuce Entertain You and Employers Insurance have an enforceable insurance coverage agreement pursuant to which Employers Insurance agreed to provide "all-risk" insurance coverage to Lettuce Entertain You, to wit Premier Property Protector (Policy No. YAC-L9L-471443-010). Lettuce Entertain You agreed to, and in fact did, pay insurance

138

premiums under the agreement, and in return Employers Insurance agreed to cover Lettuce Entertain You for "actual loss sustained, as provided in the TIME ELEMENT COVERAGES and TIME ELEMENT COVERAGES AND LIMITATIONS, directly resulting from a loss of the type insured by this Policy[.]" Under the Policy, Employers Insurance also agreed to pay for Lettuce Entertain You's "Extra Expense."

545.    Lettuce Entertain You has sustained direct physical loss and/or damage from a covered cause of loss under the parties' agreement.

546.    Lettuce Entertain You performed all of its obligations under the parties' agreement, including by notifying Employers Insurance of a covered cause of loss under the agreement, and any conditions precedent have been satisfied, waived, excused, or are otherwise inapplicable.

547.    Employers Insurance breached the parties' agreement by improperly denying its coverage obligations under the agreement or otherwise repudiating its obligation to cover Lettuce Entertain You's losses, as expressly required under the parties' agreement.

548.    Lettuce Entertain You has sustained damage as a result of Employers Insurance's breach of contract in an amount to be proven at trial.

WHEREFORE, Lettuce Entertain You respectfully prays that the Court enter judgment in its favor and against Employers Insurance on the breach of contract claim set forth above in Count 26, in an amount to be proven at trial, plus pre-judgment interest, and grant any and all other relief as this Court may deem just and proper.

### TWENTY SEVENTH CAUSE OF ACTION—BREACH OF CONTRACT
### Little Victories v. Society

549.    Little Victories incorporates and realleges each of the allegations set forth above as if fully set forth herein.

139

FILED DATE: 7/30/2020 9:01 PM    2020L008099

550.     Little Victories and Society have an enforceable insurance coverage agreement pursuant to which Society agreed to provide "all-risk" insurance coverage to Little Victories, to wit Businessowners Package (Policy No. BP19047795-0). Little Victories agreed to, and in fact did, pay insurance premiums under the agreement, and in return Society agreed to cover Little Victories for all "loss of Business Income" sustained due to a necessary suspension of operations, or a suspension caused by "direct physical loss of or damage to" Little Victories' insured property. Under the Policy, Society also agreed to pay for Little Victories' "Extra Expense."

551.     Little Victories has sustained direct physical loss and/or damage from a covered cause of loss under the parties' agreement.

552.     Little Victories performed all of its obligations under the parties' agreement, including by notifying Society of a covered cause of loss under the agreement, and any conditions precedent have been satisfied, waived, excused, or are otherwise inapplicable.

553.     Society breached the parties' agreement by improperly denying its coverage obligations under the agreement or otherwise repudiating its obligation to cover Little Victories' losses, as expressly required under the parties' agreement.

554.     Little Victories has sustained damage as a result of Society's breach of contract in an amount to be proven at trial.

WHEREFORE, Little Victories respectfully prays that the Court enter judgment in its favor and against Society on the breach of contract claim set forth above in Count 27, in an amount to be proven at trial, plus pre-judgment interest, and grant any and all other relief as this Court may deem just and proper.

FILED DATE: 7/30/2020 9:01 PM    2020L008099

## TWENTY EIGHTH CAUSE OF ACTION—BREACH OF CONTRACT
### Mac Parent v. North American Elite

555.    Mac Parent incorporates and realleges each of the allegations set forth above as if fully set forth herein.

556.    Mac Parent and North American Elite have an enforceable insurance coverage agreement pursuant to which North American Elite agreed to provide "all-risk" insurance coverage to Mac Parent, to wit Leading Edge All-Risk General Property (Policy No. NAP 2002449-01). Mac Parent agreed to, and in fact did, pay insurance premiums under the agreement, and in return North American Elite agreed to insure "all risks of direct physical loss or damage to" any insured property, and further agreed to cover Mac Parent for "Actual Loss Sustained" due to the necessary interruption of Mac Parent's business resulting from "direct physical loss or damage" at any of the Policy's covered locations. In addition, North American Elite also agreed to pay for Mac Parent's "Extra Expense."

557.    Mac Parent has sustained direct physical loss and/or damage from a covered cause of loss under the parties' agreement.

558.    Mac Parent performed all of its obligations under the parties' agreement, including by notifying North American Elite of a covered cause of loss under the agreement, and any conditions precedent have been satisfied, waived, excused, or are otherwise inapplicable.

559.    North American Elite is reasonably anticipated to breach the parties' agreement by improperly denying its coverage obligations under the agreement or otherwise repudiating its obligation to cover Mac Parent's losses, as expressly required under the parties' agreement.

560.    Mac Parent has sustained damage as a result of North American Elite's breach of contract in an amount to be proven at trial.

141

WHEREFORE, Mac Parent respectfully prays that the Court enter judgment in its favor and against North American Elite on the breach of contract claim set forth above in Count 28, in an amount to be proven at trial, plus pre-judgment interest, and grant any and all other relief as this Court may deem just and proper.

### TWENTY NINTH CAUSE OF ACTION—BREACH OF CONTRACT
### Manny's v. Society

561.    Manny's incorporates and realleges each of the allegations set forth above as if fully set forth herein.

562.    Manny's and Society have enforceable insurance coverage agreements pursuant to which Society agreed to provide "all-risk" insurance coverage to Manny's, to wit Businessowners Package (Policy No. BP19017911-0). Manny's agreed to, and in fact did, pay insurance premiums under the agreements, and in return Society agreed to cover Manny's for all loss of Business Income resulting from a suspension of "'operations' during the 'period of restoration'" caused by "direct physical loss of or damage to" Manny's insured property. Under the Policy, Society also agreed to pay for Manny's "Extra Expense."

563.    Manny's has sustained direct physical loss and/or damage from a covered cause of loss under the parties' agreement.

564.    Manny's performed all of its obligations under the parties' agreements, including by notifying Society of a covered cause of loss under the agreements, and any conditions precedent have been satisfied, waived, excused, or are otherwise inapplicable.

565.    Society breached the parties' agreements by improperly denying its coverage obligations under the agreements or otherwise repudiating its obligation to cover Manny's losses, as expressly required under the parties' agreements.

142

566.     Manny's has sustained damage as a result of Society's breaches of contract in an amount to be proven at trial.

WHEREFORE, Manny's respectfully prays that the Court enter judgment in its favor and against Society on the breach of contract claim set forth above in Count 29, in an amount to be proven at trial, plus pre-judgment interest, and grant any and all other relief as this Court may deem just and proper.

### THIRTIETH CAUSE OF ACTION—BREACH OF CONTRACT
#### Old Grounds Social v. Badger Mutual

567.     Old Grounds Social incorporates and realleges each of the allegations set forth above as if fully set forth herein.

568.     Old Grounds Social and Badger Mutual have an enforceable insurance coverage agreement pursuant to which Badger Mutual agreed to provide "all-risk" insurance coverage to Old Grounds Social, to wit Commercial Policy Program (Policy No. 00711-69369). Old Grounds Social agreed to, and in fact did, pay insurance premiums under the agreement, and in return Badger Mutual agreed to cover Old Grounds Social for "the actual loss of Business Income [Old Grounds Social] sustain[s] due to the necessary suspension of [its] operations during the period of restoration," where "[t]he suspension [was] caused by direct physical loss of or damage to" Old Grounds Social's insured property. In addition, Badger Mutual also agreed to pay for "Extra Expense."

569.     Old Grounds Social has sustained direct physical loss and/or damage from a covered cause of loss under the parties' agreement.

570.     Old Grounds Social  performed all of its obligations under the parties' agreement, including by notifying Badger Mutual of a covered cause of loss under the agreement, and any conditions precedent have been satisfied, waived, excused, or are otherwise inapplicable.

143

FILED DATE: 7/30/2020 9:01 PM   2020L008099

571.     Badger Mutual breached the parties' agreement by improperly denying its coverage obligations under the agreement or otherwise repudiating its obligation to cover Old Grounds Social's losses, as expressly required under the parties' agreement.

572.     Old Grounds Social has sustained damage as a result of Badger Mutual's breach of contract in an amount to be proven at trial.

WHEREFORE, Old Grounds Social respectfully prays that the Court enter judgment in its favor and against Badger Mutual on the breach of contract claim set forth above in Count 30, in an amount to be proven at trial, plus pre-judgment interest, and grant any and all other relief as this Court may deem just and proper.

### THIRTY FIRST CAUSE OF ACTION—BREACH OF CONTRACT
### Peggy Notebaert Nature Museum v. Cincinnati

573.     The Peggy Notebaert Nature Museum incorporates and realleges each of the allegations set forth above as if fully set forth herein.

574.     The Peggy Notebaert Nature Museum and Cincinnati have an enforceable insurance coverage agreement pursuant to which Cincinnati agreed to provide "all-risk" insurance coverage to the Peggy Notebaert Nature Museum, to wit Common Policy (Policy No. EPP 049 73 42/EBA 049 73 42). The Peggy Notebaert Nature Museum agreed to, and in fact did, pay insurance premiums under the agreement, and in return Cincinnati agreed to cover the Peggy Notebaert Nature Museum for "the actual loss of 'Business Income'" resulting from "the necessary 'suspension' of . . . 'operations' during the 'period of restoration,'" where "[t]he 'suspension' [is] caused by direct 'loss' to property at a 'premises' caused by or resulting from any Covered Cause of Loss." Under the Policy, Cincinnati also agreed to cover the Peggy Notebaert Nature Museum's "Extra Expense."

144

FILED DATE: 7/30/2020 9:01 PM    2020L008099

575.     The Peggy Notebaert Nature Museum has sustained direct physical loss and/or damage from a covered cause of loss under the parties' agreement.

576.     The Peggy Notebaert Nature Museum performed all of its obligations under the parties' agreement, including by notifying Cincinnati of a covered cause of loss under the agreement, and any conditions precedent have been satisfied, waived, excused, or are otherwise inapplicable.

577.     Cincinnati breached the parties' agreement by improperly denying its coverage obligations under the agreement or otherwise repudiating its obligation to cover the Peggy Notebaert Nature Museum's losses, as expressly required under the parties' agreement.

578.     The Peggy Notebaert Nature Museum has sustained damage as a result of Cincinnati's breach of contract in an amount to be proven at trial.

WHEREFORE, The Peggy Notebaert Nature Museum respectfully prays that the Court enter judgment in its favor and against Cincinnati on the breach of contract claim set forth above in Count 31, in an amount to be proven at trial, plus pre-judgment interest, and grant any and all other relief as this Court may deem just and proper.

### THIRTY SECOND CAUSE OF ACTION—BREACH OF CONTRACT
### Noodles & Company v. Affiliated FM Insurance

579.     Noodles & Company incorporates and realleges each of the allegations set forth above as if fully set forth herein.

580.     Noodles & Company and Affiliated FM Insurance have enforceable insurance coverage agreements pursuant to which Affiliated FM Insurance agreed to provide "all-risk" insurance coverage to Noodles & Company, to wit All Risk Coverage (Policy Nos. ES441 and ER857). Noodles & Company agreed to, and in fact did, pay insurance premiums under these agreements, and in return Affiliated FM Insurance agreed to cover Noodles & Company for all

FILED DATE: 7/30/2020 9:01 PM    2020L008099

"Business Interruption loss" as a "direct result of physical loss or damage" to Noodles & Company's insured property. In addition, Affiliated FM Insurance agreed to pay for Noodles & Company's "Extra Expense."

581.    Noodles & Company has sustained direct physical loss and/or damage from a covered cause of loss under the parties' agreement.

582.    Noodles & Company performed all of its obligations under the parties' agreement, including by notifying Affiliated FM Insurance of a covered cause of loss under the agreement, and any conditions precedent have been satisfied, waived, excused, or are otherwise inapplicable.

583.    Affiliated FM Insurance is reasonably anticipated to breach the parties' agreement by improperly denying its coverage obligations under the agreement or otherwise repudiating its obligation to cover Noodles & Company's losses, as expressly required under the parties' agreement.

584.    Noodles & Company has sustained damage as a result of Affiliated FM Insurance's breach of contract in an amount to be proven at trial.

WHEREFORE, Noodles & Company respectfully prays that the Court enter judgment in its favor and against Affiliated FM Insurance on the breach of contract claim set forth above in Count 32, in an amount to be proven at trial, plus pre-judgment interest, and grant any and all other relief as this Court may deem just and proper.

### THIRTY THIRD CAUSE OF ACTION—BREACH OF CONTRACT
### RFR v. Secura

585.    RFR incorporates and realleges each of the allegations set forth above as if fully set forth herein.

146

586.    RFR and Secura have an enforceable insurance coverage agreement pursuant to which Secura agreed to provide "all-risk" insurance coverage to RFR, to wit Commercial Property Coverage (No. 80-BP-003313730-9). RFR agreed to, and in fact did, pay insurance premiums under the agreement, and in return Secura agreed to pay for the "actual loss of Business Income" and "Extra Expense" resulting from a period of suspension caused by the "direct physical loss of or damage to" RFR's insured property.

587.    RFR has sustained direct physical loss and/or damage from a covered cause of loss under the parties' agreement.

588.    RFR performed all of its obligations under the parties' agreement, including by notifying Secura of a covered cause of loss under the agreement, and any conditions precedent have been satisfied, waived, excused, or are otherwise inapplicable.

589.    Secura breached the parties' agreement by improperly denying its coverage obligations under the agreement or otherwise repudiating its obligation to cover RFR's losses, as expressly required under the parties' agreement.

590.    RFR has sustained damage as a result of Secura's breach of contract in an amount to be proven at trial.

WHEREFORE, RFR respectfully prays that the Court enter judgment in its favor and against Secura on the breach of contract claim set forth above in Count 33, in an amount to be proven at trial, plus pre-judgment interest, and grant any and all other relief as this Court may deem just and proper.

### THIRTY FOURTH CAUSE OF ACTION—BREACH OF CONTRACT
### Robert's Pizza v. Society

591.    Robert's Pizza incorporates and realleges each of the allegations set forth above as if fully set forth herein.

147

592.    Robert's Pizza and Society have an enforceable insurance coverage agreement pursuant to which Society agreed to provide "all-risk" insurance coverage to Robert's Pizza, to wit Businessowners Policy (No. BP18012594-1). Robert's Pizza agreed to, and in fact did, pay insurance premiums under the agreement, and in return Society agreed to cover Robert's Pizza for "the actual loss of Business Income [Robert's Pizza] sustain[s] due to the necessary suspension of [its] 'operations' during the 'period of restoration,'" where "[t]he suspension [was] caused by direct physical loss of or damage to" Robert's Pizza's insured property. Under the Policy, Society also agreed to pay for Robert's Pizza's "Extra Expense."

593.    Robert's Pizza has sustained direct physical loss and/or damage from a covered cause of loss under the parties' agreement.

594.    Robert's Pizza performed all of its obligations under the parties' agreement, including by notifying Society of a covered cause of loss under the agreement, and any conditions precedent have been satisfied, waived, excused, or are otherwise inapplicable.

595.    Society breached the parties' agreement by improperly denying its coverage obligations under the agreement or otherwise repudiating its obligation to cover Robert's Pizza's losses, as expressly required under the parties' agreement.

596.    Robert's Pizza has sustained damage as a result of Society's breach of contract in an amount to be proven at trial.

WHEREFORE, Robert's Pizza respectfully prays that the Court enter judgment in its favor and against Society on the breach of contract claim set forth above in Count 34, in an amount to be proven at trial, plus pre-judgment interest, and grant any and all other relief as this Court may deem just and proper.

FILED DATE: 7/30/2020 9:01 PM     2020L008099

### THIRTY FIFTH CAUSE OF ACTION—BREACH OF CONTRACT
### Roti v. Charter Oak Fire

597.    Roti incorporates and realleges each of the allegations set forth above as if fully set forth herein.

598.    Roti and Charter Oak Fire have an enforceable insurance coverage agreement pursuant to which Society agreed to provide "all-risk" insurance coverage to Roti, to wit Special Business Common Policy (No. P-630-6G219733-COF-20). Roti agreed to, and in fact did, pay insurance premiums under the agreement, and in return Charter Oak Fire agreed to cover Roti for all loss of Business Income Roti sustains due to the necessary suspension of operations during a period of restoration, "caused by direct physical loss of or damage to" Roti's property. In addition, Charter Oak Fire also agreed to pay for Roti's "Extra Expense."

599.    Roti has sustained direct physical loss and/or damage from a covered cause of loss under the parties' agreement.

600.    Roti performed all of its obligations under the parties' agreement, including by notifying Charter Oak Fire of a covered cause of loss under the agreement, and any conditions precedent have been satisfied, waived, excused, or are otherwise inapplicable.

601.    Charter Oak Fire breached the parties' agreement by improperly denying its coverage obligations under the agreement or otherwise repudiating its obligation to cover Roti's losses, as expressly required under the parties' agreement.

602.    Roti has sustained damage as a result of Charter Oak Fire's breach of contract in an amount to be proven at trial.

WHEREFORE, Roti respectfully prays that the Court enter judgment in its favor and against Charter Oak Fire on the breach of contract claim set forth above in Count 35, in an

FILED DATE: 7/30/2020 9:01 PM    2020L008099

amount to be proven at trial, plus pre-judgment interest, and grant any and all other relief as this Court may deem just and proper.

### THIRTY SIXTH CAUSE OF ACTION—BREACH OF CONTRACT
**Sparrow v. Society**

603.    Sparrow incorporates and realleges each of the allegations set forth above as if fully set forth herein.

604.    Sparrow and Society have an enforceable insurance coverage agreement pursuant to which Society agreed to provide "all-risk" insurance coverage to Sparrow, to wit Businessowners Package (Policy No. TRM 588812-5). Sparrow agreed to, and in fact did, pay insurance premiums under the agreement, and in return Society agreed to cover Sparrow for all "loss of Business Income" sustained due to a necessary suspension of operations, or a suspension caused by "direct physical loss of or damage to" Sparrow's insured property. Under the Policy, Society also agreed to pay for Sparrow's "Extra Expense."

605.    Sparrow has sustained direct physical loss and/or damage from a covered cause of loss under the parties' agreement.

606.    Sparrow performed all of its obligations under the parties' agreement, including by notifying Society of a covered cause of loss under the agreement, and any conditions precedent have been satisfied, waived, excused, or are otherwise inapplicable.

607.    Society breached the parties' agreement by improperly denying its coverage obligations under the agreement or otherwise repudiating its obligation to cover Sparrow's losses, as expressly required under the parties' agreement.

608.    Sparrow has sustained damage as a result of Society's breach of contract in an amount to be proven at trial.

FILED DATE: 7/30/2020 9:01 PM    2020L008099

WHEREFORE, Sparrow respectfully prays that the Court enter judgment in its favor and against Society on the breach of contract claim set forth above in Count 36, in an amount to be proven at trial, plus pre-judgment interest, and grant any and all other relief as this Court may deem just and proper.

### THIRTY SEVENTH CAUSE OF ACTION—BREACH OF CONTRACT
### Spilt Milk v. Society

609.    Spilt Milk incorporates and realleges each of the allegations set forth above as if fully set forth herein.

610.    Spilt Milk and Society have an enforceable insurance coverage agreement pursuant to which Society agreed to provide "all-risk" insurance coverage to Spilt Milk, to wit Businessowners Package (Policy No. BP16007045-4). Spilt Milk agreed to, and in fact did, pay insurance premiums under the agreement, and in return Society agreed to cover Spilt Milk for all "loss of Business Income" sustained due to a necessary suspension of operations, or a suspension caused by "direct physical loss of or damage to" Spilt Milk's insured property. Under the Policy, Society also agreed to pay for Spilt Milk's "Extra Expense."

611.    Spilt Milk has sustained direct physical loss and/or damage from a covered cause of loss under the parties' agreement.

612.    Spilt Milk  performed all of its obligations under the parties' agreement, including by notifying Society of a covered cause of loss under the agreement, and any conditions precedent have been satisfied, waived, excused, or are otherwise inapplicable.

613.    Society breached the parties' agreement by improperly denying its coverage obligations under the agreement or otherwise repudiating its obligation to cover Spilt Milk's losses, as expressly required under the parties' agreement.

151

614.    Spilt Milk has sustained damage as a result of Society's breach of contract in an amount to be proven at trial.

WHEREFORE, Spilt Milk respectfully prays that the Court enter judgment in its favor and against Society on the breach of contract claim set forth above in Count 37, in an amount to be proven at trial, plus pre-judgment interest, and grant any and all other relief as this Court may deem just and proper.

### THIRTY EIGHTH CAUSE OF ACTION—BREACH OF CONTRACT
### Smyth & The Loyalist v. Cincinnati

615.    Smyth & The Loyalist incorporates and realleges each of the allegations set forth above as if fully set forth herein.

616.    Smyth & The Loyalist and Cincinnati have an enforceable insurance coverage agreement pursuant to which Cincinnati agreed to provide "all-risk" insurance coverage to Smyth & The Loyalist, to wit Commercial Property Coverage (Policy No. ECP 039 65 99). Smyth & The Loyalist agreed to, and in fact did, pay insurance premiums under the agreement, and in return Cincinnati agreed to cover Smyth & The Loyalist for "the actual loss of 'Business Income'" Smyth & The Loyalist "sustain[s] due to the necessary 'suspension' of [its] 'operations' during the 'period of restoration,'" where "[t]he 'suspension' [was] caused by direct 'loss' to property at a 'premises' caused by or resulting from any Covered Cause of Loss." Under the Policy, Cincinnati also agreed to pay for Smyth & The Loyalist's "Extra Expense."

617.    Smyth & The Loyalist has sustained direct physical loss and/or damage from a covered cause of loss under the parties' agreement.

618.    Smyth & The Loyalist performed all of its obligations under the parties' agreement, including by notifying Cincinnati of a covered cause of loss under the agreement, and any conditions precedent have been satisfied, waived, excused, or are otherwise inapplicable.

152

FILED DATE: 7/30/2020 9:01 PM    2020L008099

FILED DATE: 7/30/2020 9:01 PM    2020L008099

619.    Cincinnati breached the parties' agreement by improperly denying its coverage obligations under the agreement or otherwise repudiating its obligation to cover Smyth & The Loyalist's losses, as expressly required under the parties' agreement.

620.    Smyth & The Loyalist has sustained damage as a result of Cincinnati's breach of contract in an amount to be proven at trial.

WHEREFORE, Smyth & The Loyalist respectfully prays that the Court enter judgment in its favor and against Cincinnati on the breach of contract claim set forth above in Count 38, in an amount to be proven at trial, plus pre-judgment interest, and grant any and all other relief as this Court may deem just and proper.

### THIRTY NINTH CAUSE OF ACTION—BREACH OF CONTRACT
### Third Coast Hospitality v. Starr Surplus Lines

621.    Third Coast Hospitality incorporates and realleges each of the allegations set forth above as if fully set forth herein.

622.    Third Coast Hospitality and Starr Surplus Lines have an enforceable insurance coverage agreement pursuant to which Starr Surplus Lines agreed to provide "all-risk" insurance coverage to Third Coast Hospitality, to wit Property Coverage Form (Policy No. SLSTPTY11266620). Third Coast Hospitality agreed to, and in fact did, pay insurance premiums under the agreement, and in return Starr Surplus Lines agreed to cover Third Coast Hospitality for all loss "directly resulting from necessary interruption" of Third Coast Hospitality's business operation "caused by direct physical loss or damage to" to Third Coast Hospitality's insured property. Under the Policy, Starr Surplus Lines also agreed to pay for Third Coast's "Extra Expense."

623.    Third Coast Hospitality has sustained direct physical loss and/or damage from a covered cause of loss under the parties' agreement.

153

624. Third Coast Hospitality performed all of its obligations under the parties' agreement, including by notifying Starr Surplus Lines of a covered cause of loss under the agreement, and any conditions precedent have been satisfied, waived, excused, or are otherwise inapplicable.

625. Starr Surplus Lines is reasonably anticipated to breach the parties' agreement by improperly denying its coverage obligations under the agreement or otherwise repudiating its obligation to cover Third Coast Hospitality's losses, as expressly required under the parties' agreement.

626. Third Coast Hospitality has sustained damage as a result of Starr Surplus Lines' breach of contract in an amount to be proven at trial.

WHEREFORE, Third Coast Hospitality respectfully prays that the Court enter judgment in its favor and against Starr Surplus Lines on the breach of contract claim set forth above in Count 39, in an amount to be proven at trial, plus pre-judgment interest, and grant any and all other relief as this Court may deem just and proper.

### FORTIETH CAUSE OF ACTION—BREACH OF CONTRACT
#### Tandoor Char House v. Illinois Casualty

627. Tandoor Char House incorporates and realleges each of the allegations set forth above as if fully set forth herein.

628. Tandoor Char House and Illinois Casualty have an enforceable insurance coverage agreement pursuant to which Illinois Casualty agreed to provide "all-risk" insurance coverage to Tandoor Char House, to wit Businessowners Policy (No. BP41552). Tandoor Char House agreed to, and in fact did, pay insurance premiums under the agreement, and in return Illinois Casualty agreed to cover Tandoor Char House for "loss of Business Income" sustained during a necessary suspension of operations during a period of restoration, where the suspension

154

was caused by "direct physical loss of or damage to" Tandoor Char House's insured property. In addition, Illinois Casualty also agreed to pay for Tandoor Char House's "Extra Expense."

629.     Tandoor Char House has sustained direct physical loss and/or damage from a covered cause of loss under the parties' agreement.

630.     Tandoor Char House performed all of its obligations under the parties' agreement, including by notifying Illinois Casualty of a covered cause of loss under the agreement, and any conditions precedent have been satisfied, waived, excused, or are otherwise inapplicable.

631.     Illinois Casualty breached the parties' agreement by improperly denying its coverage obligations under the agreement or otherwise repudiating its obligation to cover Tandoor Char House's losses, as expressly required under the parties' agreement.

632.     Tandoor Char House has sustained damage as a result of Illinois Casualty's breach of contract in an amount to be proven at trial.

WHEREFORE, Tandoor Char House respectfully prays that the Court enter judgment in its favor and against Illinois Casualty on the breach of contract claim set forth above in Count 40, in an amount to be proven at trial, plus pre-judgment interest, and grant any and all other relief as this Court may deem just and proper.

### FORTY FIRST CAUSE OF ACTION—BREACH OF CONTRACT
### Urban Plates v. Zurich

633.     Urban Plates incorporates and realleges each of the allegations set forth above as if fully set forth herein.

634.     Urban Plates and Zurich have an enforceable insurance coverage agreement pursuant to which Zurich agreed to provide "all-risk" insurance coverage to Urban Plates, to wit Property Portfolio Protection (No. CPO 5723964-00). Urban Plates agreed to, and in fact did, pay insurance premiums under the agreement, and in return Zurich agreed to cover Urban Plates

FILED DATE: 7/30/2020 9:01 PM   2020L008099

FILED DATE: 7/30/2020 9:01 PM    2020L008099

for "the actual loss of 'business income'" resulting from a necessary suspension of Urban Plates' business and any "actual and necessary 'extra expense'" Urban Plates incurred caused by "direct physical loss of or damage to" Urban Plates' insured property.

635.    Urban Plates has sustained direct physical loss and/or damage from a covered cause of loss under the parties' agreement.

636.    Urban Plates performed all of its obligations under the parties' agreement, including by notifying Zurich of a covered cause of loss under the agreement, and any conditions precedent have been satisfied, waived, excused, or are otherwise inapplicable.

637.    Zurich breached the parties' agreement by improperly denying its coverage obligations under the agreement or otherwise repudiating its obligation to cover Urban Plates' losses, as expressly required under the parties' agreement.

638.    Urban Plates has sustained damage as a result of Zurich's breach of contract in an amount to be proven at trial.

WHEREFORE, Urban Plates respectfully prays that the Court enter judgment in its favor and against Zurich on the breach of contract claim set forth above in Count 41, in an amount to be proven at trial, plus pre-judgment interest, and grant any and all other relief as this Court may deem just and proper.

## FORTY SECOND CAUSE OF ACTION—BREACH OF CONTRACT
### Wow Bao v. Hartford Fire

639.    Wow Bao incorporates and realleges each of the allegations set forth above as if fully set forth herein.

640.    Wow Bao and Hartford Fire have an enforceable insurance coverage agreement pursuant to which Hartford Fire agreed to provide "all-risk" insurance coverage to Wow Bao, to wit Property Choice Coverage (No. 10 UUN JA6952). Wow Bao agreed to, and in fact did, pay

156

insurance premiums under the agreement, and in return Hartford Fire agreed to cover Wow Bao for "the actual loss of Business Income" and "Extra Expense" resulting from a necessary interruption of Wow Bao's business caused by "direct physical loss of or direct physical damage to" Wow Bao's insured property.

641.     Wow Bao has sustained direct physical loss and/or damage from a covered cause of loss under the parties' agreement.

642.     Wow Bao performed all of its obligations under the parties' agreement, including by notifying Hartford Fire of a covered cause of loss under the agreement, and any conditions precedent have been satisfied, waived, excused, or are otherwise inapplicable.

643.     Hartford Fire breached the parties' agreement by improperly denying its coverage obligations under the agreement or otherwise repudiating its obligation to cover Wow Bao's losses, as expressly required under the parties' agreement.

644.     Wow Bao has sustained damage as a result of Hartford Fire's breach of contract in an amount to be proven at trial.

WHEREFORE, Wow Bao respectfully prays that the Court enter judgment in its favor and against Hartford Fire on the breach of contract claim set forth above in Count 42, in an amount to be proven at trial, plus pre-judgment interest, and grant any and all other relief as this Court may deem just and proper.

### FORTY THIRD CAUSE OF ACTION—BREACH OF CONTRACT
### Well Done v. Citizens Insurance

645.     Well Done incorporates and realleges each of the allegations set forth above as if fully set forth herein.

646.     Well Done and Citizens Insurance have an enforceable insurance coverage agreement pursuant to which Citizens Insurance agreed to provide "all-risk" insurance coverage

FILED DATE: 7/30/2020 9:01 PM    2020L008099

FILED DATE: 7/30/2020 9:01 PM    2020L008099

to Well Done, to wit Commercial Line Policy (Policy Number: ZBC D219122 03). Well Done

agreed to, and in fact did, pay insurance premiums under the agreement, and in return Citizens

Insurance agreed to cover Well Done for "the actual loss of business income" it sustains due to

the "necessary 'suspension' of [its] 'operations' during the 'period of restoration,'" where the

suspension is caused by "direct physical loss of or damage to" Well Done's insured property.

Under the Policy, Citizens Insurance also agreed to pay for Well Done's "Extra Expense."

647.    Well Done has sustained direct physical loss and/or damage from a covered cause
of loss under the parties' agreement.

648.    Well Done performed all of its obligations under the parties' agreement, including
by notifying Citizens Insurance of a covered cause of loss under the agreement, and any
conditions precedent have been satisfied, waived, excused, or are otherwise inapplicable.

649.    Citizens Insurance breached the parties' agreement by improperly denying its
coverage obligations under the agreement or otherwise repudiating its obligation to cover Well
Done's losses, as expressly required under the parties' agreement.

650.    Well Done has sustained damage as a result of Citizens Insurance's breach of
contract in an amount to be proven at trial.

WHEREFORE, Well Done respectfully prays that the Court enter judgment in its favor
and against Citizens Insurance on the breach of contract claim set forth above in Count 43, in an
amount to be proven at trial, plus pre-judgment interest, and grant any and all other relief as this
Court may deem just and proper.

## FORTY FOURTH CAUSE OF ACTION—UNJUST ENRICHMENT
### All Plaintiffs Against All Defendants

651.    In the alternative, if Defendant Insurers' denials of coverage for Plaintiffs' claims
for business interruption coverage are upheld, then Defendant Insurers have been unjustly

FILED DATE: 7/30/2020 9:01 PM    2020L008099

enriched in the amount of excess premium for business interruption coverage they have charged and retained while Plaintiffs' properties have been shut down or operationally impaired as the result of the Shutdown Orders.

652.    Defendant Insurers have priced and charged premiums for each of the Plaintiffs' respective Policies on the basis of their insured properties operating as fully functional food service businesses and museums. Accordingly, the insured risks included the prospect of having to pay claims for lost business at levels commensurate with fully operational businesses.

653.    During the time period while Plaintiffs' properties have been lost, damaged, shut down or otherwise operationally impaired by the Shutdown Orders, Defendant Insurers' risk of having to pay other business interruption claims has been reduced in many instances to zero and in all instances by substantial monetary amounts. Each of the Policies contain provisions making Defendant Insurers liable to pay business interruption loss only to the extent it would not have been incurred anyway, such as the provision taken below from the insurance policy between Lettuce Entertain You and Employers Insurance:

> In determining the amount we cover as the actual loss sustained, we will consider the continuation of only those charges and expenses that would have been earned had there been no interruption of production or suspension of business operations or services.

654.    For example, if Plaintiffs' establishments were to suffer a total fire loss tomorrow, Defendant Insurers would decline to pay any business interruption loss that would have been incurred anyway as the result of the Shutdown Orders.

655.    Defendant Insurers know all this, yet they have intentionally continued to charge and collect as "earned"—and Plaintiffs have continued to pay—premiums for which Defendant Insurers, according to their own self-serving justifications for denying coverage, assumed no commensurate risk.

FILED DATE: 7/30/2020 9:01 PM   2020L008099

656.   Defendant Insurers have been unjustly enriched, at Plaintiffs' expense, and should be required to disgorge to Plaintiffs the full amounts of excess premium for business interruption coverage they have unlawfully charged, collected, and retained, as equity and good conscience require.

657.   Defendant Insurers misconduct in this respect has been willful, wanton, and in bad faith.

WHEREFORE, Plaintiffs respectfully pray that the Court enter judgment in their favor and against each respective Defendant Insurer on the unjust enrichment claim set forth above in Count 44, in an amount to be proven at trial, plus pre-judgment interest, and grant any and all other relief as this Court may deem just and proper.

**Dated:  July 30, 2020**                                   **Respectfully Submitted,**

/s/ *John H. Mathias, Jr.*

John H. Mathias Jr.
David M. Kroeger
Gabriel K. Gillett
Megan B. Poetzel
Precious S. Jacobs
Joshua M. Levin
JENNER & BLOCK LLP (05003)
353 N. Clark Street
Chicago, IL 60654-3456
Telephone: 312-923-2917
Email: jmathias@jenner.com

Jeremy M. Creelan (*Pro Hac Vice* forthcoming)
JENNER & BLOCK LLP (05003)
919 Third Ave., 38th Floor
New York, NY 10022
Telephone:  212-891-1678
Email: jcreelan@jenner.com